# **<u>EXHIBIT J</u>**



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**REQUEST FOR SERVICE**
**June 19, 2019 12:42**

By: MICHAEL J. O'SHEA 0039330

Confirmation Nbr. 1741552

TAMMY DECOSTA                                        CV 19 916707

      vs.

CUYAHOGA COUNTY OHIO, ET AL              **Judge:**  TIMOTHY MCCORMICK

**Pages Filed:**  189



Common Pleas Court of Cuyahoga County, Ohio
**Nailah K. Byrd, Clerk of Courts**

## INSTRUCTIONS FOR SERVICE

Tammy Decosta
_____
Plaintiff(s)

Vs.
Cuyahoga County Ohio, et al.
_____
Defendants(s)

Case Number CV 19 916707

Judge: Timothy McCormick

Date: June 19, 2019

Method of Service Requested:

Certified Mail Service ✔️  Ordinary Mail Service ☐  Federal Express Service ☐

Personal Service by the Sheriff of _____ County ____

Residence Service by the Sheriff of _____ County ____

Personal Service By Process Server ____

Residence Service by Process Server ____

Name(s) and Address(es) of Parties to Serve:

| Ken Mills | John Doe/Jane Doe Nurses | John Doe/Jane Doe Correction Officers |
|---|---|---|
| c/o Department of Law | c/o Department of Law | c/o Department of Law |
| 2079 East 9th Street | 2079 East 9th Street | 2079 East 9th Street |
| Cleveland, Ohio 44115 | Cleveland, Ohio 44115 | Cleveland, Ohio 44115 |

Additional Instructions:
Please serve parties by certified mail at the address provided.

Filing Party Name: Michael J. O'Shea    Supreme Court ID if applicable: 0039330

Phone Number: 216-241-0011

_For Use by Sheriff or Process Server Only_

Number of Service Attempts: _____

Address for Service if Different from address included above: _____



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**June 12, 2019 17:52**

By: MICHAEL J. O'SHEA 0039330

Confirmation Nbr. 1736141

TAMMY DECOSTA                                    CV 19 916707

    vs.

CUYAHOGA COUNTY OHIO, ET AL          **Judge:** TIMOTHY MCCORMICK

**Pages Filed:** 187

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

|  |  |
|---|---|
| **TAMMY DECOSTA**<br>C/O Lipson O'Shea Legal Group<br>700 W. St. Clair Avenue #110<br>Cleveland, Ohio 44113 | Case No. |
| Plaintiff, | JUDGE |
| vs. | **COMPLAINT** |
| **CUYAHOGA COUNTY, OHIO**<br>c/o Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115 | |
| and | |
| **ARMOND BUDISH**<br>Cuyahoga County Executive<br>c/o Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115 | |
| and | |
| **CLIFFORD PINKNEY**<br>Cuyahoga County Sheriff<br>c/o Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115 | |
| and | |
| **ERIC J. IVEY**<br>former Cuyahoga County<br>Jail Warden<br>c/o Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115 | |

```
and                              )
                                 )
KEN MILLS                        )
former Regional Director of      )
Corrections of Cuyahoga          )
County Sheriffs Department       )
c/o Department of Law            )
2079 E. 9th Street               )
Cleveland, OH 44115              )
                                 )
and                              )
                                 )
THOMAS TALLMAN                   )
Medical Director                 )
c/o Chief Legal Officer          )
MetroHealth System               )
2500 MetroHealth Drive           )
Cleveland, OH 44109              )
                                 )
and                              )
                                 )
JOHN DOE/JANE DOE CORRECTIONS    )
OFFICERS                         )
c/o Department of Law            )
2079 E. 9th Street               )
Cleveland, OH 44115              )
                                 )
and                              )
                                 )
JOHN DOE/JANE DOE NURSES         )
c/o Department of Law            )
2079 E. 9th Street               )
Cleveland, OH 44115              )
                                 )
and                              )
                                 )
JOHN DOE COMPANY                 )
(for providing medical           )
services)                        )
address presently unknown        )
                                 )
        Defendants.              )
                                 )
```

2

## Facts and Jurisdiction

1.    Plaintiff Tammy Decosta (**"Plaintiff"**) is an individual who was residing in Cuyahoga County at all times relevant to the facts and issues in this complaint.

2. Defendant Cuyahoga County (**"Defendant County"**) is a unit of local government established under the laws of the State of Ohio. The County is sued through the Cuyahoga County Executive and/or Council who are named only in their official capacity pursuant to RC 302.14 to 302.19.

3. Defendant Clifford Pinkney (**"Defendant Sheriff"**) is the appointed sheriff of Cuyahoga County; Defendant Eric Ivey (**"Defendant Warden"**) was at all times relevant to this action the warden of the Cuyahoga County Corrections Center (the "Jail"), defendant Ken Mills (**"Defendant Regional Director"**) was at all times relevant to this action the Regional Director of Corrections of Cuyahoga County Sheriffs Department; and Defendant Thomas Tallman (**"Defendant Medical Director"**) was at all times relevant to this action the Medical Director of the Jail. Defendant Sheriff's, Defendant Warden's, Defendant Regional Director's and Defendant Medical Director's responsibilities include the operation of the Jail and the provision of appropriate care to people held in the Jail.    Defendant Sheriff, Defendant Warden, Defendant Regional

3

Director and Defendant Medical Director are sued in official capacity.

4.    At all times relevant to the allegations made in this complaint, Defendant Sheriff, Defendant Warden, Defendant Regional Director and Defendant Medical Director were was acting in their official capacity, within the scope of their employment, under color of law, and are responsible the policies, practices, and customs related to medical and mental health care at the Jail.

5.    Jurisdiction is invoked pursuant to 42 USC §1983 et seq;[1] and venue is proper in that the parties reside, or, at the time the events took place, resided in Cuyahoga County, and the events giving rise to Plaintiff's claims also occurred in Cuyahoga County.

6.    Defendant County was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in  Ohio acting under the color of law; Defendant County is a "person" under 42 USC §1983; Defendant County is the employer and principal of county executive Armond Budish (the "Executive"), and Defendant Sheriff, Defendant Warden, Defendant Regional Director and Defendant Medical Director are responsible for the policies, practices, and customs of the Jail.

---

[1]    See *Cooperman v. University Surgical Assocs.*, 32 Ohio St. 3d 191, 513 N.E.2d 288 (1987); *Schwarz v. Board of Trustees of Ohio State Univ.*, 31 Ohio St. 3d 267,510 N.E.2d 808 (1987) and *Conley v. Shearer*, 64 Ohio St. 3d 284, 292-93, 595 N.E.2d 862, 869-70 (1992).

4

7. Defendants Jane/John Doe nurses (**"Defendant Nurses"**) are duly licensed to practice nursing by and in the State of Ohio. Upon information and belief and at all times relevant, Defendant Nurses were to provide treatment to Plaintiff at the Jail and were to advise corrections officers and doctors of proper care and transportation of inmates within the Jail. Defendant Nurses are sued in their individual and her official capacities.

8. Defendant Jane/John Doe corrections officers ("**Defendant COs**") are corrections officers, who at all times relevant was employed by the County to work in the Jail, including monitoring, servicing and transporting of inmates within the Jail. Defendant Cos are all sued in individual and official capacity.

9. Defendant John Doe Company is a company licensed to do business in the State of Ohio, and which contracted with the County to provide medical staff, including nurses, to work in the Jail at all time relevant to this complaint.

10. All captioned defendants (collectively, the "Defendants") have long been on notice of – and have even taken action to worsen – overcrowding, unhygienic conditions, movement restrictions, insufficient and inedible food, lack religious freedom, lack of access to their attorneys, and inadequate medical and mental health care at the Jail.

5

11.  The Defendants have further long been on notice of the incompetent supervision and management of the Jail.

12. The Defendants, individually or by and through actual or ostensible agents and/or employees, were involved in monitoring, servicing and transporting Plaintiff within the Jail, while Plaintiff was an inmate at the Jail, including the events relevant to this action.

13. On May 30, 2018, Plaintiff fell in a large pool of water, which was coming from a cell from a sink/toilet which had been leaking for many days and running out into the areas which service the inmates of the jail.

14.  Upon information and belief, Defendant COs and/or employees of the Jail documented the leak and filed necessary maintenance reports.

15.  Various employees of the Jail came to view the leak to no avail.

16.  The area where Plaintiff fell is used for activities, phone use and feeding inmates, however, no one from the Jail would try to get the water hazard cleaned up before letting inmates out of their cells.

17.  The cell where the water was running from was occupied by inmate Amber Riley and next to her cell was inmate Holly Hentgrass.

6

18.   Once Plaintiff fell, Jail CO Franklin called a medical emergency for Plaintiff.

19.   Many inmates and Cos were aware of the water hazard at the Jail.

20.   There are 3 camera's on the POD, so this incident should be on video.

21.   Plaintiff was in cell #14, and after receiving breakfast, was collecting all trays, and slipped and fell on the concrete floor in front of room/cell #11.

22.   Plaintiff was knocked out for a few minutes.

23.   CO Franklin arrived and notified medical emergency, and they soon arrived with nurses and SRT Team.

24.   Plaintiff was taken to the medical department and was treated for a swollen knee and backache.

25.   Plaintiff was given Tylenol and an ice pack for her knee for 20 minutes at a time.

26.   Defendant Nurses asked if Plaintiff hit her head in the fall and Plaintiff said yes.

27.   Defendant Nurses checked to make sure there was no open gash and told Plaintiff that the Tylenol would help if Plaintiff got a headache.

28.   During this period of time there was a shift change.

7

29.   Notwithstanding her obvious head injuries, Plaintiff was treated as if Plaintiff was a problem and in the way of Jail staff, and Defendant Nurses were in a hurry to document and treat Plaintiff.

30.   Plaintiff was eventually returned to her cell.

31.   Upon entering her cell, Plaintiff took a nap, and when Plaintiff woke Plaintiff realized that she was seeing colored spots and lines in Plaintiff's left eye along with what Plaintiff can only describe as floaters.

32.   Plaintiff spoke to CO Franklin and another officer who told Plaintiff to tell the nurse when the nurse does her rounds.

33.   Plaintiff began telling the officers/nurses (upon information and belief known as Peter, Scott and Ms. Aquino ("Aquino"), and a few more to no avail.

34.   Each time Plaintiff complained about her conditions and symptoms, Defendant COs' and/or Defendant Nurses' response was "I'll tell the doctor".

35.   Defendant COs and Defendant Nurses stopped medical evaluation and treatment and called Plaintiff down to the medical unit and stated that Plaintiff's medical condition was nothing more just high blood pressure despite the fact that Plaintiff had no previous diagnosis and/or medication for such.

8

36. No one at the Jail ever did a blood pressure check on the Plaintiff.

37. Plaintiff's condition and complaints went on for weeks to no avail.

38. Plaintiff filled out several sick-calls about Plaintiff's eye sight and knee, and Plaintiff put in separate sick calls to each illness, so that the Jail employees wouldn't have anything to say about Plaintiff putting 2 conditions on one slip - and this too was ignored.

39. Plaintiff continued to complain about ths condition of her eye - all to no avail.

40. Plaintiff saw another one of the Defendant Nurses who stated something to the effect "I'm a mental health nurse, not a doctor."

41. Plaintiff told this nurse that she (the nurse) still worked with the medical department and asked her (the nurse) to help Plaintiff speak to the doctor.

42. This nurse told Plaintiff they (Defendant Nurses and Defendant COs were really busy and medical emergencies happen all day and they didn't have time to see Plaintiff.

43. Plaintiff continued to put in sick calls to no avail, even though the Plaintiff was experiencing limited vision.

9

44.    Plaintiff got an x-ray ordered by one of the Defendant Nurses for her knee but still Defendant Nurses and/or Defendant COs would not let Plaintiff see a doctor and still no one was paying attention to Plaintiff's eye sight problem.

45.    Shortly after, Plaintiff went totally blind in Plaintiff's left eye.

46.    After going blind in her left eyes, Plaintiff profusely complained to medical staff, officers, etc, and still nothing was done.

47.    The Defendant Nurses laughed saying "Decosta, LAY DOWN, I'm sure it's blood pressure related!"

48.    Eventually blood pressure checks were ordered by the doctor after a nurse called for directions on what to do.

49.    The medical staff ordered blood-pressure checks for 5 days but Plaintiff was given no medication.

50.    Blood pressure checks were ordered 3 times in 2 months and periodically was done at Plaintiff's request, just to be sure that Plaintiff's blood pressure was normal - and it was normal.

51.    Another new nurse with the name "McCord-Sumlin" started in the Jail and told Plaintiff "Ms. DeCosta, I'll talk to the doctor, that's all I can do".

52.    It took 3 weeks but finally the Plaintiff saw a doctor (Dr. Francis).

10

53.   Dr. Francis examined Plaintiff and then called the medical director for the Jail.

54.   Plaintiff was then sent to Metro Hospital emergency room where the emergency room doctor called an eye doctor (Dr. Kraus).

55.   Dr. Kraus examined Plaintiff for many hours along with a few more doctors.

56.   At Metro Hospital Plaintiff learned she had a torn retina and needed surgery.

57.   Dr. Kraus told Plaintiff it was because of the fall, from the impact.

58.   Plaintiff was then seen again by surgeon (Dr. Yuan), and he discovered that Plaintiff had 2 tears, 1 of which was very rare, and could have only come from the sudden impact.

59.   The doctors at Metro Hospital said Plaintiff's vision will be limited and blurry.

60.   Plaintiff finally had surgery on August 3, 2018 at Metro Hospital and a few weeks later received laser surgery due to pockets of fluid.

61.   Plaintiff had to sleep with her head at 60 degrees for 2 ½ months.

62.   Dr. Yuan ordered a few eye drops and explained to Plaintiff that they were very important and to be used as prescribed.

11

63. The drops were given to the staff at the Jail, along with post operative summary of Plaintiff's medical issues and needs.

64. Despite clear medical instructions to the contrary, the staff at the jail discontinued the drops.

65. When seen by Dr. Yuan for a follow-up, Dr. Yuan asked Plaintiff about the drops, and when Plaintiff told him that the Jail staff has discontinued the drops Dr. Yuan was very upset.

66. Dr. Yuan called the jail and spoke with staff at the Jail and told them how important that medication was.

67. Once again Dr. Yuan sent an office visit summary with medical instructions along with a message to the Jail staff that emphasized how important the eye drops are for recovery results and that they are not to be discontinued.

68. In October of 2018 Plaintiff felt problems in her eye again and was seeing spots, colors and gray shadows.

69. Plaintiff asked CO "Ben" to call medical staff and tell them that Plaintiff's retina had probably ripped again.

70. Dr. Francis saw Plaintiff again in the Jail, and upon learning of the actions of the Jail staff, sent the Plaintiff back to Metro Hospital.

71. Once at Metro Hospital it was determined that in fact Plaintiff's retina had ripped off.

12

72. Dr. Yuan performed another surgery and told Plaintiff afterwards that there was a great amount of scar tissue due to the retina being ripped the first time for so long, this time he wasn't sure of the outcome.

73. Dr. Kraus and Dr. Yuan told Plaintiff that Plaintiff was legally blind, which caused severe emotional distress to Plaintiff.

74. Dr. Kraus and Yuan explained to Plaintiff that had Plaintiff been seen immediately after the fall that Plaintiff's sight could have bee saved.

75. In the midst of complaining to the staff at the Jail, Plaintiff was threatened by Defendant COs to be placed in lock up and to be refused medication.

76. Defendant COs and/or Defendant Nurses told Plaintiff that Plaintiff was only complaining to get medication.

77. Defendant COs and/or Defendant Nurses repeatedly told Plaintiff that they were short staffed again or that they told Dr. Hancock or that medical emergencies were going on.

78. Plaintiff was told by Defendant COs that the Jail is designed to hold 1800 inmates and that the Jail was presently holding more than 2300-2400 inmates.

79. Plaintiff was repeatedly told by Defendant COs and/o Defendant Nurses that the Jail was short staffed, and that the doctor will get to Plaintiff when he can.

13

80.  When the U.S. Marshall's came into the Medical POD of the Jail, Defendant COs stopped them from talking to Plaintiff.

81.  The Jail is operating under a state of constant crisis, endangering the health and safety of detainees and inmates and staff alike on a daily basis.

82.  The Jail is underfunded, understaffed, poorly administered, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the jail walls.

83.  Detainees and inmates are regularly denied access to adequate medical and mental health care, hygienic conditions, movement, sufficient and edible food, access to religion, and access to their attorneys.

84.  The conditions within the Jail violate the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

85.  All defendants to this action (collectively, the "Defendants") have long been on notice of the horrific conditions and constitutional deprivations occurring daily at the Jail, yet have failed to timely or effectively remedy the deplorable state of affairs.

86.  The Jail has long been well known for repeated and ongoing horrific and inhumane conditions, including but not limited to the conditions set forth in the federal lawsuit captioned, *Clay*

14

*et al. v. Cuyahoga County et al.*; United States District Court Case No. 1:18-cv-02929 (the "Clay Suit"), which allegations the Plaintiff incorporates by reference herein (a copy of the entire Clay Suit is attached hereto and made a part hereof as <u>Exhibit 1</u> - including all attached exhibits to the Clay Suit).

87.   The horrible Jail medical conditions have been further documented  in the matter *Brack v. Cuyahoga County*; Cuyahoga Case No. 915706 (the "Brack Suit") (a copy of the entire Brack Suit is attached hereto and made a part hereof as <u>Exhibit 2</u>).

88.   The conduct of all of the foregoing Defendants is the proximate cause of the Plaintiff's damages, including but not limited to the loss of her eye, gashes, contusions, medical bills, pain, suffering, hedonic damages, economic damages, and non-economic damages.

**COUNT I**
**NON-IMMUNITY ACTS/OMISSIONS**
**RC 2744.03(A)(6)**

89.   Plaintiff realleges and incorporate all paragraphs of this pleading as if fully rewritten herein.

90.   The Defendants' acts or omissions (hereinafter, the "Acts/Omissions") were with malicious purpose, in bad faith, or in a wanton or reckless manner.

15

91. These Acts/Omissions are the proximate cause of the aforementioned damages.

## COUNT II
### 42 USC §1983 - EIGHTH AND FOURTEENTH AMENDMENTS

92. Plaintiff realleges and incorporate all paragraphs of this pleading as if fully rewritten herein.

93. The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiff under the Eighth and Fourteenth Amendments to the United States Constitution, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

94. The Defendants have, under color of state law, deprived Plaintiff of clearly established rights, privileges and immunities secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, of which a reasonable person would have known.

95. The rights include but are not limited to, the right to due process of law, the right to be free from unreasonable seizures, the right to be free from the use of excessive force and the right to the opportunity to an adequate medical evaluation, and adequate and reasonable care when incarcerated - and this right includes the right to receive necessary medication.

16

96. The conduct of the Defendants constitutes deliberate indifference.

97. The conduct of the Defendants shocks the conscience.

98. The policies, practices, and customs of the Jail and/or the Defendants, as alleged in the preceding paragraphs, violate Plaintiff's basic human rights and dignity, and Plaintiff's right to be free from unconstitutional conditions of confinement and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

99. These policies, practices, and customs had been and may continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the foregoing damages.

100. Defendants have been and are aware of the unconstitutional and dangerous conditions of the Jail and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiff.

101. Defendants have failed to prevent, caused, and continue to cause Plaintiffs tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury Plaintiff has experienced.

17

102. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiff as set forth above.

## COUNT III
## 42 USC §1983 - FIFTH AMENMENT

99. Plaintiff realleges and incorporate all paragraphs of this pleading as if fully rewritten herein.

100. The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiff under the Fifth Amendment to the United States Constitution (Due Process - denial of right to be heard as to medical complaints and concerns), subjecting Plaintiff to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

101. Defendants have been and are aware of the unconstitutional and dangerous conditions of the Jail and have intentionally barred Plaintiff from her Due Process grievance rights and/or been deliberately indifferent to such rights and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiff.

18

**COUNT IV**
**(Monell; Failure To Train and Supervise; 42 USC 1983**

102.   Plaintiff realleges and incorporate all paragraphs of this pleading as if fully rewritten herein.

103.   The Defendants failed to adequately train and supervise the jail corrections officers and staff in the intake, assessment and correctional and medical care of inmates including Plaintiff.

104.   The rules, regulations, customs, policies and procedures of the Jail were inadequate and unreasonable.

105.   The policies, customs, patterns and practices of the Defendants were the moving force behind the Constitutional violations suffered by Sean.

106.   Plaintiff's claims are founded, in part, upon one or more alleged violations of Plaintiff's rights, privileges and immunities as secured by the United States Constitution.

107.   Although the policymakers were on notice of the obvious need to train and supervise Jail staff in the area of day to day jail operations, policies and procedures relating to medical and mental health assessment and follow up care of inmates, the Defendants failed to adequately train and supervise the individual jail staff.

19

108. The policy makers failed to develop and institute adequate reality based training programs relating to the incarceration, care and treatment of individuals such as Plaintiff.

109. As such the Defendants acted unreasonably and were repeatedly deliberately indifferent to the rights of citizens subject to incarceration in the Jail, including Plaintiff.

## Count V
## CIVIL CLAIM FOR CONSPIRACY UNDER 42 U.S.C. § 1983

110. Plaintiff realleges and incorporate all paragraphs of this pleading as if fully rewritten herein.

111. The Defendants, through concerted action, by plan, and with a conspiratorial objective, have deprived and continue to deprive Plaintiff of her constitutional rights.

112. Overt acts by these Defendants include, but are not limited to, the facts set forth above and a complete failure to stop the unconstitutional conduct and also a complete failure to remain silent about and not report this unconstitutional conduct.

113. The Defendants' actions and conduct have resulted in the foregoing damages.

20

## Count VI
## CLAIM FOR CIVIL CONSPIRACY UNDER OHIO LAW

114. Plaintiff realleges and incorporate all paragraphs of
this pleading as if fully rewritten herein.

115. The Defendants who participated in the foregoing conduct
were engaged in a conspiracy under Ohio Law.

116. The Defendants acted maliciously and in concert to
injure Plaintiff.

117. Each of the Defendants acted in concert by failing to
prevent this unconstitutional conduct, despite a duty to do so.

118. The Defendants' actions and conduct have resulted in
the foregoing damages.

## Count VII
## RECKLESS, WANTON AND WILLFUL HIRING, RETENTION, AND SUPERVISION

119. Plaintiff realleges and incorporate all paragraphs of this
pleading as if fully rewritten herein.

120. There is an employment relationship between Defendant
County and the other Defendants.

121. At all times relevant, these other Defendants were, by
virtue of the conduct set forth herein, were incompetent.

21

122. Defendant County had constructive knowledge of the incompetence of these Defendants.

123. The malicious purpose, bad faith, wanton or reckless manner acts and omissions of these Defendants were foreseeable by Defendant County and caused Plaintiff's injuries.

124. Defendant County was malicious, in bad faith, or in a wanton or reckless manner in hiring, retaining, and supervising these Defendants which was the proximate cause of the severe and permanent injuries suffered by Plaintiff.

125. Defendant County had a duty to supervise these Defendants.

126. Defendants County had a duty to provide Plaintiff housed in the Jail with a safe environment.

127. Defendant County failed to supervise these other Defendants.

128. Defendant County failed to keep Plaintiff and other inmates safe.

129. Defendant County failed to take corrective action against these other Defendants who posed a threat of harm to Plaintiff and other inmates.

130. Instead Defendant County sat idly by and did nothing.

131. Political subdivision employees who engage in "acts or omissions with malicious purpose, in bad faith, or in a wanton or

22

reckless manner" are not immune from suit in Ohio. Ohio Rev. Code § 2744.03(A)(6)(b).

133.    Defendants' conduct arose to a level beyond mere negligence.

134.    Defendants acted in a reckless or wanton manner, in bad faith, and/or with malicious purpose in failing to supervise the employees of the Jail, including these other Defendants.

135.    The Defendants' actions and conduct have resulted in the foregoing damages.

WHEREFORE, Plaintiff is entitled to a judgment against all Defendants, jointly and severally, as follows:

1.    As to all Counts, Plaintiff demands judgment in an monetary amount in excess of $25,000.00, together with interest and costs;

2.    Attorney fees as permitted by 42 USC 1983;

3.    In addition to normal economic and non-economic damages, pre-judgment interest;

4.    As to all Counts, court costs, discovery costs, attorney fees and interest to the extent permitted by law.

5.    Any and all relief permitted by law and equity.

23

Respectfully submitted;

LIPSON O'SHEA LEGAL GROUP


*/s/ Michael J. O'Shea*
Michael J. O'Shea, Esq. (0039330)
michael@lipsonoshea.com
The Hoyt Block Building
Suite 110
700 West St. Clair Avenue
Cleveland, Ohio 44113
(216) 241-0011
(440) 331-5401 - fax
**Attorneys for Plaintiff**

24

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION



EXHIBIT

| | |
|---|---|
| | |

TONYA CLAY,
ANTHONY BONNER,
JAMES MARTIN,
GEORGETTE PATTERSON,
ZACHARY SCRUGGS,
KINDELL SMITH, AND
JOVAN VARNER,
c/o Friedman & Gilbert
55 Public Square, Suite 1055
Cleveland, Ohio 44113,

    Plaintiffs,

-vs-

**CUYAHOGA COUNTY, OHIO**
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**ARMOND BUDISH,**
Cuyahoga County Executive
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**CLIFFORD PINKNEY,**
Cuyahoga County Sheriff
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**ERIC J. IVEY**
Cuyahoga County Corrections Center Warden
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

CASE NO.:

JUDGE:

**COMPLAINT**

**JURY TRIAL DEMANDED**

and

**GEORGE TAYLOR**
Interim Director of Regional Corrections
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**BRANDY CARNEY**
Chief Public Safety & Justice Services Officer
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**THOMAS TALLMAN**
Medical Director
c/o Chief Legal Officer, MetroHealth System
2500 MetroHealth Drive
Cleveland, OH 44109

and

**METROHEALTH SYSTEM**
c/o Chief Legal Officer, MetroHealth System
2500 MetroHealth Drive
Cleveland, OH 44109

and

**UNKNOWN DEFENDANTS**
c/o Department of Law
2079 E. 9th Street
Cleveland, OH 44115

and

**UNKNOWN MEDICAL DEFENDANTS**
c/o Chief Legal Officer, MetroHealth System
2500 MetroHealth Drive
Cleveland, OH 44109

     Defendants.

2

Plaintiffs Tonya Clay, Anthony Bonner, James Martin, Georgette Patterson, Zachary Scruggs, Kindell Smith, and Jovan Varner for their complaint against Defendants Cuyahoga County, Armond Budish, Clifford Pinkney, Eric Ivey, George Taylor, Brandy Carney, Thomas Tallman, MetroHealth System, Unnamed Defendants, and Unnamed Medical Defendants allege as follows:

## INTRODUCTION

1.     Cuyahoga County Corrections Center (CCCC) is operating under a state of constant crisis, endangering the health and safety of Detainees/Inmates and staff alike on a daily basis. CCCC is underfunded, understaffed, poorly administered, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the jail walls. Detainees/Inmates are regularly denied access to adequate medical and mental health care, hygienic conditions, movement, sufficient and edible food, access to religion, and access to their attorneys. The conditions within CCCC violate the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at CCCC, yet have failed to timely or effectively remedy the deplorable state of affairs.

2.     This is a class-action civil-rights action, brought under 42 U.S.C. § 1983 and Ohio law, challenging the inhumane, dangerous, and unconstitutional conditions endured by Detainees/Inmates at the Cuyahoga County Corrections Center. Plaintiffs, on behalf of themselves and similarly situated individuals, seek injunctive and declaratory relief in order to bring conditions of confinement within CCCC into compliance with federal and state law.

## JURISDICTION AND VENUE

3.     The Jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C § 1983 et seq; the Judicial Code, §§1331 and 1343(a); and the Constitution of the United States.

3

4.      Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district.

## PARTIES

5.      Plaintiff Tonya Clay is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Ms. Clay resided in the City of Cleveland, in Cuyahoga County, Ohio.

6.      Plaintiff Anthony Bonner is presently an inmate in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Bonner resided in the City of Cleveland, in Cuyahoga County, Ohio.

7.      Plaintiff James Martin is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Martin resided in the City of Cleveland, in Cuyahoga County, Ohio.

8.      Plaintiff Georgette Patterson is presently an inmate in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Ms. Patterson resided in the City of Cleveland, in Cuyahoga County, Ohio.

9.      Plaintiff Zachary Scruggs is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Scruggs resided in the City of Cleveland, in Cuyahoga County, Ohio.

10.     Plaintiff Kindell Smith is presently a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Smith resided in the City of Cleveland, in Cuyahoga County, Ohio.

4

11. Plaintiff Jovan Varner is presently an inmate a pretrial detainee in the custody of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in the complaint, Mr. Varner resided in the City of Cleveland, in Cuyahoga County, Ohio.

12. Defendant Cuyahoga County ("the County") was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant Cuyahoga County is a "person" under 42 U.S.C. § 1983. Defendant Cuyahoga County is the employer and principal of Defendants Armond Budish, Clifford Pinkney, Eric Ivey, George Taylor, Brandy Carney, and Thomas Tallman, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center.

13. Defendant Armond Budish is Cuyahoga County Executive. At all times relevant to the allegations made in this complaint, Budish was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Budish has final policymaking authority over the policies, practices, and customs of the CCCC. He is sued in his official capacity.

14. Defendant Clifford Pinkney is Cuyahoga County Sheriff. At all times relevant to the allegations made in this complaint, Pinkney was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Pinkney has final policymaking authority over policies, practices, and customs of the CCCC. He is sued in his official capacity.

15. Defendant Eric Ivey is the warden of the Cuyahoga County Correctional Center. At all times relevant to the allegations made in this complaint, Ivey was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies,

Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

practices, and customs of the Cuyahoga County Corrections Center. Ivey has final policymaking authority over policies, practices, and customs of the CCCC. He is sued in his official capacity.

16.     Defendant George Taylor is the Interim Director of Regional Corrections for Cuyahoga County. At all times relevant to the allegations made in this complaint, Taylor was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Taylor has final policymaking authority over policies, practices, and customs of the CCCC. He is sued in his official capacity.

17.     Defendant Brandy Carney is the Chief Public Safety & Justice Services Officer for Cuyahoga County. At all times relevant to the allegations made in this complaint, Carney was acting in her official capacity, within the scope of her employment, under color of law, and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center. Carney has final policymaking authority over policies, practices, and customs of the CCCC. She is sued in her official capacity.

18.     Defendant Thomas Tallman in the Medical Director of the Cuyahoga County Corrections Center. At all times relevant to the allegations made in this complaint, Tallman was acting in his official capacity, within the scope of his employment, under color of law, and is responsible for the policies, practices, and customs related to medical and mental health care at the Cuyahoga County Corrections Center. Tallman has final policymaking authority over policies, practices, and customs of the CCCC. He is sued in his official capacity.

19.     Defendant MetroHealth System was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant Cuyahoga County contracts with Defendant MetroHealth System to oversee and provide medical and mental health services at the Cuyahoga

6

County Corrections Center. Defendant MetroHealth System is a "person" under 42 U.S.C. § 1983 and is responsible for the policies, practices, and customs related to medical and mental health care in the Cuyahoga County Corrections Center.

FACTS

**History and Development of Unconstitutional Conditions at<br>the Cuyahoga County Corrections Center**

20. Defendants are responsible for the Cuyahoga County Corrections Center (CCCC), including the care and treatment of Detainees/Inmates in custody therein. Defendants are required to ensure that the policies, practices, and customs of the CCCC comply with federal and Ohio law concerning the treatment of persons in custody.

21. Unconstitutional and deplorable conditions in the CCCC are a historic problem. Defendants have long been on notice of – and have even taken action to worsen – overcrowding, unhygienic conditions, movement restrictions, insufficient and inedible food, lack religious freedom, lack of access to their attorneys, and inadequate medical and mental health care. Defendants have further long been on notice of the incompetent supervision and management of the CCCC.

22. The track record of Defendant Cuyahoga County and Defendant Pinkney's Sheriff's Department in operating a humane jail facility demonstrates continued indifference and longstanding, systematically unconstitutional operational procedures.

23. The same problems that existed at the jail facility built in 1930, previously located at East 21st Street and Payne Avenue in Cleveland, Ohio, continue to the present day: overcrowding, poor and unacceptable medical and mental health treatment, poor sanitation, lack of inmate social services, lack of recreation, poor nutrition, and substandard access to religious rights and programs. Since 1975, Defendant Cuyahoga County has been under federal court

7

monitoring at least twice, leading to the construction of newer facilities that are still in use today: Jail I, built in 1976, and Jail II, built in 1996. These same facilities – Jail I and Jail II – are where Plaintiffs remain in custody today.

24.     In the case of *Sykes, et al. v. Krieger, et al.*, U.S.D.C. N.D. Ohio, Case No. C71-1181, filed November 30, 1971, the parties reached a consent decree in 1975 in order to address constitutional violations in the old County jail. The Court ordered that the jail was engaging in "Fifth and Fourteenth constitutional amendment infringements resulting from prevailing conditions at the Cuyahoga County Jail arising from the inordinately excessive number of inmates incarcerated at the facility," ordering that the overcrowding "cannot be permitted to continue into the future." *Sykes v. Kreiger*, 451 F. Supp. 421, 424-425 (N.D. Ohio 1975). The Court further ordered that the jail population "shall not exceed 375 individuals" and ordered the defendants to present a "joint comprehensive plan designed to reduce the population" within a set timeframe. *Id.*

25.     Shortly thereafter, the facility now called "Jail I" (located at West 3rd Street and Lakeside Avenue in Cleveland, Ohio) was opened. But just nine years after *Sykes*, this new facility was the subject of another conditions-of-confinement lawsuit. Filed in 1984, *Watts v. McFaul, et al.*, U.S.D.C. N.D. Ohio, Case No. C84-362, pursued claims related to overcrowding, violations of inmates' right to free worship, and failure to maintain adequate staffing, resulting in the denial of inmate services. This case also resulted in a consent decree, involving federal judicial oversight lasting from 1987 through 1994, which limited the population in Jail I to its maximum capacity of 770 inmates and addressed a panoply of constitutional violations similar to those at issue in this case. *See Watts v. McFaul*, 158 F.R.D. 598 (N.D. Ohio 1994).

26.     However, during the pendency of this consent decree, Cuyahoga County failed to comply with its requirements. In 1989, a motion to show cause was filed against the Sheriff and County commissioners seeking an order of contempt. In October 1991, the Court ordered that all

8

misdemeanants sentenced to Jail I should be released ten days from the date of the order and felons sentenced to serve a prison term there should have their cases reviewed by the trial judge for an alternative resolution. The sheriff was also ordered not to accept any prisoner sentenced there until further court order. Ultimately, in order to avoid either a shutdown of the jail, or other sanctions against public officials, Cuyahoga County was able to submit a bond issue to the voters to fund Jail II, which was built in 1994, prior to the termination of the consent decree. *Id.*

27.     Despite building two new jails in 1976 and 1995, CCCC today operates in complete crisis, under worse overcrowding conditions than these prior federal cases: though the capacity of Jail I and Jail II is only 1,765, as of November 1, 2018, the current Inmate/Detainee population is over 2,400. At least seven people died in CCCC in a four-month span. The rates of in-custody deaths, assaults by correctional officers, deprivations of basic human rights, and safety of Detainees/Inmates and staff alike have all reached emergency levels.

28.     In 2014, County Executive Defendant Armond Budish hired Kenneth Mills as Director of Regional Corrections. Mills was responsible for overseeing operations of the entire CCCC complex. Despite being the highest-ranking administrator of the jail, Mills had absolutely no experience in the field of corrections administration. The in-custody deaths in 2018 all occurred under Mills' watch.

29.     Detainees/Inmates and their families have raised innumerable concerns and complaints about deplorable conditions. Some CCCC staff have quit their jobs in protest. Other stakeholders, including judges in the Cleveland Municipal Court and Cuyahoga Common Pleas Court, have expressed serious concern over jail conditions and the manner in which the facility is being operated.

Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

**The Ohio Department of Rehabilitation and Correction Finds in 2017 that
CCCC Is Operating in Violation of Ohio Law**

30.     The Ohio Department of Rehabilitation and Corrections' (ODRC) Bureau of Adult

Detention November 2017 inspection found CCCC was not in compliance with Ohio's Minimum

Standards for Adult Detention Centers. (ODRC Bureau of Adult Detention Report attached as

Exhibit 1.) The inspection revealed that CCCC was in violation of Ohio Admin Code Sections:

      a.  5120:1-8-04 (A)(4): CCCC was not in compliance with minimum

         requirements for sufficient space, including day space of "thirty-five square

         feet per number of occupants occupying the day space at one time" at a

         "[m]inimum size of one hundred five square feet," as CCCC "exceeded the

         Bureau Recommended Capacity for their facility and there is not the required

         amount of day space for each inmate";

      b.  5120:1-8-04 (B): CCCC was not in compliance with the requirement that

         seating shall be provided in holding areas, holding cells, housing cells,

         dormitories, dayrooms and eating areas for each inmate, having "exceeded the

         Bureau Recommended Capacity for their facility" without "the required

         amount of seating for each inmate";

      c.  5120:1-8-04 (F): CCCC was not in compliance with minimum toilet facilities

         of one operable toilet for every twelve occupants, as CCCC "has exceeded the

         Bureau Recommended Capacity for their facility and there is not the required

         amount of toilets for this standard";

      d.  5120:1-8-04 (G): CCCC was not in compliance with minimum shower

         facilities "of one operable shower for every twelve occupants, as CCCC

10

exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of showers for this standard";

e. 5120:1-8-04 (J): CCCC did not provide "[n]atural light" "in housing units, dorms, cells and/or dayspaces" as "[t]he age and layout of the existing jail facility does not provide natural light for Housing Unit 4 North";

f. 5120:1-8-11 (A): CCCC did not provide "[e]xercise and/or equipment for inmates" or "ensure that inmates are offered at least five hours per week" as CCCC's "current policy, procedures and practices need reinforced to reflect standard and components specified" and CCCC's "supporting documentation did not evidence compliance for this standard regarding recreation access for the Inmate Population in Jail 1."

**The Pretrial Justice Institute Finds in 2017 that CCCC Is Overcrowded**

31.    On September 2017, Pretrial Justice Institute (PJI) issued a report entitled "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback." This report found that on average, CCCC has been operating at over 100% capacity for four of the past five years. (*See* Pretrial Justice Institute, "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback," September 2017, available at https://university.pretrial.org/HigherLogic/System/DownloadDocumentFile. ashx?DocumentFileKey=c4587ef2-8416-18fe-e19d-b188d3691e93&forceDialog=0.)

32.    The PJI report noted that CCCC is so overcrowded that most of Detainees/Inmates are housed two people per cell even though cells are designed for only one person.

11

**The Cuyahoga County Bail Task Force Finds in March 2018 that
Inmates/Detainees Remain in CCCC Custody for Unnecessarily Long Periods of Time**

33.     The PJI report was also cited in the March 16, 2018 Report and Recommendations of the Cuyahoga County Bail Task Force. The Task Force set forth several specific recommendations to centralize pretrial services and reform the bail system in Cuyahoga County, including, for example, providing bail hearings six or seven days a week and accepting bail payments twenty-four hours per day, seven days per week, to ensure that individuals do not sit inside CCCC for unnecessarily long periods of time before bond is set and paid.

**Cuyahoga County Has Been on Notice of Overcrowding and Medical and
Mental Health Issues Since at Least 2017 But Has Taken No Action
and Instead Increased Overcrowding**

34.     In May of 2018, former Director of Regional Corrections Kenneth Mills admitted to the Cuyahoga County Council that the main jail had been understaffed for "a while," but was unsure exactly how long.

35.     On December 13, 2018 at a CMBA Hot Talks event, Defendant Cuyahoga County Chief Public Safety & Justices Services Officer Brandy Carney admitted that the ODRC's yearly inspection put Defendant Cuyahoga County on notice of overcrowding and issues with medical and mental health care at CCCC.

36.     Nonetheless, upon information and belief, Defendants failed to take any corrective action to bring CCCC into compliance with Ohio's Minimum Standards as defined in Ohio Admin. Code § 5120:1.

37.     Further, upon information and belief, Defendants failed to take any corrective action to bring CCCC into compliance with constitutional standards.

38.     Defendant Cuyahoga County has also regionalized CCCC's operations, and in this process, took over operations for the Cleveland City Jail and other municipal jail facilities. In

12

taking over these facilities, Cuyahoga County increased the number of Detainees/Inmates in County custody despite already-rampant overcrowding in the CCCC.

     39.     Upon information and belief, Cuyahoga County officials stated in public meetings that they expected the jail regionalization to bring between $1.7 million and $5.5 million in net revenue annually to Defendant Cuyahoga County. Former Director of Regional Corrections Kenneth Mills stated on April 3, 2018 to Cuyahoga County Council, "[A]s long as we keep the beds filled up, I think it's a very safe projection."

**United States Marshals Service Report Condemns the Conditions at CCCC**

     40.     On November 21, 2018, the United States Marshals Service (USMS) released a Quality Assurance Facility Review report. This report documented numerous failings discovered in USMS's thorough review of conditions, policies, and practices at CCCC. The report concluded that conditions in CCCC are inhumane and dangerous for both Inmates/Detainees and corrections officers. (USMS Report attached as Exhibit 2).

     41.     The USMS Report findings include, but are not limited to:

     a.   Failure to institute a quality control plan to provide an annual review of CCCC operations to ensure compliance with CCCC policies and procedures;

     b.   Failure of Warden and Assistant Warden to make required weekly visits to housing units and visits are not documented;

     c.   Failure to maintain proper inmate/detainee records;

     d.   Failure to track the frequency and cumulative length of Restrictive Housing Unit (RHU) placement;

     e.   Failure to provide updated inmate handbooks, any inmate handbooks in any language other than English, and to properly consider language needs of non-English speakers;

13

f.  Failure to properly track, store, and ensure safety and security of Detainees'/Inmates' personal property;

g.  Failure to provide Detainees/Inmates with disabilities with necessary accommodations, including access to all services and programs such as outside recreation;

h.  Failure to compensate Detainees/Inmates monetarily for work;

i.  Failure to provide necessary staffing;

j.  Failure to comply with restrictive housing policies required for Special Response Team (SRT) staff members assigned to RHU;

k.  Failure to provide training to RHU staff on correctional implications for brain development of young adults (ages 18-24) and associated de-escalation tactics;

l.  Failure to train annually on safety/security/fire/medical procedures, sexual abuse and assault, and supervision of offenders;

m.  Failure to properly staff the medical unit;

n.  Failure to ensure proper certifications by all medical unit staff;

o.  Provision of only minimally-acceptable sanitation in the 7th-floor mental health dispensary;

p.  Failure of the medical quality management program or Continuous Quality Improvement (CQI) Program to meet within the past year;

q.  Failure to document any corrective actions to remedy problems with medication delivery and duplication of orders by medical providers;

r.  Failure to properly maintain and manage medical records;

s.  Failure to conduct medical screening of City of Cleveland detainees upon intake;

14

t.  Failure to make medical unit aware of Detainees'/Inmates' health needs upon intake unless they present urgent or emergency situations;

u.  Failure to conduct comprehensive medical and mental health appraisals within 14 calendar days of Detainee/Inmate arrival;

v.  Failure to conduct oral screenings by dentist or qualified dental staff within 14 calendar days of Detainee/Inmate arrival;

w.  Failure to address the backlog of Detainee/Inmate requests for medical and dental care, known as "kites";

x.  Failure to properly track chronic care patients;

y.  Failure to implement a proactive program to discuss and implement individually-tailored plans for special needs patients which include, but are not limited to, developmentally disabled individuals, frail/elderly individuals, individuals with physical impairments, serious mental health needs, and juveniles;

z.  Failure to provide for juvenile Detainees/Inmates needs with regard to diet, exercise, and nutrition, including the failure of medical staff to request increased caloric diets for juveniles;

aa. Failure to house juveniles separately from adult Detainees/Inmates;

bb. Failure to comply with federal, state, and local regulations regarding the safe disposal and storage of biohazard and infectious waste;

cc. Failure to consistently process medication for Detainees/Inmates who are scheduled for court or changes in housing;

dd. Failure to provide thorough and consistent training for medical administration;

15

Electronically Filed 06/12/2019 17:52 /  / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

ee. Failure to provide intensive clinical mental health treatment to Detainees/Inmates with stable conditions who are housed in RHU during the entirely of their stays in RHU;

ff. Failure to conduct a face-to-face assessment for Detainees/Inmates with stable mental health conditions in RHU at least once per week;

gg. Failure to conduct weekly security inspections of all areas of the facility;

hh. Failure to conduct daily security inspections upon staff assuming a post;

ii. Failure to maintain records of calls to Main Control and County maintenance personnel regarding areas in need of repair;

jj. Failure to utilize generally-accepted best practices for Use-of-Force teams to ensure staff and Detainee/Inmate safety;

kk. Failure to tag and label as evidence all video tapes involving use-of-force incidents;

ll. Failure to require all persons involved in use-of-force incidents to complete written reports.

42.    The USMS report's analysis of CCCC medical personnel revealed the following shocking deficiencies:

a.   One medical staff member had expired CPR certifications;

b.   Four medical staff have expired licenses;

c.   One Licensed Practical Nurse has no license on file;

d.   One Medical Technical Assistant did not have a diploma;

e.   Two EduCare nurses had only partial CPR certifications;

f.   One Licensed Practical Nurse and one Nurse Practitioner have board actions on their verifications but no documents of the disposition of those actions;

16

      g. CCCC does not utilize a National Practitioner Data Bank to search for health

         care professional disciplinary or sanctions history.

43. The USMS report also found that the 6th-floor Medical Unit at CCCC is unsanitary and overcrowded.

44. The USMS report also stated that there is no on-site OB/GYN physician on-site at CCCC since June 2018 when the county's prior OB/GYN physician resigned.

45. The USMS report found that CCCC is severely overcrowded: the capacity of Jail I and Jail II is only 1,765, but the current Inmate/Detainee population is over 2,400.

46. The USMS report also found that CCCC is so overcrowded that Detainees/Inmates are regularly forced to sleep on mats on the floor. USMS also documented two pregnant women, including one five-months pregnant woman, sleeping on the floor.

47. The USMS report also found that Detainees/Inmates awaiting court hearings are placed in cells without functioning toilets or running water, and without anywhere to sit, for periods of time greater than ten hours. The USMS review team found that up to 12 inmates were locked in a cell designed for two people while awaiting court hearings. They are left unsupervised.

48. The USMS report also identified 96 corrections officer vacancies, indicating severe understaffing. The report states, "as a result of the high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding provision for detainees'/inmates' basic needs."

49. Interviews conducted by the United States Marshals Service revealed concerns among CCCC staff for their own safety and security due to staffing shortages.

50. Rather than taking efforts to appropriately staff the facility, Defendants instead implemented what are referred to as "Red Zone" conditions during which Detainees/Inmates are

17

confined to their cells for 27+ hours at a time are not permitted to access dayrooms, showers, telephones, or outside recreation areas.

51.     Although CCCC often implements Red Zone restrictions, there is no policy or written directive outlining proper procedures for implementation of Red Zone.

52.     The USMS report noted six deaths at CCCC between June and October 2016. The report further found that CCCC failed to conduct any debriefing or mortality review of these deaths and failed to comply with their own policy requiring documentation, minutes of debriefing, medical summary, timeline of incarceration, notifications, and autopsy reports to be available in the medical department. There was also no information regarding these inmate deaths available or maintained in the Warden's office.

53.     Upon information and belief, at least seven inmates died within the custody and care of CCCC between June 10, 2018 to October 2, 2018. Three of these people committed suicide. Over the course of the past year, 55 people have attempted suicide while in the care and custody of CCCC.

54.     After each death, someone confiscated the housing unit logs from the time of the death and replaced them with new logs.

55.     Over 100 Detainee/Inmate interviews conducted by the USMS review team revealed "strong and consistent allegations of brutality, use of force punishment, and cruel treatment of the Security Response Team (SRT)," who dress in para-military uniforms.

56.     The USMS review team also observed SRT officers verbally abusing and aggressively interacting with Detainees/Inmates, and observed aggressive conduct and abusive, explicit language directed at Detainees/Inmates by SRT members.

57.     A strong threat of retaliation faces Plaintiffs and anyone else in the custody of Cuyahoga County who comes forward with information about the conditions at CCCC.

18

58.     SRT officers escorting Detainees/Inmates to interviews with the USMS review team called those Detainees/Inmates "snitches." The behavior was so threatening and dangerous that the USMS review team requested up to ten Detainees/Inmates be removed from CCCC custody for fear of retaliation and Detainee/Inmate safety.

59.     USMS report findings also address general sanitation in CCCC, noting that sanitation levels throughout the housing pods is poor, and that multiple pods contained no cleaning chemicals for Detainees/Inmates to clean their cells.

60.     USMS report findings also address unsanitary foodservice, including the presence of mice and vermin, molded and dirty water seeping from cracks in food trays, and contamination of food plated in unserviceable trays.

61.     The USMS report further notes that Detainee/Inmate court meals were not properly refrigerated or stored and were found placed in an unused office area that reeked of dead vermin.

62.     Likewise, the USMS report finds that CCCC engages in intentional and deliberate use of food as a punitive measure, including diets for Detainees/Inmates in RHU lacking basic daily nutritional needs and caloric intake standards.

63.     Further, the USMS report noted that medical and religious diets for Inmates/Detainees whose dietary requirements cannot be met from the main menu are not provided.

64.     Likewise, the USMS report states that there is no Imam available for Muslim Detainees/Inmates.

65.     The USMS further found that Detainees/Inmates assigned to "No Contact Housing" are confined for up to 27 hours at a time, are denied daily access to showers and recreation, and are denied toothbrushes, toothpaste, toilet paper, and razors or barbering.

19

66.     The USMS report also found that Inmates/Detainees are subject to up to 30-day disciplinary isolation without disciplinary hearings in violation of their Fifth and Fourteenth Amendment Due Process rights.

67.     The report also stated that in cases involving a potential disciplinary isolation lasting longer than 30 days, those Detainees/Inmates receive a hearing but do not have access to an impartial disciplinary hearing process.

### CCCC Operates in Violation of Ohio Minimum Jail Standards

68.     As evidenced in the USMS report and Plaintiffs' accounts, CCCC is in violation of the Ohio minimum jail standards, as defined in Ohio Admin. Code § 5120:1-8, pertaining to operation of full-service jails in the State of Ohio. Violations Ohio Admin. Code § 5120:1-8 include, but are not limited to:

> a. Failure to provide Detainees/Inmates "with articles to maintain personal hygiene (toothbrush, toothpaste, feminine hygiene items and soap";
>
> b. Failure to limit use of force to "the amount of force necessary to control a given situation," where "in no event is physical force used as punishment";
>
> c. Failure to use holding cells with "[s]ixty square feet for one to three occupants with twenty square feet for each additional occupant up to a maximum of one hundred twenty square feet (six occupants)";
>
> d. Failure to provide seating in holding areas and cells for each inmate;
>
> e. Failure to house inmates in double occupancy cells of at least "one hundred square feet with nine feet least dimension for double occupancy, single bunks";
>
> f. Failure to maintain temperature at "acceptable comfort levels" in cells;

20

g.  Failure to provide "sanitation facilities" including "access to an operable flush toilet and lavatory with hot and cold potable water on a twenty-four hour a day basis without staff assistance";

h.  Failure to provide "shower facilities at a minimum of one operable shower for every twelve occupants";

i.  Failure to maintain all areas as "safe and sanitary, including food service and laundry areas" and "daily cleaning of toilets, urinals, sinks, drinking facilities and showers in areas occupied by inmates and disposal of garbage";

j.  Failure to exchange or launder bed linens once weekly;

k.  Failure to exchange or launder issued clothing once weekly, and exchange or launder personal clothing and undergarments twice weekly;

l.  Failure to provide each inmate an opportunity for a hot shower at least every forty-eight hours;

m.  Failure to provide shaving equipment and supplies daily and to make provisions for inmate haircuts;

n.  Failure to provide inmates with access to legal counsel of record including telephone contact, written communication, and confidential visits;

o.  Failure to arrange for all levels of health care, mental health care, and dental care, and failure to assure quality, accessible, and timely services for inmates;

p.  Failure to ensure that all health and mental health personnel are appropriately credentialed, with verification of current credentials on file at the facility;

q.  Failure to provide a daily procedure whereby inmates have an opportunity to report medical and mental health complaints through health-trained personnel, or for urgent matters, to any jail employee, along with failure to provide a

21

grievance system for medical and mental health treatment, where daily complaints and grievances are addressed in a timely manner, recorded and maintained on file, reviewed daily by a qualified health care personnel and treatment or follow-up are provided as necessary;

r. Failure to maintain accurate health/mental health records in written or electronic format;

s. Failure to immediately refer inmates evidencing signs of mental illness or developmental disability to qualified mental health personnel;

t. Failure to provide special nutritional and medical diets;

u. Failure to serve maintain healthy and sanitary kitchen environment and to immediately address health and cleanliness issues;

v. Failure to provide exercise, television, table games, reading materials, academic training, and opportunity to practice recognized religions;

w. Failure to ensure that disciplinary measures do not include corporal punishment or withholding food;

x. Failure to implement disciplinary hearings and to afford an opportunity to appeal disciplinary actions;

y. Failure to ensure that administrative segregation is not used as a penalty;

z. Failure to ensure no retaliation by staff for inmate grievances.

**Former CCCC Official Removed Over Public Statements about Denial of Detainees'/Inmates' Access to Adequate Medical Care**

69.    Gary Brack, former Director of Ambulatory Care at CCCC, spoke out against the conditions at CCCC at a May 2018 Cuyahoga County Council meeting. Brack blamed former Director of Regional Corrections Kenneth Mills "for meddling in jail healthcare, obstructing the

22

hiring of nurses and creating an unsafe and environment for staff by scaling back security in the jail's medical unit." (*See* Adam Ferrise, "Ex-Cuyahoga County Jail Supervisor Subpoenaed to testify before Grand Jury", *Cleveland.com* (Dec. 10, 2018), available at https://www.cleveland.com/metro/2018/12/ex-cuyahoga-county-jail-medical-supervisor-subpoenaed-to-testify-before-grand-jury.html.)

70.     Rather than launching an investigation into the medical care crisis at the CCCC, or whether Mills was fit to continue in the director position, Defendant Budish removed Gary Brack because Brack was outspoken and critical against Mills.

71.     County spokeswoman Mary Louise Madigan characterized this conflict, noting that "Armond [Budish] did have a meeting at Metro. It was clear that Mr. Brack and the jail director, Ken Mills, didn't work well together, and we asked that he not be returned to his position at the jail." (*See* Courtney Astolfi and Adam Ferrise, "Budish Personally Requested Ouster of County Jail's Medical Supervisor Who Criticized Jail Administration", *Cleveland.com* (Dec. 13, 2018), available at https://www.cleveland.com/metro/2018/12/budish-personally-requested-ouster-of-cuyahoga-county-jails-medical-supervisor-who-criticized-jail-administration-sources-say.html.)

**CCCC Detainees/Inmates Are Regularly Denied Medical and Mental Health Care**

72.     After Brack's appearance at the May 2018 County Council meeting, at least seven inmates died in Cuyahoga County's custody within a span of barely four months, including inmates likely not receiving proper psychiatric and/or medical care.

73.     Defendant Cuyahoga County provided improperly redacted records concerning the deaths to members of the media. Though the County subsequently provided unredacted records, full records about these deaths have not been released to the media or the public. (*See* Adam Ferrise, "Death of Cuyahoga County Jail inmate subject of criminal investigation: What we know

23

about 7 jail deaths," *Cleveland.com* (Nov. 21, 2018), available at https://www.cleveland.com/expo/news/erry-2018/11/12db721f324418/death-of-cuyahoga-county-jail.html.)

74.    Though Defendant County Executive Armond Budish has publicly stated that CCCC is the largest mental health provider in Ohio, upon information and belief, CCCC has not had a staff psychiatrist since April 2018 and only one nurse practitioner administers mental health care 10 hours a day, four days a week. CCCC does not offer any mental health care for the rest of the time.

75.    Lack of adequate staffing of corrections officers further exacerbates the denial of access to medical and mental health care because there are not sufficient corrections officers to escort Detainees/Inmates to and from the medical and mental health units.

76.    In June 2018, a state inspector found that CCCC failed to complete required intake medical assessments within the legally required timeframe.

77.    This delay results in Detainees/Inmates with serious mental health and medical needs being denied proper care and necessary medication and/or treatment when they enter CCCC facilities.

78.    Marcus Harris, former jail nursing director, has also stated that inmates at the Euclid Jail, also run by Defendant Cuyahoga County under regionalization of jail operations, often did not receive the required initial medical assessment upon booking, leaving medical conditions unchecked for days.

79.    In May 2018, Mr. Harris stated that he quit his job at CCCC in January amid inmate safety and ethics concerns. He believes the conditions at CCCC were so unsafe that "every day when [he] went to work [he] had to wonder if someone was going to be dead or assaulted." (*See* Courtney Astolfi, "Inmates deprived of proper medical care under Cuyahoga County jail director,

24

former nursing supervisor says," *Cleveland.com* (May 31, 2018), available at https://www.cleveland.com/metro/index.ssf/2018/05/inmates_deprived_of_proper_med.html.)

80. Compounding medical and mental health issues, CCCC regularly denies Inmates/Detainees access to necessary hygiene products, including sanitary pads and soap, and access to sufficient cleaning supplies to attempt to keep their own living areas, bedding, and clothing clean and sanitary.

### CCCC Inmates/Detainees Are Regularly Denied Access to Attorneys

81. Members of the criminal defense bar regularly report that they arrive at CCCC to visit clients in Cuyahoga County custody, and after waiting for periods up to hours long, their clients are never brought to speak with them.

82. Further, Inmate/Detainee visits with counsel are regularly limited to a 30-minute maximum time period.

83. The failure to transport Inmates/Detainees to visitation areas to speak with counsel impedes their constitutional right to counsel. Further, non-visitation and Restrictive time periods effectively forces defendants to accept plea deals and prevents them from exercising their right to trial, particularly in cases involving complex evidence which cannot be reviewed during 30-minute and/or non-existent attorney visits.

### Defendants' Alleged Attempts to Remedy the Constitutional and State Law Infirmities in the Operation of CCCC Are Inconsistent, Inadequate, and/or Misrepresentations

84. Cuyahoga County agents have publicly claimed they are taking steps to remedy some problems identified in the USMS report. However, these "fixes" are inconsistent, inadequate, poorly administered, or have been misrepresented.

85. Further, Defendants have not remedied any of the constitutional violations within CCCC.

25

86. For example, the USMS report states that CCCC refused to install shower curtains for Detainees/Inmates in Red Zone RHU. Likewise, the report describes molded and dirty water seeping from cracks in food trays, and contamination of food plated in unserviceable trays. Though County officials have publicly claimed they have provided new food trays and shower curtains, putative class members state that the new food trays are already soiled and smell moldy because they were mixed in with the old trays, and many showers still have malfunctioning or moldy shower curtains. Similarly, although County officials have reportedly hired exterminators to treat CCCC facilities, putative class members report they have not seen exterminators and insects are still prevalent throughout the jail, including in cells and in stagnant water and on walls in shower areas.

87. Cuyahoga County's Board of Control also approved funding on December 17, 2018 for a corrections consulting organization to recommend reforms and a separate expansion of prisoner living space. However, the increased living space will only accommodate 118 of the nearly 700 Inmates/Detainees who are pushing the CCCC population above its rated limit. Until the County decreases the jail population or adds enough beds to house every Detainee/Inmate without exceeding facility capacity, overcrowding remains a dire issue. Likewise, the corrections consulting organization has an entire year to come up with mere recommendations. (*See* Peter Krouse, "Cuyahoga County Board of Control approves funding for jail study, prisoner space," *Cleveland.com* (Dec. 17, 2018), available at https://www.cleveland.com/news/2018/12/cuyahoga-county-board-of-control-approves-funding-for-jail-study-prisoner-space.html.) But an entire year is far too long to wait to address the desperate and dire crisis in the CCCC. Further, recommendations do not constitute actual reform.

88. Further, many people remain in CCCC custody due to their inability to post even relatively low bonds. The Cuyahoga County Court of Common Pleas and other local courts

26

continue to set bonds people are unable to pay, condemning those without financial means to suffer months, and sometimes years, of rights violations in overcrowded CCCC facilities.

89.     Compounding these violations, CCCC's grievance system is broken, leaving Detainees/Inmates with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process. Detainees'/Inmates' complaints, kites, and grievances are not delivered and/or go unanswered. Their complaints remain unaddressed, and their suffering continues unabated.

**Class Representative Plaintiffs' Accounts Illustrate and Clarify USMS Report Findings**

90.     As set forth below, Class Representative Plaintiffs have suffered unconstitutional conditions at CCCC.

TONYA CLAY

91.     Plaintiff Tonya Clay is a 48-year-old woman currently held as a pretrial detainee in CCCC. Ms. Clay has been housed in CCCC since September 13, 2018.

92.     When she first arrived at CCCC, Ms. Clay was assigned to sleep on a mat on the floor of the common area in her pod for approximately one month due to overcrowding. Since that time, Ms. Clay has been one of two inmates housed in a cell designed to hold one person. All of the one-person cells on her pod currently house two women – one who sleeps on the metal bunk and one who sleeps on a mat on the floor.

93.     Ms. Clay regularly sees bugs swarming around the showers. Mold covers the walls of the showers and the cracks between the tiles. The drain in the shower Ms. Clay utilized in her previous pod was constantly clogged, resulting in dirty water pooling on the floor and covering Detainee'/Inmates' feet.

94.     As of December 12, 2018, there were no new shower curtains in Ms. Clay's pod and she does not believe any exterminators have been in her pod.

27

95.     Ms. Clay has been on Red Zone for much of her time at CCCC. Her entire pod was once locked down in cells for two straight days, let out only to pick up/return a food tray, and pick up/drop of laundry.

96.     There was a sink/toilet fixture inside Ms. Clay's previous cell, however it often malfunctioned. For one entire week, the only water available from the sink in Ms. Clay's cell was hot. She therefore had no access to cool drinking water during that week for all durations when she was locked in her cell on Red Zone. Finally, a plumber came in to fix the problem, but a new problem arose. After the plumber's work, black water began flowing from the sink. The black water continued to appear intermittently.

97.     Ms. Clay has resorted only to eating food from the commissary when possible, which is expensive, due to the unsatisfactory food served by CCCC. Ms. Clay has been served milk that was past its expiration date and meat that looked and tasted spoiled. Ms. Clay has also been served chicken patties that were freezer burned and very hard. In general, the food portions are small and are not sufficiently filling.

98.     Ms. Clay is also constantly cold in her cell, making it very difficult to sleep. CCCC refused to give her an extra blanket without a medical order.

99.     Detainees/Inmates are only allotted two sanitary pads at once and must ask for more when required for hygienic purposes. However, corrections officers have told her that the help button in her pod should not be pressed unless someone is "dying." She and other Detainee/Inmates are therefore unable to use the help button to call for more sanitary pads when locked in their cells on Red Zone. Corrections officers have told Ms. Clay that their pod is out of both toilet paper and sanitary pads, and made no apparent effort to locate additional necessary supplies.

100.    Ms. Clay also has only two pair of underwear that she was provided by CCCC, which have become threadbare due to the fact that she washes them herself using her own soap in

28

her cell after each use. Ms. Clay is unable to purchase additional underwear through the commissary because it is not offered: only boxer shorts are sold on commissary for men.

101.    Ms. Clay suffers from neuropathy, glaucoma, and liver damage, among other ailments. These conditions cause her severe pain as well as loss of vision in one eye. CCCC denied her all access to medical care for three months. When Ms. Clay finally saw a nurse at CCCC, the nurse told her to take Motrin, a medication she is unable to take due to liver issues. After sending several kites requesting care, CCCC allowed Ms. Clay to have blood work done, the results of which she has yet to receive.

102.    Ms. Clay has also been diagnosed with both Bipolar Disorder and PTSD. She never received a response to any kites sent to the CCCC Social Worker concerning these conditions. CCCC refused to continue the medications Ms. Clay was taking when she arrived at the facility, and instead prescribed different mental health medications. These new medications are not effective and Ms. Clay has sent numerous kites seeking an evaluation. She still has not seen any medical professional to treat her mental health conditions.

103.    Ms. Clay has witnessed intimidation and aggressive tactics on the part of SRT officers. She has been told to "shut the fuck up" and witnessed SRT officers ripping up the sheets of another inmate's bunk during a "shake-down."

104.    Ms. Clay had an altercation with another inmate and, as a result, was moved to segregated housing, known as "the hole," without a disciplinary hearing. While in the hole, Ms. Clay was denied access to all books and reading material other than a Bible. She was also denied phone calls and all non-attorney visits. She was locked into her small cell alone for all but approximately 20 minutes per day when she was permitted to exit the cell to shower. Meals were passed through a slot in the cell door. She remained in the hole for three days.

29

105.    Ms. Clay is a recovering alcoholic, but has been denied access to AA meetings because they are often canceled due to Red Zone.

106.    Ms. Clay is Christian and is regularly denied the right to practice her religion because church services are canceled and/or severely shortened due to staffing issues.

107.    Ms. Clay has no access to the computer room or law library.

ANTHONY BONNER

108.    Anthony Bonner is a 39-year old man who has been held in CCCC since July 24, 2018.

109.    The food served to Mr. Bonner is consistently very small portions. He has been served bologna with no bread.

110.    Mr. Bonner shares a one-person cell with another man. His toilet was once clogged and inoperable for an entire week. During that time, he and his cell mate had to request permission from corrections officers to use the toilet in the common area during Red Zone lock downs.

111.    Two men locked down in a one-person cell means that one person has nowhere to sit, eat, or sleep but on the floor, the toilet, or his cellmate's bunk (and only if the cellmate permits). Cellmates attempt to give each other privacy when one needs to use the bathroom by hiding under bedsheets or helping to create a makeshift curtain around the toilet with a bedsheet, and by continuously flushing the toilet to prevent sounds and odors from permeating the cell.

112.    Each Detainee/Inmate has only one orange uniform. When this uniform is taken to laundry (which only occurs at sporadic and irregular times), each man must sit in his underwear, if he has any, until the uniform is returned. This means two adult men are forced to sit in a small cell on lockdown for hours in nothing but their underwear, or wrapped in a sheet or towel if they have no underwear. These conditions cause Mr. Bonner to feel emasculated.

30

113.    Each Detainee/Inmate is issued one thin blanket and two sheets. Detainees/Inmates are not issued a pillow.

114.    The two showers shared by over 48 men in Mr. Bonner's pod are filthy, covered in mold and soap scum. No new shower curtain has been provided for many months. For a period of time, the showers had no curtains.

115.    Most of the time, Mr. Bonner is held on Red Zone lockdown and confined to his cell for 22 hours or more. When Detainees/Inmates are released to take showers and move about the day room, there often is not enough time for all of the men to shower. This causes conflict among Detainees/Inmates who are desperate to clean themselves.

116.    Recreation time is irregularly made available to the Detainee/Inmates, and only to ten people at a time.

117.    Mr. Bonner wants to attend Alcoholics Anonymous meetings, however they are often canceled due to Red Zone and understaffing. Even when meetings do happen, only seven people are permitted to attend.

118.    Religious services are canceled more often than not due to Red Zone restrictions.

119.    Mr. Bonner has been denied access to attorney calls when on Red Zone restrictions.

120.    Mr. Bonner has requested mental health care and has not received any response.

121.    Mr. Bonner was held in isolation for over two weeks. The walls, floor, sink, and toilet were filthy. During this time, he repeatedly requested mental health care and was denied. He was served plain oatmeal for every breakfast and one bologna sandwich, one apple or orange, and one small bag of carrots for every lunch and dinner. He was also served one carton of milk for lunch and dinner, which was often past its expiration date. He was denied access to commissary and therefore unable to supplement this limited food. He was also denied all access to phone calls, visits, movement beyond a short time to use to the shower, recreation, and all books except a Bible.

31

122.    On another occasion, Mr. Bonner's entire pod was locked down as punishment because corrections officers claimed to have smelled marijuana. All Detainees'/Inmates' privileges were revoked. They were only permitted to leave their cells for 20 minutes at a time on a rotating basis to shower. They were served only plain oatmeal for breakfast, and one bologna sandwich, one apple or orange, and one small bag of carrots for lunch and dinner.

JAMES MARTIN

123.    Plaintiff James Martin is a 35-year-old man in CCCC awaiting sentencing. He has been housed in CCCC since June 20, 2018.

124.    Mr. Martin spent approximately the first two months of his incarceration sleeping on the floor of the common area day room of a pod. The pod was so overcrowded that no cells were available to him or to the 18 men sleeping on the floor in the day room. All of these men had to share one toilet for approximately one month until a second toilet became available.

125.    There are two showers for the entire pod of approximately 48 men. Due to Red Zone restrictions, the men are only permitted out of their cells for limited amount of time daily, and all need to share the showers and phones. As a result, Mr. Martin regularly goes several days without access to a shower because there is not enough time allotted for all men to shower. When he is able to shower, the shower area is riddled with insects and the shower curtain is covered in mold and scum.

126.    Detainees/Inmates are provided with inadequate cleaning chemicals and no towels or rags to apply cleaning chemicals. Just one bucket, one sponge, and one toilet scrub brush are provided daily for all Detainees/Inmates in the entire pod to share.

127.    Further, CCCC does not provide clean laundry on a consistent and regular basis. Each Detainee/Inmate has only one orange uniform. When the orange uniforms are taken to be laundered, each Detainee/Inmate must remain in his underwear until the uniform is returned. If an

32

individual does not have a pair of underwear available to him, he is forced to wrap himself in a towel or sheet to cover himself until the laundry is returned.

128.    Mr. Martin has been denied proper medical care and monitoring for his serious medical needs, despite his attempts to contact medical staff via unanswered kites.

129.    Mr. Martin has a diagnosis of Bipolar I for which he has received medication but not counseling. He has received no response to his kite for the jail social worker concerning this issue. Mr. Martin often is placed in restrictive housing for conduct resulting from CCCC's failure to properly treat his mental health conditions.

130.    As of December 19, 2018, Mr. Martin has not experienced the changes Defendant Cuyahoga County claims to have implemented – there are no new shower curtains and the food is served on trays that smell dirty and like old food.

131.    Severe Red Zone conditions continue. Mr. Martin was locked down on Red Zone starting from Sunday December 16, 2018 at approximately 9:00 p.m. and continuing until Monday December 17, 2018 at approximately 8:00 p.m. He and his pod-mates were allowed out of their cells to shower, move around, socialize, and use the phone for just two hours, until approximately 10:00 p.m. They were then locked in their cells again until Tuesday. At 2:30 PM on Tuesday December 18, his entire pod remained on Red Zone lockdown.

132.    During Red Zone, Detainee/Inmates are locked in their one-person cells with another person. One person sleeps on a mat on the floor, and one person sleeps on the metal bunk attached to the wall. They eat in their cells. The toilet and sink are attached to the wall and there is no enclosure around the toilet to create any modicum of privacy.

133.    Mr. Martin was recently placed on "cell isolation" for five days during which he was locked in his cell with his cellmate, but was only permitted to leave his cell to shower once a

33

day for approximately 15 minutes. He never received a hearing or any due process and the jail investigator never interviewed him.

134.     Mr. Martin has sent multiple unanswered kites to CCCC's Head Chaplain regarding religious information and requesting a yarmulke. He is a Hebrew Israelite and has been denied access to a Rabbi and religious services. Mr. Martin believes, but is not sure, that he receives Kosher meals – but the meals are always cold and he is served the same two meals every day.

GEORGETTE PATTERSON

135.     Plaintiff Georgette Patterson is a 53-year-old woman currently serving a five-month sentence in CCCC custody for a misdemeanor conviction. Ms. Patterson has been housed in CCCC since August 10, 2018.

136.     Upon her admittance to CCCC, Ms. Patterson was not medically screened. She was suffering from food poisoning causing vomiting and diarrhea but was refused medical treatment because CCCC staff accused her of detoxing. She remained in soiled clothes and sheets for almost twelve hours. At the time, she was assigned to a mat on the floor in the common area of a pod.

137.     After a few days at CCCC, Ms. Patterson was sent to the MetroHealth emergency room for chest pains and was diagnosed with hyponatremia. She did not receive any necessary follow-up care at CCCC until three to four weeks later after she sent numerous kites seeking medical attention.

138.     Ms. Patterson also suffers from Celiac Disease and was denied a proper diet by CCCC until approximately one month ago after supporters outside the jail called to advocate on her behalf. Months of improper diet caused Ms. Patterson to suffer serious medical symptoms and related discomfort.

139.     Ms. Patterson is one of many women housed in CCCC who has suffered and continues to suffer severe pain and discomfort from long-lasting vaginal infections. CCCC and

34

medical officials continue to deny her access to any necessary and proper medical care to treat the infections over a period of months.

140. Ms. Patterson has been denied access to Alcoholics Anonymous and Heroin Anonymous. She has witnessed correctional staff turn volunteer AA/HA facilitators away due to insufficient staffing.

141. Ms. Patterson is also diagnosed with Bipolar Disorder. She was in possession of her prescription medication when she was admitted to CCCC, however the medications were taken from her and were not replaced. Despite sending several kites about mental health care since first arriving at CCCC, she did not receive any therapy or medication to treat her condition until December 18, 2018.

142. Since arriving at CCCC, Ms. Patterson has shared a one-person cell with another inmate aside from the one week she spent sleeping on the floor of the pod common area. Ms. Patterson was forced to sleep on the floor of the cell, despite the fact that there was a bunk order in Ms. Patterson's medical chart from previous time spent at CCCC. Each of the 14 cells in her pod are filled to double the capacity and people are continuously sleeping on the floor of the pod common room.

143. CCCC has served Ms. Patterson inconsistent and sometimes inadequate portions of food. At times, she receives only dry cereal for breakfast. She has also been served expired, moldy, spoiled, and otherwise disgusting food, including but not limited to cookies with wheat weevils inside, coleslaw with maggots, bread with mold, and chicken patties with mold. New food trays have been mixed with old and are now smelly and soiled.

144. There was no running water from the sink in Ms. Patterson's cell for three months, which meant that she had to get drinking water from another source. During Red Zone times or at night, a corrections officer would sometimes allow Ms. Patterson to leave her cell for drinking

35

water. However, if no officer was around, or if they refused, she had no access to drinking water. Recently, brown water flowed in both the toilet and the sink in Ms. Patterson's cell for three days in a row.

145.    One of the two showers that Ms. Patterson and approximately 28 other inmates use has a clogged drain which causes filthy water to build up to their ankles. Recently, corrections officers removed the shower curtain from the clogged shower rather than fix it. Now, everyone on the pod must share one shower. The shower and the shower curtain are dirty and moldy, and the shower curtain has not been replaced.

146.    Toilet paper is rationed to two rolls per cell per week for cells housing two people. The toilet paper supply is often inadequate to last for the week. The corrections officers in Ms. Patterson's pod consistently tell her that toilet paper has run out.

147.    All women are given only two sanitary pads at a time. Women are required to return to the corrections officers to ask for more, however, they are often told that there are no more sanitary pads available. In this case, women are forced to use toilet paper, if there is any, or their washcloth, if they have one, in lieu of sanitary pads. Although women attempt to save sanitary pads for the following month whenever possible, SRT officers regularly raid and tear apart cells, and during these raids, SRT officers often throw away any extra sanitary pads. Ms. Patterson has also witnessed SRT officers confiscate and throw away women's prescription medical creams during raids.

148.    Ms. Patterson is a Christian and has been denied the free exercise of her religion by CCCC. Church services have been canceled or severely shortened many times due to understaffing and Red Zone lockdowns.

149.    Recently, Ms. Patterson was sent to the Restrictive Housing Unit for three days before she was afforded any due process. After three days, she was ordered to be released at 7:30

36

p.m., however at that time she was told there was nowhere to move her. She remained in Restrictive

housing for twelve additional hours. During her first day, she was held for 24 hours inside her cell.

On the second and third days she was allowed out for approximately 20 minutes. During the entire

three days she was not allowed access to any books but for a Bible, and was permitted no phone

calls or visits. She was denied a phone call to her attorney for approximately 24 hours.

ZACHARY SCRUGGS

150.    Plaintiff Zachary Scruggs is a 35-year-old man and has been in County custody as

a pretrial detainee in CCCC since March 9, 2018.

151.    Mr. Scruggs' pod is at nearly double the capacity for which it was built – with every

cell, designed for one person, holding two men, one who must sleep on a mat on the floor. Mr.

Scruggs shares his one-person cell with another man.

152.    Since arriving at CCCC, Mr. Scruggs has had limited access to a shower. At times,

he has been forced to wait multiple days between showers: when Detainees/Inmates are briefly

released from Red Zone restrictions, there are too many men attempting to use the shower for all

men to access showers before Red Zone starts again. There are no new shower curtains; the shower

and the curtains are covered in mold and soap scum. There are still bugs in the showers and in the

cells. Mr. Scruggs is not aware of any exterminator treating the facility recently.

153.    The toilet in Mr. Scruggs' cell was broken for two weeks, which caused water to

flood the cell. During this time, he and his cell-mate had to request permission to use the toilet in

the common area during Red Zone. CCCC failed to timely fix the toilet or provide necessary

supplies and assistance to clean up the mess. Corrections officers forced them to wait unreasonable

amounts of time before permitting them to use the bathroom.

154.    As of December 18, 2018, the only toilet in the common area has been leaking,

causing water to flow into the common area of the pod.

37

155. Mr. Scruggs has witnessed the lack of appropriate staffing in CCCC and is often on Red Zone lockdown as a result. On more than one occasion, his pod was on Red Zone for an entire weekend due to the fact that there was a single officer working to cover four dorms.

156. Mr. Scruggs' access to the free practice of his religion has also been impacted by Red Zone and staffing shortages. Church services are often cut very short to get inmates back into their cells to begin Red Zone lockdown again.

157. The food which Mr. Scruggs is served is on trays which smell of mildew, and is often cold due to corrections officers allowing the food to sit for an hour before it is served to Inmates/Detainees. The food portions are small and not filling; he has lost weight while in custody due to insufficient calorie intake.

158. Mr. Scruggs has also suffered from suicidal thoughts as a direct result of the conditions in CCCC.

159. CCCC's attorney visitation policies and practices have resulted in a denial of Mr. Mr. Scruggs's right to a lawyer. CCCC only allows thirty minutes at a time to visit with his attorney, which does not allow him enough time to review necessary discovery and evidence in order to assist in his defense.

160. Mr. Scruggs has experienced intimidation on the part of SRT officers. SRT conducts nearly weekly "shake downs" during which they tear apart cells, flip people off beds, yell and name call for no reason, throw away personal property, and act in an unreasonably aggressive and threatening manner.

KINDELL SMITH

161. Plaintiff Kindell Smith is a 28-year-old man. He has been held in CCCC as a pretrial detainee since June 21, 2018.

38

162.   Mr. Smith suffers from asthma and requires regular breathing treatments. CCCC does not provide him these breathing treatments as prescribed. Mr. Smith also requires a CPAP machine and although his family provided his CPAP machine to CCCC, officials have never allowed Mr. Smith to use it. Mr. Smith filed a medical grievance regarding his lack of CPAP machine and irregular breathing treatments. He received no response.

163.   Mr. Smith violated a phone restriction policy and, as a result, his phone privileges were ordered Restrictive.  He was then placed in segregated housing, where he was held in solitary confinement for 24 hours per day.  During the time Mr. Smith was in segregated housing, food was regularly held back by corrections officers, he received no recreation time, and he was repeatedly threatened with mace.  Corrections officers also choked Mr. Smith.

JOVAN VARNER

164.   Plaintiff Jovan Varner is a 33-year-old man. He has been held in CCCC as a pretrial detainee since December 20, 2017.

165.   During his time in CCCC, Mr. Varner has witnessed mice near food in the kitchen. The meals served to him by CCCC are very small portions, are often cold, and are served on food trays which have a mildew smell. He has not observed any new trays.

166.   CCCC houses Mr. Varner with another inmate in a cell designed to house only one inmate at a time. He has slept on the floor for the entire year he has been at CCCC.

167.   At one point, Mr. Varner spent three weeks in a cell with a broken toilet that had urine and feces sitting in it. Although he made several complaints, CCCC failed to fix the toilet in a timely manner. Instead, a corrections officer told Mr. Varner to put a bag in his toilet to collect excrement and other solids with and then to dispose of the bag periodically. As a result, Mr. Varner and his cellmate were forced to endure the odor of both urine and excrement throughout the cell.

39

168.     The conditions at CCCC make it impossible for Mr. Varner to keep himself clean, hygienic, and appropriately groomed. The pod on which Mr. Varner is housed has two showers for approximately 48 inmates. Due to the number of men and the limited time during which the men can access the shower, Mr. Varner is unable to shower daily, and sometimes for periods of several days. These showers are infested with insects, and the showers and shower curtains are not only moldy, but Detainees/Inmates are also given insufficient supplies with which to clean showers and their own cells.

169.     Despite the fact that barbers are supposed to visit CCCC once per month, Mr. Varner has been denied access to regular haircuts; he has been waiting approximately six months for a haircut.

170.     CCCC washes Mr. Varner's clothing only approximately once every one to two weeks. His sheets are washed even less frequently.

171.     Mr. Varner suffers from asthma and should carry an inhaler. He had an inhaler on his person when entering into custody at CCCC, however CCCC staff took it away from him. Mr. Varner's multiple kites for medical treatment have gone unanswered. Since his admission to CCCC, Mr. Varner has not been able to access any inhaler and has not received necessary medical treatment.

172.     Mr. Varner also suffers from PTSD from previous traumatic life events. He has written several kites regarding treatment, however has only been seen for counseling once since entering CCCC.

173.     Most days, Mr. Varner's pod is locked down on Red Zone. During Red Zone, Mr. Varner and his cell mate are locked into one-person cell – sometimes for dangerously long periods of time. During Red Zone, corrections officers are not easily accessible to the Detainees/Inmates. The Detainees/Inmates are not permitted access to the phone, showers, television, or recreation.

40

Church services are shortened. Mr. Varner and the other Detainees/Inmates spent most of Thanksgiving 2018 locked down on Red Zone; as a result, he was unable to call his family.

174.    SRT officers frequently search Mr. Varner's cell.  He feels highly intimidated by SRT officers and their extremely aggressive tactics toward Detainees/Inmates.

CLASS ACTION ALLEGATIONS

The CCCC Class

175.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Smith, and Varner (collectively the "CCCC Class Plaintiffs") bring this action on behalf of themselves and a class of similarly situated persons who are now, or will in the future be, subjected to the policies, practices, and customs of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement.

176.    FED. R. CIV. P. 23(a)(1) – Impracticality of joinder: The CCCC Class is so numerous that joinder of all class members is impracticable.  As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the conditions of confinement set forth herein and therefore face a significant risk of serious illness, injury, and death. Additionally, the class membership is fluid as Detainees/Inmates enter and exit the facilities daily.

177.    CCCC Class members are identifiable using records maintained in the ordinary course of business by CCCC.

178.    FED. R. CIV. P. 23(a)(2) – Commonality: Common questions of law and fact exist as to all CCCC Class members. Among the common questions are:

        a.  Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, subject class members to

41

an ongoing, substantial and imminent risk of physical and psychological harm, illness, and death;

b. Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, violate the class members' Fourth, Fifth, and Fourteenth Amendment rights to due process;

c. Whether the conditions of confinement in CCCC violate the Eighth Amendment's prohibition on cruel and unusual punishment;

d. Whether the Defendants' refusal to provide adequate medical, including dental, and mental health care to class members constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment;

e. Whether the conditions of confinement in CCCC, and the Defendants' refusal to provide adequate medical and mental health care, result in constitutionally cognizable harm or present a constitutionally unacceptable risk of harm;

f. Whether the Defendants unreasonably instituted or condoned the conditions of confinement in CCCC and refused to provide adequate medical and mental health care;

g. Whether the Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of class members;

h. Whether the Defendants maintain a policy, custom and/or widespread practice of violating class members' constitutional rights through the conditions under which they confine class members and the lack of adequate medical or mental health care; and

i. Whether the Defendants fail to hire, train and/or supervise CCCC staff and agents resulting in violations of class members' constitutional rights.

42

179.    FED. R. CIV. P. 23(a)(2) – **Typicality:** The claims of the Plaintiffs are typical of those of the CCCC Class, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

180.    Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire class.

181.    **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the class and will serve diligently as a class representative. Their interests are aligned with those of the CCCC class and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

182.    **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

183.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the CCCC Class are common to and apply generally to all members of the Class. The injunctive and declaratory relief sought will apply as a whole to all members of the CCCC Class.

184.    A class action would be the most fair and efficient method of adjudicating the class members' claims.

### The Restrictive Housing Subclass

185.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, Smith, and Varner (collectively the "Restrictive Housing Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are

43

now, or will in the future be, held in any form of Restrictive housing in CCCC, including but not limited to Red Zone.

186.     **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Restrictive Housing Subclass is so numerous that joinder of all subclass members is impracticable.  As of October 30, 2018, over 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the conditions of confinement set forth herein, including but not limited to Red Zone, and therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

187.     Restrictive Housing Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

188.     **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Restrictive Housing Subclass members and predominate over any individual issues that may exist. Among the common questions are:

> a.   Whether Red Zone restrictive housing violates subclass members' Fourth, Fifth, Eighth, and Fourteenth Amendment rights by subjecting them to substantial and imminent risk of physical and psychological injury and cruel and unusual punishment without due process;
>
> b.   Whether the use of restrictive housing and isolation as punishment without due process violates subclass members' Fourth, Fifth, Eighth, and Fourteenth Amendment rights by subjecting them to substantial and imminent risk of physical and psychological injury and cruel and unusual punishment without due process;
>
> c.   Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Fourth, Fifth, Eighth, and

44

Fourteenth Amendments through the use of Red Zone, isolation, and other restrictive housing under which they confine subclass members;

d. Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments;

e. Whether the Defendants unreasonably instituted the conditions of confinement, condoned such conditions, and/or were deliberately indifferent to them.

189.    FED. R. CIV. P. 23(a)(2) – **Typicality:** The claims of the Plaintiffs are typical of those of the Restrictive Housing Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

190.    Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

191.    **FED. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Restrictive Housing Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

192.    **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates – all of the Detainee/Inmates in custody at CCCC are held under Red Zone isolation conditions and many are held under even further restrictive conditions – and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

45

193.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Restrictive Housing Subclass are common to and apply generally to all members of the subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Restrictive Housing Subclass.

194.    A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Medical Care Subclass

195.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Martin, Patterson, Smith, and Varner (collectively the "Medical Care Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement and lack of access to medical care.

196.    **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Medical Care Subclass is so numerous that joinder of all subclass members is impracticable.  As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subjected to the lack of access to adequate medical care, including dental care, and therefore face a significant risk of serious illness, injury, and death. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

197.    Medical Care Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

46

198.   FED. R. CIV. P. 23(a)(2) – **Commonality:** Common questions of law and fact exist as to all Medical Care Subclass members and predominate over any individual issues that may exist. Among the common questions are:

    a.   Whether Defendants' failure to operate a system of adequate medical care poses a substantial risk of serious harm in violation of subclass members' Eighth and Fourteenth Amendment rights;

    b.   Whether the Defendants maintain a policy, custom and/or widespread practice of violating subclass members' rights under the Eighth and Fourteenth Amendments through the failure to operate a system of adequate medical care;

    c.   Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of subclass members' rights under the Eighth and Fourteenth Amendments;

    d.   Whether Defendants have been objectively unreasonable and/or deliberately indifferent to the serious health care needs, including medical care needs of subclass members, and to the risk posed by their failure to maintain an adequate health care system;

    e.   Whether the extreme level of overcrowding and understaffing within CCCC interferes with the provision of adequate medical care.

199.   FED. R. CIV. P. 23(a)(2) – **Typicality:** The claims of the Plaintiffs are typical of those of the Medical Care Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

200.   Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

47

201.  **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Medical Care Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

202.  **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

203.  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Medical Care Subclass are common to and apply generally to all members of the subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Medical Care Subclass.

204.  A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Mental Health Care Subclass

205.  Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, and Varner (collectively the "Mental Health Care Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional, illegal, and dangerous conditions of confinement and lack of access to mental health care.

48

206.     FED. R. CIV. P. 23(a)(1) – Impracticality of joinder: The Mental Health Subclass
is so numerous that joinder of all class members is impracticable.  As of October 30, 2018, 2420
Detainees/Inmates were confined at CCCC, all of whom are subjected to the lack of access to
adequate mental health care, therefore face a significant risk of serious illness, injury, and death.
Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

207.     Mental Health Subclass members are identifiable using records maintained in the
ordinary course of business by CCCC.

208.     FED. R. CIV. P. 23(a)(2) – Commonality: Common questions of law and fact exist
as to all Mental Health Subclass members and predominate over any individual issues that may
exist. Among the common questions are:

      a.  Whether Defendants' failure to operate a system of adequate mental health care
          poses a substantial risk of serious harm in violation of subclass members'
          Eighth and Fourteenth Amendment rights;

      b.  Whether the Defendants maintain a policy, custom and/or widespread practice
          of violating subclass members' rights under the Eighth and Fourteenth
          Amendments through the failure to operate a system of adequate mental health
          care;

      c.  Whether the Defendants fail to train and/or supervise CCCC staff and agents
          resulting in violations of subclass members' rights under the Eighth and
          Fourteenth Amendments;

      d.  Whether Defendants have been objectively unreasonable and/or deliberately
          indifferent to the serious health care needs, including mental health care needs
          of subclass members, and to the risk posed by their failure to maintain an
          adequate health care system;

49

    e. Whether the extreme level of overcrowding and understaffing within CCCC interferes with the provision of adequate mental health care.

209. **FED. R. CIV. P. 23(a)(2) – Typicality:** The claims of the Plaintiffs are typical of those of the Mental Health Care Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

210. Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

211. **FED. R. CIV. P. 23(a)(2) – Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Mental Health Care Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

212. **FED. R. CIV. P. 23(b):** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

213. This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Mental Health Care Subclass are common to and apply generally to all members of the subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Mental Health Care Subclass.

214. A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### The Religious Freedom Subclass

50

215.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs Clay, Bonner, Martin, Patterson, Scruggs, and Varner (collectively the "Religious Freedom Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of persons who are now, or will in the future be, subjected to the policies and practices of the Cuyahoga County Correction Center, including but not limited to the unconstitutional deprivation of their right to religious freedom.

216.    **FED. R. CIV. P. 23(a)(1) – Impracticality of joinder:** The Religious Freedom Subclass is so numerous that joinder of all subclass members is impracticable. As of October 30, 2018, 2420 Detainees/Inmates were confined at CCCC, all of whom are subject to the lack of access to religious practice and expression. Additionally, the subclass is fluid as Detainees/Inmates enter and exit the facilities daily.

217.    Religious Freedom Subclass members are identifiable using records maintained in the ordinary course of business by CCCC.

218.    **FED. R. CIV. P. 23(a)(2) – Commonality:** Common questions of law and fact exist as to all Religious Freedom Subclass members and predominate over any individual issues that may exist. Among the common questions are:

      a.  Whether the denial of access to religious texts, services, leaders, clothing/grooming, and/or diets violates subclass members' First Amendment rights;

      b.  Whether the Defendants maintain a policy, custom and/or widespread practice of violating class members' rights under the First Amendment;

      c.  Whether the Defendants fail to train and/or supervise CCCC staff and agents resulting in violations of class members' rights under the First Amendment.

51

219.    FED. R. CIV. P. 23(a)(2) – **Typicality:** The claims of the Plaintiffs are typical of those of the Religious Freedom Subclass, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the subclass claims.

220.    Defendants are expected to raise common defenses to these claims, so that final injunctive relief and corresponding declaratory relief is appropriate for the entire subclass.

221.    FED. R. CIV. P. 23(a)(2) – **Adequacy of Representation:** Plaintiffs will fairly and adequately represent the interests of the subclass and will serve diligently as a subclass representative. Their interests are aligned with those of the Religious Freedom Subclass and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

222.    FED. R. CIV. P. 23(b): This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of subclass members is over 2,240 Detainees/Inmates and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.

223.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Religious Freedom Subclass are common to and apply generally to all members of the Subclass. The injunctive and declaratory relief sought will apply as a whole to all members of the Religious Freedom Subclass.

224.    A class action would be the most fair and efficient method of adjudicating the subclass members' claims.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth, Eighth and Fourteenth Amendments

225.    All of the foregoing paragraphs are incorporated as though fully set forth here.

52

226. The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

227. The policies, practices, and customs of the CCCC, as alleged in the preceding paragraphs, violate Plaintiff's basic human rights and dignity, and their right to be free from unconstitutional conditions of confinement, cruel and unusual punishment, and unreasonable searches and seizures under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

228. These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

229. Defendants have been and are aware of the unconstitutional and dangerous conditions of the CCCC and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the classes they represent.

230. Defendants have failed to prevent, caused, and continue to cause Plaintiffs and the classes they represent tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury they are currently experiencing or are at risk of experiencing. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

231. Plaintiffs have no adequate remedy at law for these violations.

53

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment

232.    All of the foregoing paragraphs are incorporated as though fully set forth here.

233.    The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the First Amendment to the United States Constitution, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this complaint.

234.    The policies, practices, and customs of the CCCC, as alleged in the preceding paragraphs, violate Plaintiffs' rights to freely and openly exercise their religious freedom guaranteed under the First Amendment to the United States Constitution.

235.    These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

236.    Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them by failing to take steps to prevent the harm and/or provide a remedy.

237.    Defendants have caused and continue to cause Plaintiffs and the classes they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

238.    Plaintiffs have no adequate remedy at law for these violations.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Sixth Amendment

239.    All of the foregoing paragraphs are incorporated as though fully set forth here.

Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

240.    The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Sixth Amendment of the United States Constitution, which guarantees the right to effective assistance of counsel and the right to confer with one's lawyer. These violations subject Plaintiffs and the classes they represent to a substantial risk of serious harm, and have caused and continue to cause the injuries alleged in this complaint.

241.    These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violation of the constitutional rights of Plaintiffs and the classes they represent.

242.    Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them by failing to take steps to prevent the harm and/or provide a remedy.

243.    Defendants have caused Plaintiffs and the class they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

244.    Plaintiffs have no adequate remedy at law for these violations.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fifth Amendment

245.    All of the foregoing paragraphs are incorporated as though fully set forth here.

246.    The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the classes they represent under the Fifth Amendment of the United States Constitution, which protects against the denial of liberty without due process of law.

55

These violations subject Plaintiffs and the classes they represent to a substantial risk of serious harm, and have caused and continue to cause the injuries alleged in this complaint.

247.    Restrictive housing policies and practices, including but not limited to Red Zone, without due process have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the classes they represent.

248.    The CCCC's grievance system is broken, leaving Detainees/Inmates with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process.

249.    Defendants have been put on notice of these constitutional violations and have unreasonably instituted and/or condoned these violations, and/or been deliberately indifferent to them by failing to take steps to prevent the harm and/or provide a remedy.

250.    Defendants have caused Plaintiffs and the classes they represent tremendous mental and emotional anguish and suffering and are the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the classes they represent as set forth above.

251.    Plaintiffs have no adequate remedy at law for these violations.

### PRAYER FOR RELIEF

Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs and the class and subclasses they represent have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the class and subclasses they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the violations of these rights create a present and significant risk of injury, illness, and death.

56

WHEREFORE, Plaintiffs and the class and subclasses they represent request that the Court grant them the following relief:

a. Declare that this lawsuit be certified under Federal Rule of Procedure 23 as a Class Action on behalf of all present and future inmates of the CCCC;

b. Adjudge and declare that the acts, omissions, and practices of Defendants and their agents, employees, officials, and all persons acting in concert with them, under color of law and otherwise, as described herein, are in violation of the rights of Plaintiffs and the class and subclasses they represent pursuant to the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

c. Preliminarily and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of law, from subjecting Plaintiffs and the class and subclasses they represent to the illegal and unconstitutional conditions, acts, omissions, policies, practices, and customs set forth above, including the following specific relief:

1. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining the Defendants from operating the CCCC in violation of the minimum standards for full service jails in the State of Ohio, including maintaining population at or below the maximum permitted population and from requiring detainee/inmates to sleep on the floor;

2. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining Defendants from operating the CCCC in an unsanitary and unsafe manner, including but not limited to enjoining Defendants from housing detainee/inmates without access to safe and clean drinking water, toilets, hygienic conditions, and providing moldy, spoiled, unsafe food;

57

3. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent enjoining the Defendants from denying detainee/inmates adequate access to necessary medical and mental health care;

4. That injunctive relief and a permanent injunction be granted to the Plaintiffs and the classes they represent by ordering Defendants to allow ready access to confidential attorney visits and free exercise of religion;

5. Appointment of a monitor to create, institute, and oversee a plan to immediately take corrective action to address the constitutional violations and the policies, practices, and customs of the Defendants which proximately cause the constitutional violations set forth above;

a. Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practicable, a plan to eliminate the substantial risk of serious harm suffered by Plaintiffs and the class and subclasses they represent as a result of Defendants' policies, practices, customs, and failures to train and supervise correctional and medical staff, as set forth herein. The plan should include, at a minimum:

1. Population: Policies and procedures for population management so that the number of prisoners is kept at a level that can be safely managed and is not in excess of CCCC facilities' legal capacity;

2. Staffing: Policies and procedures to increase the number of trained correctional and medical staff to ensure the safety and security of the Detainee/Inmate population;

3. Environmental Conditions: Policies, procedures, and training to improve basic sanitary conditions that do not promote the spread or exacerbation of

58

diseases or infections, including but not limited to immediately reducing overcrowding, a deep clean of the facilities, bed bug extermination, and remedying plumbing problems and access to clean drinking water;

4. Classification and Housing: Policies, procedures, and training to classify and house prisoners to ensure their safety and security;

5. Screening: Policies, procedures, and training for thorough screening for medical, dental, and mental health conditions that require treatment, and for communication of medical, dental, and mental health needs to medical, dental, and mental health care providers;

6. Health Care Access: Policies, procedures, and training that provide prisoners with timely access to health care;

7. Health Care Staffing: Policies and procedures to provide prisoners with timely access to sufficient numbers of qualified and competent clinicians who can provide routine, urgent, emergency, and specialty health care, and who do not withhold care for punitive purposes;

8. Emergency Response: Policies, procedures, and training for timely and competent responses to medical and mental health emergencies;

9. Medication and Supplies: Policies, procedures, and training for timely, secure, and accurate prescription and distribution of medications and supplies necessary for medically adequate care;

10. Chronic Care: Policies, procedures, and training for timely access to competent care for chronic conditions;

11. Mental Health Treatment: Policies, procedures, and training for: timely access to necessary treatment by qualified staff for serious mental health

59

needs, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch; access to hospitalization and inpatient care; prohibitions or limitations on the use of seclusion and restraints; disciplinary policies and practices regarding persons with psychiatric disabilities that appropriately consider their disabilities; and training of corrections and health care staff to recognize and treat prisoners' psychiatric and/or psychological disabilities;

12. Quality Assurance: Policies and procedures for a regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

13. Restrictive Housing: Policies and procedures prohibiting confinement of Detainees/Inmates in conditions of social isolation and restrictive movement that put prisoners at substantial risk of serious physical and mental harm;

14. Grievances: Policies, procedures, and training for an effective, accessible, and well-administered grievance process;

b. Order the implementation of meaningful due process rights for inmates who are accused of rule infractions, which includes notification, a hearing by impartial staff, the ability to call witnesses, and the ability to question the accuser;

c. Order the implementation of reasonable system for determining sanctions for inmates found to have committed rule infractions, to be identified in the inmate handbook, setting forth the specific punishment for various institutional offenses, and eliminating unfettered discretion in punishment and removal of privileges;

Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

d. Order Defendants to allow access to religious services and to cease and desist from infringing upon religious freedom;

e. Order Defendants to provide Detainees/Inmates with open, unrestricted, private, contact visits with their attorneys;

f. Order the appointment of an independent Ombudsman to hear Detainee/Inmate complaints at CCCC;

g. Order Defendant to create and honor a Detainee/Inmate Bill of Rights;

h. An award of costs and reasonable attorneys' fees to Plaintiff's counsel in an amount to be determined by the Court;

i. All such other relief to which Plaintiff is entitled and/or this Court deems equitable.

### *TRIAL BY JURY ON ALL CLAIMS FOR RELIEF HEREBY DEMANDED.*

*/s/ Sarah Gelsomino*
Sarah Gelsomino (0084340)
Jacqueline Greene (0092733)
Terry Gilbert (0021948)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, Ohio 44113
T: (216) 241-1430
F: (216) 621-0427
sgelsomino@f-glaw.com
jgreene@f-glaw.com
tgilbert@f-glaw.com

James L. Hardiman (0031043)
CLEVELAND BRANCH NAACP
3615 Superior Avenue
Cleveland, Ohio 44114
T: (216) 431-7811
F: (216) 431-7644
attyjhard@aol.com

J. Philip Calabrese (0072709)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, Ohio 44113
T: (216) 443-9000
F: (216) 443-9011
pcalabrese@porterwright.com

Caroline H. Gentry (0066138)
PORTER WRIGHT MORRIS & ARTHUR LLP
One South Main Street, Suite 1600
Dayton, OH 45402
T: (937) 449-6748
F: (937) 449-682
cgentry@porterwright..com

*Counsel for Plaintiffs*
Dated: December 20, 2018

61



**Ohio** | Department of
Rehabilitation & Correction

**John R. Kasich,** Governor
Gary C. Mohr, Director

03/15/2018

Sheriff Clifford Pinkney
Cuyahoga County Correction Center
1215 West 3rd Street
Cleveland, OH 44113

RE: 2017 Annual Jail Inspection

Dear Sheriff Clifford Pinkney:

In accordance with Section 5120.10 of the Ohio Revised Code and Executive Order 92-03 of the Department of
Rehabilitation and Correction, the Cuyahoga County Correction Center, a full service jail, was inspected on 11/14/2017.
The inspection was restricted to assessing compliance with a group of standards, selected from the Standards for
Jails in Ohio promulgated by the Department of Rehabilitation and Correction. The group of standards being inspected
focused on Reception & Release, Classification, Security, Housing, Sanitation and Environmental Conditions,
Communication, Visitation, Medical and Mental Health Services, Food Service, Recreation and Programming, Inmate
Discipline, Administrative Segregation, Grievance, Staffing, and Staff Training. The inspection consisted of this
Inspector receiving and/or reviewing requested documentation and/or materials, touring selected areas of the jail, and
having discussions with various jail staff.

The total actual general housing capacity for the Cuyahoga County Correction Center is 1765. On the date of the jail
inspection, there were 2281 inmates incarcerated in the Cuyahoga County Correction Center. The Ohio Department of
Rehabilitation and Correction recommended housing capacity for the jail is 1765, which is based upon total available
living space and other requirements. Officials should maintain prisoner counts within the Department's recommended
capacity figure.

The Cuyahoga County Correction Center (Full Service Jail) is in compliance with 108 standards, 53 "Essential", and 55
"Important".

5120:1-8-01 (A)(1); -01 (A)(3); -01 (A)(4); -01 (A)(7); -01 (A)(9); -01 (A)(12); -02 (B)(1); -02 (B)(2); -02 (B)(4); -02 (D);
-03 (A)(1); -03 (A)(3); -03 (A)(4); -03 (A)(5); -03 (A)(6); -03 (A)(7); -03 (B)(2); -03 (B)(4); -03 (B)(5); -03 (B)(6); -03 (B)
(7); -03 (B)(8); -03 (B)(9); -03 (B)(10)(a); -03 (B)(10)(b); -03 (B)(10)(c); -03 (B)(10)(d); -03 (B)(11)(b); -03 (B)(11)(c);
-03 (B)(12); -03 (B)(15); -03 (B)(16); -03 (B)(17); -04 (C); -04 (D); -04 (E); -04 (H); -04 (K); -05 (A); -05 (B); -05 (C);
-05 (E); -05 (G)(1); -05 (G)(2); -05 (H)(3); -05 (I); -05 (J); -05 (K); -05 (L); -05 (M); -05 (N); -05 (O); -05 (P); -05 (Q); -06
(B); -06 (C); -06 (G); -07 (A); -07 (D); -07 (E); -07 (H); -07 (I); -09 (A); -09 (B); -09 (C); -09 (D); -09 (E); -09 (F); -09 (G);
-09 (H); -09 (J); -09 (K); -09 (M); -09 (N); -09 (P); -09 (Q); -09 (R); -09 (U); -09 (V); -09 (W); -09 (X); -10 (A); -10 (B); -10
(C); -10 (D); -10 (E); -10 (F); -10 (G)(1); -10 (G)(2); -11 (B); -11 (E); -12 (B); -12 (C); -12 (F); -12 (G); -12 (H); -15 (B);
-15 (D); -15 (E); -16 (A); -17 (D); -17 (E); -17 (F); -17 (G); -18 (A); -18 (B); -18 (C); -18 (E);

The Cuyahoga County Correction Center did not comply with 6 standards, 0 "Essential", and 6 "Important". This letter
is intended to serve as a basis for developing plans of action for bringing the facility into compliance with the
deficiencies noted during the inspection.

5120:1-8-04 (A) (4) Full service jails shall provide inmates with sufficient space. The jail shall maintain documentation

---

Operation Support Center · 770 W. Broad Street · Columbus, Ohio 43222
www.drc.ohio.gov                                                    EXHIBIT 1

Case: 1:18-cv-02929-SO Doc #: 1-1 Filed: 12/20/18 2 of 3. PageID #: 53

regarding square footage and maximum occupancy figures for all housing and holding areas; and shall comply with the following minimum requirements: Dayspace: (Important) Thirty-five square feet per number of occupants occupying the dayspace at one time. Minimum size of one hundred five square feet.

Comments: The jail has exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of day space for each inmate.

5120:1-8-04 (B) (Important) ) Seating shall be provided in holding areas, holding cells, housing cells, dormitories, dayrooms and eating areas for each inmate.

Comments: The jail has exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of seating for each inmate

5120:1-8-04 (F) (Important) Toilet facilities at a minimum of one operable toilet for every twelve occupants.

Comments: The jail has exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of toilets for this standard.

5120:1-8-04 (G) (Important) Shower facilities at a minimum of one operable shower for every twelve occupants. Water temperatures shall be controlled thermostatically in a range from one hundred five to one hundred twenty degrees Farenheit.

Comments: The jail has exceeded the Bureau Recommended Capacity for their facility and there is not the required amount of showers for this standard.

5120:1-8-04 (J) (Important) Natural light shall be provided in housing units, dorms, cells and/or dayspaces.

Comments: The age and layout of the existing jail facility does not provide natural light for Housing Unit 4 North, not meeting the requirements for this standard.

5120:1-8-11 (A) (Important) Exercise and/or equipment for inmates shall be provided and the jail shall ensure that inmates are offered at least five hours per week.

Comments: The jails current policy, procedures and practices need reinforced to reflect standard and components specified. Additionally, the jail's supporting documentation did not evidence compliance for this standard regarding recreation access for the Inmate Population in Jail 1.

The Cuyahoga County Correction Center is in compliance with 100% of the Essential Standards and at least 90% of the Important Standards meeting the requirements of a "Compliant Jail". It should be noted however; the jail did not comply with 6 of the Important Standards upon which the facility was inspected. This letter is intended to serve as a basis for developing plans of action for bringing the facility back into compliance with the remaining deficiencies noted during the inspection.

The Bureau of Adult Detention encourages the jail to correct the remaining deficiencies noted in the inspection report prior to the next annual jail inspection. Plan of Action forms are enclosed and can be submitted through the Ohio Jail Management System (OHJMS) at www.OHJMS.Intelligrants.com. Feel free to contact the Bureau if you need assistance or clarification in this effort. The Bureau remains available to discuss the aspects of this report and to provide reference materials or assistance as desired.

Sincerely,

Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

_Joel M. Commins_

Joel Commins, State Jail Inspector
Bureau of Adult Detention
615 Superior Ave
Cleveland, Ohio 44113
Phone: (216) 787-4902
Email: joel.commins@odrc.state.oh.us

Electronically Filed 06/12/2019 17:52 /  / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK



QUALITY ASSURANCE REVIEW

Cuyahoga County Correctional Center
Facility Review
October 30 - November 1, 2018

EXHIBIT 2

Electronically Filed 06/12/2019 17:52 /  / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

CUYAHOGA
COUNTY
CORRECTIONAL
CENTER

Oct 30-Nov 1, 2018

Quality Assurance Report

## Table of Contents

Executive Summary..................................................................................................2
Facility Review Team................................................................................................3
USMS Personnel......................................................................................................3
Facility Information...................................................................................................5
Staffing By Functional Areas....................................................................................6
Functional Area Ratings...........................................................................................6
Overall Performance Ratings....................................................................................7
Deficient Areas........................................................................................................8
Capacity.................................................................................................................24
General Overview by Functional Area ................................................................ 25
A - Administration and Management........................................................................25
B - Health Care......................................................................................................28
C - Security and Control.........................................................................................33
D - Food Service....................................................................................................36
G - Services and Programs.....................................................................................45
Detailed Findings by Functional Area................................................................ 48
A - Administration and Management........................................................................48
B - Health Care......................................................................................................49
C - Security and Control.........................................................................................49
D - Food Service....................................................................................................50
E - Restrictive Housing..........................................................................................50
F - Safety and Sanitation.......................................................................................51
G - Services and Programs.....................................................................................51



CUYAHOGA COUNTY CORRECTIONAL CENTER

Oct 30-Nov 1, 2018
EXHIBIT 2

SENSITIVE LIMITED DISTRIBUTION

1

**Executive Summary**

The purpose of this Facility Review is to provide the United States Marshals Service (USMS), Prisoner Operations Division (POD) a comprehensive overview of operations at the Cuyahoga County Correctional Center (CCCC) located in Cleveland, Ohio. The Facility Review uses the Federal Performance-Based Detention Standards (FPBDS) for non-federal detention facilities. The FPBDS are designed to ensure the safe, secure, and humane confinement of federal detainees and provide a document to indicate the facility's level of performance. The overall facility operation received a rating of **"Unsatisfactory/At-Risk"**.

The Facility Review was conducted by a team of contract correctional subject matter experts (SMEs) from the Correctional Management and Communications Group, LLC. CCCC co-houses USMS detainees in the same housing units (USMS detainees are not separated out, identified or defined by any distinguished or unique identifying factor, or housed in USMS only pods or housing units) with other county inmates, therefore the focus of this review is on the conditions of confinement for the entire population and references both USMS detainees and CCCC inmates. During the three-day onsite visit, the team toured and observed operations of all CCCC facilities including the Cuyahoga County Jail I Annex in Bedford and the Cuyahoga County Jail II Annex, in Euclid. The Facility Review included review of all relevant policies, procedures, and other supporting documentation. Facility Review team staff conducted numerous interviews with facility staff, contractors, USMS detainees and Cuyahoga County inmates.

Facility staff and contractors were professional and responsive to the Facility Review team members' requests for information, documentation and access throughout all facilities. Some staff members approached Facility Review team SME's willingly shared information beyond the interview questions while others were guarded in their responses.

Facility Review team members interviewed a sampling (200+) of the detainee/inmate populations to determine their perception of personal treatment, health care, food service, sanitation and overall facility operations. 80% of the detainees/inmates interviewed expressed concern with health care, food service, sanitation, and 100% of the detainees/inmates feared retaliation by or from the Security Response Team (SRT) staff or other Correctional Officer staff members for speaking with Facility Review team members. More than 20 anonymous notes or letters were passed to Facility Review team members directly by detainees/inmates confined to the Restrictive Housing Unit, expressing fear of brutal retaliation and in some cases fear for their life.

Non-compliances with the FPBDS were identified in all functional areas. Overall, Administration and Management, Food Service, Restrictive Housing and Safety and Sanitation were determined to be **"Unsatisfactory/At-Risk"**, Security and Control and Health Care are "Marginal", and Services and Programs is "Satisfactory".

The **"Unsatisfactory/At-Risk"** designation indicates performance of the functional area does not meet most contractual requirements and recovery is not likely in a timely manner. Additionally the performance of the function is so defective or deficient, it actually presents a risk to the safety of staff and detainees; the risk include life and safety concerns as well as inhumane conditions of confinement, which violate safe, secure, humane conditions and/or violate detainee/inmate Constitutional Rights.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER  Oct 30-Nov 1, 2018  Facility Review Report

Attributing to the overall **"Unsatisfactory/At-Risk"** rating is significant "At-Risk" findings and behaviors associated is:

> ➢ An inadequate medical program, unexplained causes of two detainee deaths which occurred while the inmates were in CCCC custody, failure to perform post mortem mortality reviews, and insufficient and unclear answers regarding six recent inmate deaths (which includes the two previous unexplained deaths). There is no documentation available for review in absence of Mortality Reviews to identify life safety issues or to verify or discredit CCCC contributory factors;

> ➢ The intentional and deliberate use of food as a punitive measure; the diet for detainees/inmates in Restrictive Housing Units (RHU) lacks basic daily nutritional requirements, fails to meet daily nutritional caloric intake standards, is not varied and does not meet needs of detainees/inmates housed in the RHU who also present with medical conditions which require dietary variety and consideration;

> ➢ Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone". The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering;

> ➢ Refusal to install shower curtains for detainees/inmates housed in the "Red Zone" RHU, detainees/inmates are afforded not privacy when they are eventually allowed to take a shower; during showering detainees are in full view of any staff, or detainees in the shower area, as well as visible through narrow oblong windows which look directly into the showering area from the common access hallway;

> ➢ The co-locating of juvenile detainees with adult offenders in the RHU; detainees are not sight and sound separated, are not receiving the enhanced developmental nutritional intake requirements and are provided not educational or brain development programming. Juveniles are subjected to the same harsh "Red Zone" RHU conditions as the adult offenders in every fashion from hygiene to recreations and out of cell time;

> ➢ Detainee/inmates assigned to "No Contact Housing" (Special confinement restrictions ordered by the court which include no access to mail, telephones, or general population) are denied general housing privileges to which they are entitled, as they are not confined for disciplinary reasons. Detainee/inmates assigned to "No Contact Housing" confinement are up to 27 hours, are not allowed daily access to showers, and recreation and are subjected to the same "Red Zone" lockdown system as RHU detainee/inmates. Additionally, interviews with detainees/inmates in



CUYAHOGA COUNTY CORRECTIONAL CENTER  Oct 30-Nov 1, 2018 Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

the "No Contact Housing" who are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering;

➢ CCCC is not Prison Rape Elimination Act (PREA) compliant despite undergoing a voluntary pre-PREA AUDIT 2015. The voluntary pre-PREA Audit identified 119 deficiencies or non-compliance findings; further inquiry and review of documentation reveal not one of the identified 119 deficiencies or non-compliance findings since 2015 has been corrected;

➢ CCCC fire emergency drills are not being performed and facility staff could not demonstrate they can safely evacuate detainees/inmates from the facility;

➢ The CCCC is currently operating over the American Correctional Associations rated capacity, as such detainees/inmates must regularly sleep on mattresses on the floor; during the review two pregnant females were found to be sleeping on mattresses on the floor;

➢ Detainee/inmate court meals were not properly refrigerated or stored and were found placed in an unused office area which reeked of dead vermin; and

➢ Detainees/inmates are placed in cells awaiting court which are not equipped with functioning toilets or have access to running water, are stripped of all furnishing to include a place to sit, and were found to house up to 12 detainees/inmates, in an cell who's design capacity is for only up to 2 persons. Additionally, these detainees are left unsupervised and locked in these cells for periods greater than 10 hours.

A closeout briefing was conducted on Thursday, November 1, 2018. Those present included: Theo Anderson, Chief, Detention Standards and Compliance, POD, USMS; Rickye Rice, Assistant Chief, Detention Standards and Compliance, POD, USMS; Heather Bonsell, Chief, MMB, USMS; Laura Gardner, Detention Contract Administrator, Northeast Ohio, USMS; Peter Elliott, US Marshal, Northern District of Ohio, Troy Mizel, Northern District of Ohio, USMS, Anne Murphy, Northern District of Ohio, USMS; Lisa Kaplan, CV, Special Agent, Civil Rights, FBI; Preetham Rao, Special Agent, Federal Bureau of Investigations (FBI); Sicily Woods, Deputy Inspector General, Agency of Inspector General, Cuyahoga County; and members of the Review Team.

**Facility Review Team**

| Facility Name | Name | Title |
|---|---|---|
| Cuyahoga County Correctional Center | Flora Brooks Boyd | Lead Reviewer, Administration and Management and Services and Programs SME |
| | Francisca Terrero-Leibel | Health Care SME |
| | Marcus Baldwin | Security and Control SME: |
| | Bernard Higgins | Restrictive Housing SME: |
| | Rene Garcia | Food Service SME |
| | Ezell Jackson | Safety and Sanitation SME |
| | Jeffery Foster | Lead Reviewer Trainee |



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                                            Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER      Oct 30-Nov 1, 2018    Facility Review Report

### USMS Personnel

| Name | Title |
|---|---|
| Theo Anderson | Chief, Detention Standards and Compliance, POD, USMS |
| Rickye Rice | Assistant Chief, Detention Standards and Compliance, POD, USMS |
| Heather Bonsell | Chief, Medical Management Branch, POD, USMS |
| Laura Gardner | Detention Contract Administrator, POD, (Northeast Ohio) USMS |

### Accompanying Review Personnel

| Name | Title |
|---|---|
| Anne Murphy | (A) Assistant Chief Deputy, Northern District of Ohio, USMS |
| Troy Mizel | Supervising Deputy, Northern District of Ohio, USMS |
| Lisa Kaplan | Federal Bureau of Investigations, Fraud and Economics Unit, Cleveland |
| Preetham Rao | Special Agent, Federal Bureau of Investigations, Cleveland |
| Sicily Woods | Deputy Inspector General, Office of the Inspector General, Cuyahoga County |

### Facility Information

The CCCC is located in downtown Cleveland, Ohio, CCCC is owned by Cuyahoga County and operated by the Cuyahoga County Sheriff's Department. CCCC consists of two high rise buildings (Jail I and Jail II) and two satellite locations (Bedford Heights Comprehensive Re-entry Programming Center and Euclid Jail Annex). The facility houses all levels of security statuses, from maximum security to weekenders.

The current contract agreement (60-10-0049) between the USMS and CCCC allows for housing 15 male USMS detainees. The contract became effective September 30, 2010 and indicates a fixed rate of $81 per day for housing USMS detainees. Sheriff's Deputies provide court transportation for USMS detainees to the federal courthouse which is approximately a half a mile from the facility. The contract requires detainees to be housed in a manner consistent with federal law and the Federal Performance-Based Detention Standards

The facility's rated capacity is 1765 (1455 males and 310 females). On the first day of the Facility Review, there were a total of 2420 inmates (2360) and detainees (60). The average length of stay is 29 days.

Jail I consist of seven floors (3rd-10th) with a total of 45 pods. Jail II has seven floors (2nd, 3rd, 4th, 5th, 7th, 9th and 11th) with a total of 29 pods. Nine pods in Jail II are dedicated to house the Cleveland City inmates. Bedford Heights' total capacity is 83 males and Euclid Jail Annex total capacity is 179 (176 males and 3 females). CCCC's organizational structure includes: a Director of Regional Corrections who reports to the Cuyahoga County Sheriff and oversees administrative and program functional areas for the CCCC and its Annex Jail I and Jail II facilities: a Medical Director who also reports to the Sheriff and manages health care services for the CCCC and its Annex Jail I and Jail II facilities: and a Warden, who is responsible for managing and supervising the Sergeants who oversee the day-to-day operations of the CCCC and its Annex Jail I and Jail II facilities. The total authorized correctional officer custody staff compliment is 677 however, at the time of the Facility Review there are approximately 96 vacancies.

CCCC has no national accreditations. The Department of Justice Prison Rate Elimination Act (PREA) field auditors' training program conducted a PREA audit in 2015 and the Interim report dated January 2016



CUYAHOGA COUNTY CORRECTIONAL CENTER      Oct 30-Nov 1, 2018

Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

identified 119 deficient findings or areas of non-compliance which required corrective actions. The 119 findings require addressing and correcting prior to the CCCC being prepared for a formal PREA Compliance Audit; review of the CCCCs PREA corrective action plan reveal no corrective action has been taken. The facility is unable to provide information regarding the number of non-English-speaking detainees/inmates nor is the number of staff who speak languages other than English available. CCCC does not track the languages staff speak or attempt to determine how the Spanish population is accommodated. The detainee/inmate handbook is only available in English. The facility is not under any court orders or pending litigation.

### Staffing by Functional Areas

| Functional Area | # of Authorized Staff | # of Staff on Board | # of Authorized Subcontract Staff | # of Subcontract Staff |
|---|---|---|---|---|
| A - Administration and Management | | | 0 | 0 |
| B - Health Care | 67 | 55 | 23 | 14 |
| C - Security and Control | 673 | 577 | 0 | 0 |
| D - Food Service | 12 | 11 | 0 | 0 |
| E - Restrictive Housing | 28 | 28 | 0 | 0 |
| F - Safety and Sanitation | 14 | 14 | 0 | 0 |
| G - Services and Programs | 9 | 6 | 0 | 0 |
| Total | 810 | 698 | 23 | 14 |

**Contingency/Emergency Sites: None**

**Functional Area Ratings**

**Exceptional** - The level of performance exceeds the requirements of the FPBDS with exceptional internal controls. Policies and procedures for achieving the program standards are documented and specific to the mission of the facility; the policies and procedures are communicated to the staff; fully implemented; and the desired outcome is achieved. Findings and Deficiencies are non-existent.

**Very Good** - The level of performance exceeds the requirements of the FPBDS. Internal controls limit Findings and Deficiencies. Policies and procedures for achieving the program standards are documented and specific to the mission of the facility, the policies and procedures are communicated to the staff, implemented and the desired outcome is achieved. Findings and or Deficiencies are minimal and do not affect the performance of the facility.

**Satisfactory** - The program is meeting the requirements of the FPBDS. Lapses in internal controls are minimal. Findings and Deficiencies do not affect the performance of the facility.

**Marginal** - The program is unable to meet the requirements of any one of the 6 Functional Areas or one or more of the 47 Standards. Deficiencies are the result of weak internal controls in one or more areas. The facility is meeting the minimal requirements of the performance standards.

**Unsatisfactory** - Operation of the program is impaired to the point that the facility is unable to



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                                      Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

accomplish its mission. The program is unable to meet the requirements of the FPBDS and is unlikely to meet those requirements without immediate corrective action to ensure the safety and security of both staff and detainees.

## Overall Performance Ratings

| Rating | Contract Requirements | Problems | Corrective Actions |
|---|---|---|---|
| Exceptional | Exceeds Many - Gov't Benefit | Few Minor | Highly Effective |
| Very Good | Exceeds Some - Gov't Benefits | Some Minor | Effective |
| Satisfactory | Meets All | Some Minor | Satisfactory |
| Marginal | Does Not Meet Some - Gov't Impact | Serious: Recovery Still Possible | Marginally Effective; Not Fully Implemented |
| Unsatisfactory | Does Not Meet Most - Gov't Impact | Serious: Recovery Not Likely | Ineffective |

**Exceptional** - Performance meets contractual requirements and exceeds many to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective. To justify an Exceptional rating, identify multiple significant events and state how they were of benefit to the Government. A singular benefit, however, could be of such magnitude that it alone constitutes an Exceptional rating. Also, there should have been NO significant weaknesses identified.

**Very Good** - Performance meets contractual requirements and exceeds some to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with some minor problems for which corrective actions taken by the contractor was effective. To justify a Very Good rating, identify a significant event and state how it was a benefit to the Government. There should have been no significant weaknesses identified.

**Satisfactory** - Performance meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory. To justify a Satisfactory rating, there should have been only minor problems, or major problems the contractor recovered from without impact to the contract/order. There should have been NO significant weaknesses identified. A fundamental principle of assigning ratings is that contractors will not be evaluated with a rating lower than Satisfactory solely for not performing beyond the requirements of the contract/order.

**Marginal** - Performance does not meet some contractual requirements. The contractual performance of the element or sub-element being evaluated reflects a serious problem for which the contractor has not yet identified corrective actions. The contractor's proposed actions appear only marginally effective or were not fully implemented. To justify Marginal performance, identify a significant event in each category that the contractor had trouble overcoming and state how it impacted the Government. A Marginal rating should be supported by referencing the management tool that notified the contractor of the contractual deficiency (e.g., management, quality, safety, or environmental deficiency report or letter).

**Unsatisfactory** - Performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance of the element or sub-element contains a serious



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

Case: 1:19-cv-01584  Doc #: 1-10  Filed: 07/11/19  101 of 191.  PageID #: 322
Case: 1:18-cv-02929-SO  Doc #: 1-2  Filed: 12/20/18  9 of 52.  PageID #: 73
CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018     Facility Review Report

problem(s) for which the contractor's corrective actions appear or were ineffective.  To justify an unsatisfactory rating, identify multiple significant events in each category that the contractor had trouble overcoming and state how it impacted the Government. A singular problem, however, could be of such serious magnitude that it alone constitutes an unsatisfactory rating. An Unsatisfactory rating should be supported by referencing the management tools used to notify the contractor of the contractual deficiencies (e.g., management, quality, safety, or environmental deficiency reports, or letters). Compliance with FBPD Standards - By Functional Area

| Functional Area | Exceptional | Very Good | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| A - Administration and Management | | | 3 | 5 | 4 |
| B - Health Care | | | 2 | 4 | |
| C - Security and Control | | | 4 | 2 | 4 |
| D - Food Service | | | 1 | 1 | 3 |
| E - Restrictive Housing | | | 1 | | 7 |
| F - Safety and Sanitation | | | 3 | | 2 |
| G - Services and Programs | | | 7 | | 2 |
| J - PREA | | | | | |
| Total | 0 | 0 | 21 | 12 | 22 |

**Deficient Areas.**

**Administration and Management**

**(A.1.1)** The facility director ensures that written policies and procedures describe all facets of facility operation, maintenance, and administration.4- ALDF-7D-06

**(A.1.3)** Detainees can obtain copies of facility policies and procedures unless security concerns justly limit access. **4-ALDF-7D-06**

**(A.1.4)** Policies and procedures are reviewed and updated on an annual basis. **4-ALDF-7D-06**

**(A.2.1)** An internal quality control plan requires an annual review of the facility operations to ensure compliance with facility policies and procedures. Corrective measures are identified and completed. **4-ALDF-7D-09**

**(A.2.2)** At a minimum, the internal quality control plan addresses the following areas:
**(A.2.2.a)** Detainee Health Care
**(A.2.2.b)** Security and Control
**(A.2.2.c)** Safety and Sanitation
**(A.2.2.d)** Food Service
**(A.2.2.e)** Detainee Grievance Program
**(A.2.2.f)** Staff Training/Professional Certifications



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

**(A.2.3)** The review of the detainee grievance program not only ensures the viability of the grievance program but identifies grievance trends pertaining to facility functions and staff.

**(A.2.4)** Documentation of the previous quality control review and the corrective action measures are kept on file.

**(A.2.5)** The facility administrator or assistant facility administrator, and designated department heads visit the facility's living and activity areas at least weekly to encourage information contact with staff and detainees and to encourage informal contact with staff and detainees and to informally observe living and working conditions. **4-ALDF-2A-06**

**(A.3.1)** The facility maintains custody records on all detainees committed or assigned to the facility

**(A.3.2)** Each detainee custody record will include the following:
**(A.3.2.a)** Intake/booking information
**(A.3.2.b)** Cash and property receipts
**(A.3.2.c)** Reports of disciplinary actions, grievances, incidents, or crimes(s) committed while in custody
**(A.3.2.d)** Frequency and cumulative length of restrictive housing placements **DOJ-Restrictive Housing Report**
**(A.3.2.e)** Records of program participation
**(A.3.2.f)** Work assignments
**(A.3.2.g)** Classification records

**(A.3.3)** The contents of detainee records are identified and separated according to a format approved by the facility director. **4-ALDF 7D-20**

**(A.4.1)** The admission process for newly admitted detainees includes but is not limited to: **4-ALDF 2A-21**
**(A.4.1.c)** Medical, dental, and mental health screenings

**(A.4.5)** Prior to being placed in the general population, each detainee is provided with an orientation to the facility, which includes at a minimum
**(4-ALDF-2A-27; 4-ALDF-4D-22):**
**(A.4.5.c)** Explanation of transportation options for visitors
**(A.4.5.d)** Explanation of grievance procedures
**(A.4.5.i)** The handbook is translated into those languages spoken by significant numbers of detainees

**(A.4.7)** Detainees verify, by signature, the receipt of their initial orientation and of the detainee handbook and written orientation materials. Signed acknowledgement of the handbook is maintained in the detainee's file.
**4-ALDF-2A-28**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

**(A.4.8)** If a detainee cannot read orientation materials then they are read to the detainee by a staff member or are provided through the use of an audio or video tape. For detainees who do not speak English, interpretive services are provided. **4-ALDF-2A-28**

**(A.5.2)** Space is provided for storing the personal property of detainee's safety and securely. **4-ALDF 2A-24**

**(A.6.3)** Absent a compelling reason, detainees are not released directly from restrictive housing to the community. **DOJ-Restrictive Housing Report**

**(A.7.3)** Program and service areas are accessible to detainees with disabilities housed at the facility. **4-ALDF-6B-04**

**(A.8.1)** There is no discrimination regarding administrative decisions or program access based on a detainee's race, religion, national origin, gender, sexual orientation, or disability. **4-ALDF-6B-02**

**(A.9.1)** A comprehensive staffing analysis is conducted annually. Essential posts and positions, as identified in the staffing plan, are consistently filled with qualified personnel. **4-ALDF 2A-14**

**(A.9.3)** Background investigations include:
**(A.9.3.c)** Credit history

**(A.9.4)** A pre-employment physical examination is conducted for all potential Security personnel. **4-ALDF-7B-04**

**(A.9.6)** The facility conducts re-investigations of employees, contractors, and volunteers.

**(A.9.7)** Compliance with restrictive housing policies is reflected in the employee- evaluations of staff assigned to restrictive housing units. **DOJ-Restrictive Housing Report**

**(A.10.3)** All new professional and support employees, including contractors, who have regular or daily detainee contact receive training during their first year of employment. Forty hours are completed prior to being independently assigned to a particular job. An additional 40 hours of training is provided each subsequent year of employment. At a minimum, this training covers the following areas:
**(A.10.3.a)** Security procedures and regulations
**(A.10.3.b)** Supervision of detainees
**(A.10.3.c)** Signs of suicide risk
**(A.10.3.d)** Suicide precautions
**(A.10.3.e)** Use-of-force regulations and tactics
**(A.10.3.f)** Report writing
**(A.10.3.g)** Detainee rules and regulations
**(A.10.3.h)** Key control



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

**(A.10.3.i)** Rights and responsibilities of detainees

**(A.10.3.j)** Safety procedures

**(A.10.3.l)** Social/cultural lifestyles of the detainee population

**(A.10.3.m)** Cultural diversity

**(A.10.3.n)** Communication skills

**(A.10.3.p)** Counseling techniques

**(A.10.5)** All new correctional officers receive 160 hours of training during their first year of employment. At least 40 of these hours are completed prior to being independently assigned to any post. At a minimum, this training covers the following areas **(4-ALDF-7B-10):**

**(A.10.5.o)** Correctional implications of young adult (age 18-24) brain development and associated de-escalation tactics. **DOJ- Restrictive Housing Report**

**(A.10.6)** Written policy, procedure, and practice provide that all correctional officers receive at least 40 hours of annual training. This training shall include at a minimum the following areas **(4-ALDF-7B-10-1):**

**(A.10.6.a)** Standards of conduct/ethics

**(A.10.6.b)** Security/safety/fire/medical/emergency procedures

**(A.10.6.c)** Supervision of offenders including training on sexual abuse and assault

**(A.10.6.d)** Use of force

**(A.10.7)** Facility management and supervisory staff receive at least 40 hours of management and supervision training during their first year and at least 24 hours of management training each year thereafter. **4-ALDF-7B-11**

**(A.11.1)** There is a plan that specifies the procedures to be followed in situations that threaten facility security. Such situations include but are not limited to:

**(A.11.1.c)** Disturbances

**(A.11.2)** The facility has written agreements securing the provision of emergency assistance as identified by the emergency plans.

**(A.11.3)** A plan provides for continuing operations in the event of a staff work stoppage or other job action. Copies of this plan are available to appropriate supervisory personnel. **4-ALDF-1C-06**

**(A.12.1)** The facility director ensures the immediate notification to the agency of jurisdiction of serious incidents including, but not limited to:

**(A.12.1.a)** Deaths;

**(A.12.1.b)** Suicide attempts;

**(A.12.1.c)** Hunger Strikes;

**(A.12.1.d)** Emergency medical trips;

**(A.12.1.e)** Escapes;

**(A.12.1.f)** Use of Force;



SENSITIVE LIMITED DISTRIBUTION

(A.12.1.g) Full or partial facility lockdowns;

(A.12.1.h) Incidents impacting facility operations (Riots, Disturbances, Food Strikes, Fires, Natural Disasters);

(A.12.1.i) Assaults on staff or detainees requiring medical attention;

(A.12.1.j) Detainee transportation incidents;

(A.12.1.k) Incidents attracting unusual interest or publicity.

**Health Care**

(B.1.2) The responsibilities of the health authority include: **4-D-ALDF-4D-01**
(B.1.2b) Developing a facility's operational health policy and procedures.
(B.1.2e) Developing a quality management program

(B.1.5) Health care services are provided by qualified healthcare personnel whose duties and responsibilities are governed by job descriptions that include qualifications and specific duties and responsibilities. **4-ALDF-4D-03**

(B.1.7) All professional staff comply with applicable state and federal licensure, certifications, or registration requirements. Verification of current credentials are on file in the facility.
**4D-ALDF-4D-05**

(B.1.13) An automatic defibrillator is available for use at the facility. **4-ALDF-4D-09**

(B.1.14) Correctional and health care personnel are trained to respond to health-related situations within a four-minute response time. The training program is conducted on an annual basis and is established by the responsible heath authority in cooperation with the facility or program administrator and includes instruction on the following: **4-ALDF-4D-08**
(B.1.14a) Recognition of signs and symptoms and knowledge of action that is required in potential emergency situations.
(B.1.14b) Administration of basic first aid.
(B.1.14c) Certification in CPR.
(B.1.14d) Method of obtaining assistance.
(B.1.14e) Signs and symptoms of mental illness, violent behavior, and acute chemical intoxication and withdrawal.
(B.1.14f) Procedures for patient transfers to appropriate medical facilities or health care providers

(B.1.15) Individual health emergency (man-down) drill are conducted once a year on each shift where health staff are assigned. Each drill is evaluated. **NCCHC J-A-07**

(B.2.5) Medical screenings result in one of the following dispositions: Cleared for general population; Cleared for general population with prompt referral to appropriate health care service; or Referral to appropriate health care service for emergency treatment. **4-ALD-4C-22**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

(B.3.1) A comprehensive health appraisal for each detainee is completed health care professional within 14-days after arrival at the facility. If there is documented evidence of a health appraisal within the previous 90-days, a new health appraisal is not required except as determined by the designation health authority. **4-ALDF-4C-24**

(B.3.2) Health appraisals include the following: **4-ALDF-4C-24**
(B.3.2h) Development and implementation of treatment plan including recommendations concerning housing, job assignment, and program participation, when appropriate.

(B.3.6) An oral screening by dentist or qualified health care professional trained by a dentist is performed within 14-days of admission. **4-ALDF-4C-20**

(B.4.1) All detainees are informed about how to access health services during the intake/admission process in a manner understood by the detainee to include translation into languages spoken by a significant number of detainees, or verbally communicated to the detainee if literacy is an issue. **NCCHC 4C-01**

(B.4.7) Detainees who require health care beyond the capacity of the facility as determined by the responsible physician are transferred under appropriate security to a facility where such care is available. (All non-emergency outside are of USMS detainees shall require pre-authorization of the USMS to ensure consistency with the USMS detainee Heath Care Standards.) **NCCHC 4C-05**

(B.5.2) Patients with chronic diseases are identified and enrolled in a chronic disease program to decrease the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function. Chronic diseases include, but are not limited to: asthma, diabetes, high blood cholesterol, HIV, hypertension, seizure disorder, tuberculosis, and major mental illnesses. **NCCHC J-G-01**

(B.5.4) The health authority maintains a list of chronic care patients. **NCCHC J-G-01**

(B.5.5) A proactive program exists that provides care for special needs patients who require medical supervision or multidisciplinary care. Special needs patients include, but are not limited to developmentally disabled individuals, frail/elderly, physical impairments which impair mobility, and patients with serious mental health needs. **NCCHC J-G-02**

(B.5.6) The health authority maintains a list of special needs patients. **NCCHC J-G-02**

(B.5.13) Management of bio-hazardous waste and decontamination of medical and dental equipment complies with applicable local, state, and federal regulations. **4-ALDF-4C-18 (Mandatory)**



Electronically Filed 06/12/2019 17:52 /  / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

CUYAHOGA COUNTY CORRECTIONAL CENTER     Oct 30-Nov 1, 2018     Facility Review Report

**(B.5.17)** Management of pharmaceuticals includes: **4-ALDF-4C-38; NCCHC J-D-01; NCCHC J-D-02**
**(B.5.17d)** Secure storage and perpetual inventory of all controlled substances, syringes, and needles.
**(B.5.17e)** Administration of medication is by persons properly trained and under the supervision of the health authority and facility administrator or designee.
**(B.5.17f)** Providing a 7-day supply of prescribed medication to detainees transferring/releasing from the facility.

**(B.5.21)** Dental care includes the following: **4-ALDF-4C-20; NCCHC J-E-06**
**(B.5.21e)** Detainees in USMS custody for more than 12 months receive an oral examination

**(B.6.1)** Detainee Suicides
**(B.6.1h)** Suicide review debriefings include administration, health services, and security representatives.

**(B.6.5)** Detainee Death
**(B.6.5a)** As part of an overall protocol that describes the actions to be taken in the event of a detainee's death, the facility will immediately notify the agency of jurisdiction. **4-ALDF-4D-23**
**(B.6.5b)** All deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study.  This process will ensure: **NCCHC J-A-10**
**(B.6.5b.1)** All deaths are reviewed within 30 days
**(B.6.5b.2)** A death review consists:
**(B.6.5b.2.1)** An administrative review
**(B.6.5b.2.2)** A clinical mortality review
**(B.6.5b.2.3)** A psychological autopsy if death is by suicide
**(B.6.5b.3)** Treating staff are informed of the clinical mortality review and administrative review findings.

**(B.6.6)** Restrictive Housing
**(B.6.6b)** If a detainee with serious mental illness is paced in restrictive housing: DOJ-Restrictive Housing Report
**(B.6.6b.2)** The detainee receives intensive, clinically appropriate mental health treatment for the entirety of the detainee's placement in restrictive housing;
**(B.6.6b.3)** At least once per week, a qualified mental health practitioner, assigned to supervise mental health treatment in the restrictive housing unit, conducts a face-to-face clinical contact with the detainee, to monitor the detainee's mental health status and identify sign of deterioration.

**Security and Control**

**(C.1.1)** Space is provided for a 24-hour secure control center for monitoring and coordinating the facility's security, life safety, and communications systems. 4-ALDF-2A-01



CUYAHOGA COUNTY CORRECTIONAL CENTER     Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

Case: 1:19-cv-01584  Doc #: 1-10  Filed: 07/11/19  108 of 191.  PageID #: 329

Case: 1:18-cv-02929-SO  Doc #: 1-2  Filed: 12/20/18  16 of 52.  PageID #: 80
CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

**(C.1.9)** Correctional supervisors review permanent logs on each shift to provide responsible department heads/shift supervisors with relevant information. These reviews are documented. 4-ALDF-2A-11

**(C.1.10)** Supervisory staff conduct a daily patrol, including holidays and weekends, of all areas occupied by detainees. Unoccupied areas are to be inspected at least weekly. Patrols and inspections are documented. 4-ALDF-2A-12

**(C.1.11)** A qualified person conducts at least weekly inspections of all security devices, identifying those needing repair or maintenance. Results of the weekly security inspections are reported in writing. 4-ALDF-2A-13

**(C.4.8)** The agency of jurisdiction is immediately notified of any Use of Force Incident or Non-Routine Application of Restraints.

**(C.4.9)** All Use of Force incidents are reviewed by the facility director to ensure compliance with the facility's Use of Force policy.

**(C.6.1)** The use of keys is controlled and inventoried. 4-ALDF-2D-01

**(C.6.2d)** Emergency key usage is documented.

**(C.6.4)** In the event detainee workers are assigned to work details involving the use of tools, facility policy identifies what tools may be used by detainees and identifies the level of required staff supervision.

**(C.6.5)** Medical and dental instruments, equipment, and supplies (syringes, needles, and other sharps) are controlled and inventoried. 4-ALDF-2D-03

**(C.7.1)** There are current written orders for every correctional officer post, which clearly outline duties, responsibilities, and expectations of that post. 4-ALDF-2A-04

**(C.7.3)** Officers assigned to those posts acknowledge in writing that they have read and understand the orders and record the date. 4-ALDF-2A-04

**(C.7.4)** The facility administrator or designee reviews post orders annually and updates them as needed. 4-ALDF-2A-04

**(C.8.2)** Disciplinary Segregation, as a penalty for committing a prohibited act, is reserved for offenses involving violence, escape or posting a threat to institutional safety by encouraging others to engage in such conduct. DOJ-Restrictive Housing Report

**(C.8.17)** Disciplinary decisions are based solely on information obtained in the hearing process, including staff reports, the statements of the inmate charged, and the evidence derived from witnesses and documents. 4-ALDF-6C-14

**(C.8.20)** Disciplinary sentences for offenses resulting from the same incident are served concurrently. DOJ-Restrictive Housing Report



Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

**Food Service**

**(D.1.2)** The Food Service Administrator or designee conducts daily inspections of all food service areas, including dining and food preparation areas and equipment. **4-ALDF-4A-15**

**(D.2.1)** Volunteer, detainee food service workers receive a pre-assignment medical examination and periodic reexamination to ensure freedom from diarrhea, skin infections, and other illnesses transmissible by food or utensils. **4-ALDF-4A-13**

**(D.2.5)** Food service employees/workers are required to wear clean outer clothing to prevent contamination of food, equipment, utensils, linens, and single-service and single-use articles. **2013 U.S. Food Code: 2-304.11**

**(D.2.6)** Food service employees/workers are required to wear hair restraints such as hats, hair coverings or nets, beard restraints, and clothing to keep their hair from contacting exposed food; clean equipment, utensils and linens. **2013 U.S. Food Code: 2-402.11**

**(D.3.1)** Refrigerated, potentially hazardous food deliveries are checked on delivery to ensure compliance with Food Code. **2013 U.S. Food Code: 3-202.11, 3-202.15**

**(D.3.2)** Food is stored in a manner compliant with Food Code. **2013 U.S. Food Code: 3-3**

**(D.3.3)** Food is protected from contamination from equipment, utensils, and linens in a manner compliant with Food Code. **2013 U.S. Food Code: 3-305.11, 3-305.12**

**(D.4.2)** Ware washing (dishwashing) machines are operating within designed specifications and/or in a manner compliant with Food Code. **2013 U.S. Food Code: 4-204.113, 4-204-114, 4-204.115, 4-204.117, 4-204.118, 4-204.119, 4-501.110, 4-501.112, 4-501.113, 4-501-114, 4-501.116**

**(D.4.9)** Food service equipment shall be cleaned, maintained in good repair and in a manner compliant with Food Code. **2013 Food Code: 4-501.11, 4-501.12, 4-501.14**

**(D.4.13)** Equipment, Food-Contact Surfaces, and Utensils shall be clean to sight and touch. **2013 U.S. Food Code: 4-601.11a**

**(D.4.14)** The food-contact surfaces of cooking equipment and pans shall be kept free of encrusted grease deposits and other soil accumulations. **2013 U.S. Food Code: 4.601.11b**

**(D.4.15)** Nonfood-contact surfaces of equipment shall be kept free of an accumulation of dust, dirt, food residue, and other debris. **2013 U.S. Food Code: 4.601.11c**

**(D.4.16)** Equipment, food-contact surfaces, utensils, cooking equipment, baking equipment, non-food contact surfaces, and linens, shall be cleaned in frequency and method compliant with Food Code. **2013 U.S. Food Code: 4-602.11, 4-602.12, 4-602.13, 4-603.11, 4-603.12, 4-603.13, 4-603.14, 4-**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

603.15, 4-603.16, 4-603.17, 4-701.10, 4-702.11, 4-703.11, 4-801.11, 4-802.11, 4-803.11, 4-803.12, 4-803.13

**(D.4.19)** Food Service equipment, utensils, linens, and single service and single use articles are stored in a manner compliant with Food Code. **2013 U.S. Food Code: 4-903.11, 4-903.12, 4-904.11, 4-904.12, 4-904.13**

**(D.5.1)** Detainee meal menus and religious diets are reviewed annually by a qualified nutritionist or dietician to ensure that they meet the nationally recommended dietary allowances for basic nutrition for appropriate age groups. **4-ALDF-4A-07**

**(D.5.4)** Menu evaluations are conducted at least quarterly by food service supervisory staff to verify adherence to the established basic daily servings. **4-ALDF-4A-07**

**(D.5.6)** Three meals, including at least two hot meals, are provided at regular times during each 24-hour period, with no more than 14-hours between the evening meal and breakfast. Variations may be allowed based on weekend and holiday food service demands provided basic nutritional goals are met. **4-ALDF-4A-18**

**(D.5.7)** Therapeutic diets are provided as prescribed by appropriate clinicians. **4-ALDF-4A-09**

**(D.5.9)** Special diets are provided for detainees whose religious beliefs require the adherence to religious dietary laws when approved by the facility chaplain. **4-ALDF-4A-10**

**Restrictive Housing**

**(E.1.1)** Frequency and cumulative length of restrictive housing placement. **DOJ-Restrictive Housing Report**

**(E.2.1)** Absent a compelling reason, detainees are not released directly from restrictive housing to the community. **DOJ-Restrictive Housing Report**

**(E.3.1)** Compliance with restrictive housing policies is reflected in the employee-evaluations of staff assigned to restrictive housing units. **DOJ-Restrictive Housing Report**

**(E.4.1)** Correctional implications of young adult (age 18-24) brain development and associated de-escalation tactics. **DOJ-Restrictive Housing Report**

**(E.5.2)** If a detainee with serious mental illness is placed in restrictive housing: **DOJ-Restrictive Housing Report**
**(E.5.2b)** The detainee receives intensive, clinically appropriate mental health treatment for the entirety of the detainee's placement in restrictive housing.
**(E.5.2c)** At least once per week, a qualified mental health practitioner, assigned to supervise mental health treatment in the restrictive housing unit, conducts face-to-face clinical contact with the detainee, to monitor signs of deterioration.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

**(E.6.1)** Disciplinary Segregation, as a penalty for committing a prohibited act, is reserved for offenses involving violence, escape, or posing a threat to institutional safety by encouraging others to engage in such conduct. **DOJ-Restrictive Housing Report**

**(E.6.7)** Disciplinary sentences for offenses resulting from the same incident are served concurrently. **DOJ-Restrictive Housing Report**

**(E.7.2)** Policy identifies the conditions in which a detainee may be placed in restrictive housing in response to an alleged disciplinary violation. Such placement are limited to an investigation into those offenses for disciplinary segregation is an approved sanction. (Offenses involving violence, escape, or a threat to institutional safety by encouraging others to engage in such misconduct.) **DOJ-Restrictive Housing Report**

**(E.7.3)** Policy prohibits the placement of juveniles in restrictive housing. **DOJ-Restrictive Housing Report**

**(E.7.5)** Detainees are not placed in restrictive housing unless correctional officials conclude, based on evidence, that no other form of housing will ensure the detainee's safety and the safety of staff, other detainees and the public. **DOJ-Restrictive Housing Report**

**(E.7.9)** Detainees with serious mental illness are not placed in restrictive housing, unless:
**DOJ-Restrictive Housing Report**

**(E.7.9b)** In disciplinary circumstances, the detainee's lack of responsibility due to mental illness or mitigating factors related to the mental illness should also preclude the detainee's placement in restrictive housing.

**(E.7.10)** If the detainee with serious mental illness is placed in restrictive housing:
**DOJ-Restrictive Housing Report**

**(E.7.10c)** The detainees receive enhanced opportunities for in-cell and out-of- cell therapeutic activities and additional unstructured out-of-cell time, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, other detainees and the public.

**(E.7.11)** Unless medical attention is needed more frequently, all detainees in restrictive housing receives a daily visit from a qualified health care provider. The presence of a health care provider in restrictive housing is announced and recorded.

**(E.7.13)** After 30 days in restrictive housing, and every 30 days thereafter, all detainees in restrictive housing receives a face-to-face psychological review by mental health staff. **DOJ-Restrictive Housing Report**

**(E.7.14)** A detainee's initial and ongoing placement in restrictive housing is reviewed every seven days by a multi-disciplinary staff committee, which includes facility leadership and medical and mental health professional. **DOJ-Restrictive Housing Report**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

**(E.7.16)** For every detainee in restrictive housing correctional staff develop a clear plan for returning the detainee to less restrictive conditions as promptly as possible. This plan is shared with the detainee, unless doing so would jeopardize the safety of the detainee, staff, other detainees, or the public.
**DOJ-Restrictive Housing Report**

**(E.7.17)** Detainees placed in restrictive housing for preventative purposes are provided an opportunity to participate in a step-down program to allow them to progress to less restrictive housing.
**DOJ-Restrictive Housing Report**

**(E.7.20)** Restrictive housing units provide living conditions that approximate those of the general detainee population. All exceptions are clearly documented. **4-ALDF-2A-51**

**(E.7.23)** Detainees in restrictive housing receive daily visits from the facility administrator or designee, and weekly visits from members of the program staff.

**(E.7.24)** Staff assigned, on a regular basis, to work directly with detainees in restrictive housing are selected based on criteria that includes:

**(E.7.24c)** Suitability for the population
**(E.7.24d)** Specialized training which includes: (1) a review of restrictive housing policy and procedures, and (2) identifying and reporting signs of mental health decomposition of detainees in restrictive housing. **DOJ-Restrictive Housing Report**

**(E7.26)** Staff operating restrictive housing units maintain a permanent log that contains at a minimum the following for each detainee admitted to restrictive housing:

**(E.7.26f):** Tentative/actual transition date

**(E.7.29)** Written policy, procedure, and practice that all detainees in restrictive housing are provided suitable clothing, and access to basic personal items for use in their cell unless there is imminent danger that a detainee or any other detainee(s) will destroy an item or induce self-injury. **4-ALDF-2A-56-1**

**(E.7.30)** Detainees in restrictive housing unit have the opportunity to shave and shower at least three times per week. Detainees in restrictive housing units receive and exchange clothing, bedding, and linen on the same basis as detainees in general population, exceptions are permitted only when determined to be necessary. Any exception is recorded in the unit log and justified in writing. **4ALDF-2A-58**

**(E.7.31)** When a detainee in restrictive housing is deprived of any usual authorized item or activity, a report of the action is made and forwarded to the facility administrator or designee. **4-ALDF-2A-58**

**(E.7.32)** If a detainee uses food or food service equipment in a manner that hazardous to self, staff, or other detainees, alternative meal service may be provided. Alternative meal service is on an individual basis, is based on health or safety considerations only, meets basic nutritional requirements, and occurs with the



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

written approval of the facility administrator or designee and responsible health authority. The substitution does not exceed seven days. **4-ALDF-2A-59**

**(E.7.33)** Detainees in restrictive housing units can write and receive letters on the same basis as detainees in general population. **4-ALDF-2A-60**

**(E.7.34)** Detainees in restrictive housing units have opportunities for visitation unless there are substantial reasons for withholding such privileges. All denials for visitation are documented. **4-ALDF-2A-61**

**(E.7.36)** Detainees in restrictive housing units have access to reading materials. **4-ALDF-2A-63**

**(E.7.37)** Detainees in restrictive housing units are offered a minimum of one hour of exercise five days a week outside their cells, unless security or safety considerations dictate otherwise. **4-ALDF-2A-64**

**(E.7.38)** In addition to the minimum of recreation, the multi-disciplinary committee identifies ways to increase out-of-cell opportunities for recreation, education, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other detainees. **DOJ-Restrictive Housing Report**

**(E.7.40)** Detainees in restrictive housing have access to programs and services that include, but are not limited to the following:

**(E.7.40a)** Educational services
**(E.7.40b)** Commissary services
**(E.7.40c)** Library services
**(E.7.40e)** Religious guidance
**(E.7.40g)** Telephone access

**(E.7.41)** Data is available about several aspects of restrictive housing units. This data includes:
**DOJ-Restrictive Housing Report**

**(E.7.41a)** Total number of each type of restrictive housing placement
**(E.7.41b)** Restrictive housing recidivism rates
**(E.7.41c)** Average length of restrictive housing placement
**(E.7.41d)** Demographic information of detainees placed in restrictive housing to include: race, national origin, religion, gender identity, sexual orientation, disability, and age.

### Safety and Sanitation

**(F.1.1)** The facility conforms to all applicable federal, state, and/or local fire safety codes; in addition to those set forth by the National Fire Protection Association (NFPA), and the Occupational Safety and Health Administration (OSHA).

**(F.1.2)** The facility's fire prevention regulations and practices ensure the safety of staff, detainees, and visitors. These include, but not limited to: 4-ALDF-1C-08
**(F.1.2a)** An adequate fire protection service;



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

**(F.1.2b)** Availability of fire hoses or extinguishers at appropriate locations throughout the facility.

**(F.1.5)** The facility fire safety inspection includes: **4-ALDF-1C-09**
**(F.1.5a)** A weekly fire and safety inspection of the facility by a qualified departmental staff member;
**(F.1.5b)** A comprehensive and through monthly inspection of the facility by a qualified fire and safety officer for compliance with safety and fire prevention standards.
**(F.1.5c)** An annual inspection by local or state fire officials.

**(F.1.6)** Fire safety equipment is tested at least quarterly. **4-ALDF-1C-09**

**(F.1.7)** Facility furnishings meet fire safety performance requirements. **4-ALDF-1C-10**

**(F.1.8)** An evacuation plan is used in the event of a fire or major emergency. The plan is approved by an independent outside inspector trained in the application of national fire safety codes and is reviewed annually, updated if necessary, and reissued to the local fire jurisdiction. The plan includes the following: **4-ALDF-1C-02**
**(F.1.8a)** The evacuation plan does not identify the location of building/room floor plan.
**(F.1.8b)** The evacuation plan does not identify use of exit signs and directional arrows for flow of traffic.
**(F.1.8c)** The evacuation plan does not identify location of publicly posted plan.

**(F.1.10)** The facility has exits that are properly positioned, are clear from obstruction, and are distinctly and permanently marked to ensure the timely evacuations of detainees and staff in the event of fire or other emergency. **4-ALDF-1C-04**

**(F.1.11)** Fire drills are conducted (**NFPA Life Safety Code 101 Section 4.7**):

**(F.1.11a)** Fire drills conducted monthly or with sufficient frequency that observed fire drills demonstrate fire drill procedures are a matter of routine.
**(F.1.11b)** Fire drill locations and times are varied and unexpected.
**(F.1.11c)** Fire drills are documented and evaluated.

**(F.1.13)** The use and storage of flammable, toxic, and caustic chemicals include:
**(F.1.13a)** Controlled access
**(F.1.13b)** A current inventory
**(F.1.13c)** Material Data Safety Sheets
**(F.1.13d)** Personal Protective Equipment
**(F.1.13e)** Staff and detainee safety training

**(F.2.1)** The facility is kept clean and in good repair. A housekeeping and maintenance plan address all facility areas and provides for daily housekeeping and regular maintenance by assigning specific duties and responsibilities to staff and detainees. **4-ALDF-1A-04**

**(F.2.2)** The facility complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any past deficiencies noted in annual inspections have been corrected. The following inspections are implemented: **4-ALDF-1A-01**



CUYAHOGA COUNTY CORRECTIONAL CENTER      Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

**(F.2.2a)** Weekly sanitation inspection of all facility areas by a qualified department staff member.
**(F.2.2b)** Comprehensive and thorough monthly inspection by a safety/sanitation specialist.

**(F.2.4)** Vermin and pests are controlled through monthly inspections and treatment by a qualified pest control technician. **4-ALDF-4D-04**

**(F.2.7)** The facility's potable water source and supply, whether owned and operated by the public water department or the facility, is certified at least annually by an independent, outside source to be in compliance with jurisdictional laws and regulations. **4-ALDF-1A-07**

**(F.2.8)** A program exists to monitor environmental conditions of the facility. This program ensures:

**(F.2.8b)** A ventilation system supplies at least 15 cubic ft. per minutes of circulated air per occupant with a minimum of five cubic ft. per minute of outside air. Toilet rooms, and cells with toilets, have no less than four air changes. Air quantities are documented by a qualified technician not less than once every three years. **4-ALDF-1A-19**
**(F.2.8c)** Noise levels in detainee housing do not exceed 70 dBA (A scale) in daytime and 45 dBA (A scale) at night. Measurements are documented by a qualified, independent source and checked not less than every three years. **4-ALDF-1A-18**

**(F.2.10)** The number of detainees does not exceed the facility's rated bed capacity. **4-ALDF-1A-05**

**(F.2.11)** Detainee sleeping surfaces and mattresses are 12 inches off the floor.

**(F.2.12)** Detainees are provided a place to store clothes and personal belongings.

**(F.3.2)** Detainees are issued clean well-maintained clothing items in a sufficient quantity of each item, or provided an opportunity to exchange or have laundered, each item on a weekly equivalent basis:

**(F.3.2a)** Detainees are issued clean well-maintained clothing in a sufficient quantity of each item, or provided an opportunity to exchange, or have laundered, each item on a weekly equivalent basis: Two outer garments (two shirts and pants, or two jumpsuits).
**(F.3.2b)** Seven pairs of underwear.
**(F.3.2c)** Seven pairs of socks.

**(F.3.6)** Detainees are issued one mattress, not to include a mattress with integrated pillow.

**4-ALDF-4B-02**

**(F.4.1)** Detainees have access to toilets and washbasins with temperature controlled hot and cold running water 24 hours per day and are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas. **4-ALDF-4B-08**

**(F.4.2)** Detainees have access to operable showers with temperature controlled hot and cold running water. **4-ALDF-4B-09**

**(F.4.5)** Detainees have access to hair care services. Hair care tools and equipment are cleaned and disinfected. **4-ALDF-4B-07**



CUYAHOGA COUNTY CORRECTIONAL CENTER     Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

## Services and Programs

**(G.2.2)** Detainee access to counsel is ensured. Detainees are assisted in making confidential contact with attorneys and their authorized representatives. Such contact includes, but is not limited to **(4-ALDF-6A-02)**:
**(G.2.2.a)** Telephone communications

**(G.3.5)** Excluding weekends and holidays or emergency situations, incoming and outgoing letters are held for no more than 24-hours, and packages are held for not more than 48-hours. **4-ALDF-5B-10**

**(G.5.2)** There is a chaplain with the minimum qualifications of clinical pastoral education or equivalent specialized training, and endorsement by the appropriate religious-certifying body. The chaplain assures equal status and protection for all religions. 4-ALDF-5C-19

**(G.5.5)** When a religious leader of a detainee's faith is not represented through the chaplaincy staff or volunteers, the religious coordinator and chaplain assist the detainee in contacting such a person. That person must have the appropriate credentials from the faith's judiciary and may minister to the detainee under the supervision of the religious coordinator or chaplain.
**4-ALDF-5C-22**

**(G.6.1)** Detainees have access to exercise opportunities and equipment, including at least one-hour daily of physical exercise outside the cell and outdoors, when weather permits. (Access to the housing unit's dayroom does not satisfy the standard's requirement.) **4-ALDF-5C-01**

**(G.6.2)** Detainees have opportunities to participate in leisure-time activities outside their respective cell or living room on a daily basis. **4-ALDF-5C-02**

**(G.8.7)** Detainees are compensated for work performed. **4-ALDF-5C-12**

**(G.9.1)** A grievance procedure is made available to all detainees and includes at least one level of appeal. **4-ALDF-6B-01**

**(G.9.2)** Grievance forms are readily available and easily accessible to detainees.

**(G.9.4)** Detainee's grievance forms provide the opportunity for detainees to retain a copy of the grievance filed.



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

## Incidents

|  | Grand Total | Total with a Weapon |
|---|---|---|
| Number of inmate assaults on staff in past 12 months: | 14 | 0 |
| Number of inmate assaults on other inmates in the past 12 month | 11 | 3 |
| Number of staff assaults on inmates in the past 12 months: | 1 | 0 |
| Number of assaults on visitors in the past 12 months: | 0 | 0 |
| Number of attempted suicides in the past 12 months: | 55 | 0 |
| Number of completed suicides in the past 12 months: | 3 | 0 |
| Number of attempted escapes in the past 12 months: | 16 | 0 |
| Number of completed escapes in the past 12 months: | 0 | 0 |
| Number of detainee PREA incident in the past 12 months: | 52 | 0 |

## Capacity

| Capacity Metrics: Facility | |
|---|---|
| Total Capacity: | 1765 |
| Adult Male Capacity: | 1455 |
| Adult Female Capacity: | 310 |
| Total Juvenile Capacity: | 26 |
| Juvenile Male Capacity: | 21 |
| Juvenile Female Capacity: | 5 |
| Disabled Capacity: | 88 |
| Description for Disabled Capacity: | Hospital beds and low bunks |

| Capacity Metrics: USMS | Maximum | Minimum |
|---|---|---|
| Total Capacity: | | 75 |
| Adult Male Capacity: | | 60 |
| Adult Female Capacity: | | 10 |
| Total Juvenile Capacity: | | 0 |
| Juvenile Male Capacity: | | 0 |
| Juvenile Female Capacity: | | 0 |
| Disabled Capacity: | | 10 |
| Description for Disabled Capacity: | Hospital beds and low bunks | |

| Capacity Metrics: ICE | Maximum | Minimum |
|---|---|---|
| Total Capacity: | | 0 |
| Adult Male Capacity: | | 0 |
| Adult Female Capacity: | | 0 |
| Total Juvenile Capacity: | | 0 |
| Juvenile Male Capacity: | | 0 |
| Juvenile Female Capacity: | | 0 |
| Disabled Capacity: | | 0 |
| Description for Disabled Capacity: | N/A | |



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION
Exhibit 2

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

## General Overview by Functional Area

**A - Administration and Management**                    **Unsatisfactory ("At-Risk")**

Review of Administration and Management is based on review of policies, procedures, supporting documentation, direct observation, and interviews with staff and detainees/inmates. All facilities operate under CCCC's limited policies and procedures and there are no site-specific procedures for the facility's management of USMS detainees. All facets of the operation are not addressed in policy as required by FPBDS. Examples include: no written policy and procedure for policy development, annual policy review/updates, and employees' and detainees'/inmates' access to policies and procedures; the "Red Zone" system or the temporary lockdown of detainees/inmates when security staffing levels are insufficient to ensure detainees/inmates safety and required supervision of the population; and grievance procedures described in the detainees'/inmates' handbook is completely inconsistent with facility's policy.

Policies and procedures are accessible to staff through hard copy manuals available in each control room and electronically on the My Human Resources (MY HR) website. Policies and procedures which do not present security concerns have not been identified and are not available to detainees/inmates. No convincing documentation was made available to verify or prove the CCCCs annual policies and procedures are reviewed/updated annually as needed or required.

There is no internal quality control plan in place to provide an annual review of CCCCs operations to ensure compliance with CCCCs policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was conducted on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCCs staff did not comply, address or provide corrective actions for identified deficiencies which included; exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review.

A review of housing unit logs and detainee interviews reveal the Warden and Associate Wardens do not consistently make weekly visits to housing units and visits are not documented.

There is no centrally located detainees/inmates record; detainees/inmates records are maintained in various locations. The facility only maintains electronic booking and screening information entered in the Jail Management System (JMS) during intake. Detainees/inmates legal documents or criminal files are maintained in the Sheriff's Records department. Documents such as cash receipts, disciplinary actions, grievances, and program participation are maintained in other areas by various staff members. The contents of detainees/inmates records is not separated or maintained in a standardized format as required by CCCCs facility policy. The frequency and cumulative length of RHU placement is not included or documented in any files. Detainees'/inmates criminal records are located in a secure area with no public access.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

Exhibit 2

Intake staff interviews confirm staff review arrest documents including the USM-129 Individual Custody Detention Report and USM-130 Prison Custody Alert Notice, enters basic personal information and completes intake screening interviews. During the intake process detainees/inmates are escorted to medical department's intake screening area where medical staff conduct medical, dental, mental health and suicide assessments. Medical staff is responsible for conducting the history of sexual aggression and risk of sexual victimization vulnerabilities within 24-hours of a detainees/inmates arrival.

Detainees/inmates, except for the Cleveland City inmates, upon intake are searched, provided an opportunity to a shower, issued clothing, linens and hygiene items, shown a PREA video and issued a CCCC handbook. Due to the short stay of Cleveland City inmates, they remain in their person clothing and are housed separate from other detainees/inmates. Handbooks describing facility rules and sanctions are only provided in English, the CCCC detainees/inmates handbook is not available in Spanish; detainees/inmates acknowledge receipt of the handbook in writing. The CCCC detainees/inmates handbooks issued at Jail I (Bedford) and Jail II (Euclid) are dated June 2017, and is outdated and does not contain all pertinent information detainees need to successfully adjust to the facility. The information provided on how to file a grievance is not consistent with the current policy. The handbook issued at the Euclid Jail Annex, are dated January 2016. Prior to placement in general population housing, detainees/inmates are temporarily housed in an Orientation unit until medically cleared. Intake policy and procedures review along with staff and detainees/inmates interviews reveal detainees/inmates are not provided a detailed orientation while in the Orientation unit. There is no policy requiring staff to read or explain the handbook to detainees/inmates who cannot read or understand English.

Detainees'/inmate's personal property and monies is inventoried upon intake, and a copy of the itemized inventory is given to the detainee/inmate. Due to insufficient detainees/inmates personal property storage space, detainees/inmates' personal property is stored in three separate locations. Non-clothing personal property items and small items are stored in one property room while clothing items, footwear and other larger items are stored in another property room. A third property room contained soiled clothing in plastic bags awaiting cleaning. Personal property storage areas were observed and found to be disorderly, and the tracking system is complicated and not easy to follow. The current multiple storage areas do not ensure the safety and security of detainees'/inmates' personal property.

Direct observation and staff interviews reveal CCCC custody staff do not release USMS detainees. Once staff confirm a USMS detainees' identification and perform a search of the detainees in Intake, detainees are released directly to the USMS. Upon verifying inmates' release documents, staff confirm positive identification and inmates are released. Detainees/inmates are released directly from RHU to the community.

Detainees/inmates with disabilities are generally housed in the medical housing area which can accommodate wheel chairs. Interviews with detainees/inmates with disabilities and staff reveal programs and service areas such as outside recreation is not accessible to detainees/inmates with limited mobility or disabilities.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                              Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

Programs and work opportunities for female detainees/inmates are comparable to male detainees however USMS detainees are not afforded the opportunity to participate in the CCCCs work programs. Inmates are not monetarily compensated for work.
Staff receive pre-service training on cultural and ethnic sensitivity.

Review of the CCCCs annual staffing analysis reveal essential posts and positions are not identified; currently, there are 96 correctional officer vacancies. As a result of a high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding providing for detainees'/inmate's basic needs. To address staffing shortages and call outs CCCC implemented a "Red Zone" system whereby detainees/inmates are confined to their cells for periods of 27+ hours and not let out during times they normally have access to dayrooms, showers, telephones and outside recreation areas. A housing unit log book and detainee/inmate interviews indicate the "Red Zone" system was in effect in one housing unit for 12 days in a row. CCCC does not have a policy or written directive outlining specific procedures for the "Red Zone" system.

An interview with the Cuyahoga County Sheriff's Human Resource staff and a review of several personnel documents confirm background investigations are conducted for all employees and contractors. Background checks include: employment reference checks; verification of citizenship; pre-employment interviews; and drug screenings. Credit history checks, re-investigations and pre-employment physicals are not conducted. A review of the performance evaluations for Special Response Team (SRT) members who work exclusively in the RHUs, do not reflect compliance with restrictive housing policies as required for staff assigned to RHU.

New employee receive an orientation prior to assuming their duties. Orientation training includes all topics required by FPBDS. During orientation training, staff sign and acknowledge receipt of the code of ethics which describes ethical rules, prohibited acts, disciplinary sanctions and staff requirements. The Cuyahoga County Sheriff's Office provides a hotline for employees to confidentially report misconduct by other staff and/or detainees.

The Training Manager has received specialized training including an 80-hour Instructional Skills training course. Newly hired Correctional Officers receive at total 143 training hours of basic classroom training and 80 hours of field training during their first year of employment for a total of 226 hours. However, correctional implications of young adults (18-24) brain development and associated de-escalation tactics are not included in the curriculum for staff assigned to RHU. CCCC facilities base their staff training requirements on the Ohio Rehabilitation and Corrections Bureau of Adult Detention's Minimum Adult Detention Standards which only require eight hours of in-service training annually instead of 40 hours as required by FPBDS. As a result, Correctional Officers do not receive annual training on the following topics: security/safety/fire/medical emergency procedures; and supervision of offenders including training on sexual abuse and assault.

Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter.

New professional staff and support employees receive 40 hours of training prior to being independently assigned to a particular job however, they only receive two hours of annual training. FPBDS requires 40 hours of annual in-service training to include: security procedures and regulations; supervision of detainees/inmates; signs of suicide risks; suicide precautions; use of force regulations and tactics; report writing; detainees'/inmates' rules and regulations; key control; rights and responsibilities of detainees/inmates; safety precautions; and social cultural life styles of the detainee/inmate population.

Review of emergency plans confirm specific plans for emergency situations are in place except for disturbances. CCCC does not have written support agreements with external entities to provide emergency assistance as identified in the CCCC emergency plans.

There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications.

Interviews with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management.


**B - Health Care**                                          **Marginal ("At-Risk")**

Review of health care at CCCC is based on review of facility's policies and procedures, supplied relevant documents, staff interviews, review of electronic health records (EHRs), direct observation and tracing methodology. There are 65 allocated positions in the Medical department. These positions are staffed by county employees and MetroHealth (MH) contract staff. MetroHealth also supplies telemedicine services for psychiatry and other specialties.

As of September 2018, a temporary staffing company, EduCare Medical Staffing, provides staff for vacant clinical positions, as needed. The healthcare positions include an Administrative Director, a Clinical Director, a Health Service Administrator, a Director of Nursing, a Physician, a Behavioral Health Physician, a Physician's Assistant, Mental Health Nurse Practitioners, two Clinical Nurse Practitioners, twenty-one Nurses, fourteen Licensed Practical Nurses, six Medical Technical Assistants, a Radiology Technician, an Ultrasound Technician, a Paramedic, a Dentist, a Dental Hygienist, a Dental Assistant, a Pharmacist, two Pharmacy Technicians, three Medical Records Representatives and two Clerks. Physical Therapy is provided through a personal contract. Optometry is provided by MetroHealth off site.

The Administrative Director is the designated health authority. The Clinical Director has sole province of the clinical decisions. An interview with the health authority and the HSA and review of available files, reveal not all files are maintained in the Medical department, nor were provided



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

to reviewer. There are no job descriptions for the Pharmacy staff, Physical Therapist or the Mental Health Nurse Practitioner. Files presented for review contained personnel documentation such as disciplinary actions and personal leave. In October 2018, ten new nurses were hired and are receiving on the job training. None of the newly hired nurse's files or of the files of the Pharmacy staff were available for review. The files made available for review reveal: 1 medical staff had expired CPR certifications; four have expired licenses; one Licensed Practical Nurse has no license on file; one Medical Technical Assistant did not have a diploma; two EduCare nurses had partial CPR certifications; and one Licensed Practical Nurse and one Nurse Practitioner have board actions on their verification but no documentation of the disposition. A National Practitioner Data Bank query is not used for health care professional disciplinary or sanctions inquiries

The CCCC' Medical department is staffed 24/7 and includes the satellite jail facilities of Bedford and Euclid. A physician, psychiatrist, mental health practitioner and dentist are available on call. Male and female detainees/inmates are seen in the dispensary on the 6th floor at the main CCCC facility. The satellite Bedford and Euclid facilities only have male detainees/inmates, detainees/inmates in these facilities are seen in each facilities respective medical offices. The dispensary has several holding cells, exam rooms, radiology, treatment room and dental office. There is also a female dispensary next to the female housing unit on the 6th floor which was not open at the time of the review. Moreover, a mental health dispensary is located on the 7th floor; Sanitation on the 7th floor mental health dispensary was minimally acceptable.

Examination of the policies and procedures reveal they are not updated and there is no documentation of an annual review. According to the health authority, policies and procedures are available to staff on line. Hardcopies of policies and procedures are not available in case of computer failure. The quality management program or Continuous Quality Improvement (CQI) Program, has not had a meeting in the past year. There is no documentation of monitored health care aspects nor corrective actions of problems identified by staff and Pharmacy and Therapeutic (P&T) meetings. Review of the past three quarterly P&T meeting minutes identified problems with medication delivery and duplication of orders by providers. The annual training program confirm medical staff is trained to respond to health-related situations within four-minutes. Correctional staff receive respond to health-related situation training every two years.

There are four designated sealed first aid kits in the facility and one in each satellite facility (Bedford and Euclid). The Medical department has an automated External Defibrillator (AED) with their emergency equipment at the facility and three at Bedford. The AED at Bedford is not checked daily or its operability status documented. Man-down drills are not conducted annually on each shift. Documentation presented contained only clinical tabletop exercises with no response action or evaluation. Direct observation of the fire drill/man down drill conducted during the review reveal first responding staff, the Safety Manager and a nurse, arrived within four minutes. The nurse did not attempt to assess the victim and start CPR. The Safety Manager started CPR. On the suspicion of an overdose, the Safety Manager administered Narcan. The nurse did not respond to this suspicion however, nurses do not carry Narcan on their person. Subsequent medical staff arrived within five minutes with a gurney, oxygen, AED and emergency bag. One of the nurses took charge and the victim was prepared for evacuation.



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

In 2015 the CCCC began using electronic health records (EHR); a system called EPIC, which was implemented by MetroHealth. Through observation and interviews with staff, it was revealed detainees/inmates chronic care and/or urgent care rosters cannot be generated; chronic care clinics cannot be flagged and EHR has no ability to print documents. There is no alternate plan if the system is down or if the contract with MH is terminated. Confidentiality of medical information is maintained.

Medical staff complete intake screenings within 24 hours of detainee's/inmate's admission to the facility. The screening probes into past medical history, chronic illness, mental status and present condition, history of sexual aggression and risk of sexual victimization. The screenings reviewed did not indicate disposition if a detainee/inmate is cleared for general population housing however a nurse interviewed stated "it's assumed".

Inmates admitted and held for the City of Cleveland on the 3rd floor, are not afforded the process of screening by medical. Medical is made aware of an inmate's health need only when the need, issue or situation digresses to urgent or emergency, such as a diabetic inmate who has not had his/her insulin for four days, or others who become symptomatic due to not having hypertensive or psychotropic medications.

Medical staff stated a language line, through Metro Health, is used for non-English speaking detainee/inmate interviews.  The detainees/inmates handbook is available only in English, there is no there is no written material available for limited English speaking or non-English speaking detainees/inmates to explain how to access medical care and services or the procedures at the facility.

A Mental Health screening and Tuberculosis (TB) screening and testing is performed within 72 hours of the detainee's/inmate's admission.

Comprehensive medical and mental health appraisals are not conducted within 14 calendar days of detainee's/inmate's arrival. A review of the EHR of 25 detainees from the facility roster demonstrated eight were not completed within 14 calendar days. Recommendations for job assignments, housing or program participation are not noted. Only detainees/inmates with referrals to the physician or mental health practitioner are documented in the EHR. Appraisals with positive findings and medication are signed off by the CD/physician. Detainees/inmates on medication are provided with current prescriptions. The dentist or qualified dental staff do not conduct 14 calendar day oral screenings. When a detainee/inmate requests dental services, an oral exam is done which includes examination of teeth, gums and dental hygiene instructions.

Detainees/inmates request medical/dental care by submitting a request form known as "Kite". The detainee/inmate deposits the "Kite" request in a box. Clerical staff collect the "Kites" daily, sorts them and leave the "Kites" for medical staff to pick up in the 4th floor control room. Medical staff review the medical request "Kites" and process them accordingly (i.e. sick call appointment or medication renewal). The "Kite" is then scanned into the EHR. Presently, there is a back log of "Kites" to be scanned and entered in the EHR. Information in the detainees/inmates handbook explaining how to access health service, is not available in Spanish; however, Spanish is spoken by a significant number of detainees/inmates. The co-payment fee at CCCC was abolished in 2017, yet



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

Exhibit 2

service fee signs are still posted throughout the facility. Interview with the health authority confirmed the USMS is not contacted for pre-authorization of detainees' non-emergency outside care.

CCCC does not have an infirmary. Detainees needing this type of monitoring are sent to Metro Health. Random detainee/inmate chart review reveal chronic care clinics are not flagged nor identified in the EHR. A roster of chronic care clinics cannot be generated. The health authority does not maintain a list of chronic care patients and could not produce one. There is no proactive program to discuss and implement an individually tailored plan for special needs patients which include, but are not limited to: developmentally disabled individuals, frail/elderly, physical impairments and serious mental health needs. Furthermore, adolescents fall into this category because during this period they require special attention to diet, exercise and nutrition. A list of special needs patients could not be produced. Juvenile detainees/inmates are not receiving special attention to diet, exercise and nutrition; and a request for an increased caloric diet for juvenile detainees/inmates in not sent to the Food Service department by medical, even when medical staff is aware the detainee/inmate is a juvenile.

CCCC does not have an on-site Obstetric/Gynecologist (OB/GYN) physician. The county's OB/GYN physician resigned in June 2018. Females are seen for prenatal at Metro Health. Women needing gynecological services beyond the medical staff capacity are sent to Metro Health. Female charts reviewed reflected gynecological exams comparable to community standards. Two known pregnant females were interviewed. One is 32 weeks pregnant and the other one is five months pregnant and sleeps on the floor. It was confirmed both have seen the OB/GYN appropriate times. Interview with the health authority reveal pregnant females receive pre-natal vitamins and a request for an increased caloric diet is sent to the Food Service department.

The infectious disease program tests for communicable diseases such as tuberculosis, MRSA, sexually transmitted diseases like gonorrhea and chlamydia, hepatitis and HIV. Interview with medical staff and chart review reveal a compliant infectious disease program. The list for annual tuberculosis testing is created manually by reviewing the electronic charts since there is no method of creating an electronic list in EPIC. This increases the risk of missing a detainee/inmate for testing. The facility has a negative pressure room however, it is not operational.

Biohazard waste or infectious waste (IW) is processed by the company Advantra. IW is collected from the medical department by a custody staff and taken to the 5th floor mechanical room for packaging and storage until pick up. Pick up is scheduled twice a month. The IW bags and full sharp containers are placed directly in a carton box and stored in an open area. This violates local, state and federal regulations which requires all IW to be stored in a manner which maintains the integrity of the package, i.e. off the floor, and the storage area must be clearly marked IW and locked. CCCC's IW is not properly packaged for off-site transport; for IW to be transported off-site it must be placed inside a second sealed plastic bag or one single bag within a fully enclosed, rigid, sturdy container.



CUYAHOGA COUNTY CORRECTIONAL CENTER           Oct 30-Nov 1, 2018
                                                                    Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

Detainees identified as needing detoxification or chemical dependency treatment, manageable at the facility, are monitored and treated per Substance Abuse and Mental Health Services Administration (SAMHSA).

Pharmacy service is provided by an onsite pharmacist. Medications are obtained through Metro Health. Tour of the pharmacy reveal a non-formulary procedure and a procedure for providing medication orders. The pharmacy has an automated dispensing machine, Pyxis, for all controlled substances. Main stock and Pyxis count of various controlled substances was correct. Needles and syringes are not overseen by the pharmacy staff. The supply clerk orders needles and syringes electronically through a Metro Health Store Room inventory program to restock. When the clerk receives the order, the clerk places it in the locked cabinet in the dispensary. Medical staff withdraw needles and syringes as needed but do not sign them out on a log. A review of the syringe and hypodermic needle log reveal syringe and hypodermic needles are restocked however, no balance is indicated. The lack of a perpetual inventory makes it impossible to detect if needles or syringes are missing and poses a custody violation.

Three of the Medication Administration Records (MAR) reviewed contained numbers in lieu of initials. The nurse conducting the medication administration explained the numbers are codes for detainee/inmate missed medication; however, the nurse was not able to indicate where a legend for these codes could be located. Also, when detainees/inmates who are scheduled for court or change housing, their medication is not consistently processed. Training for medication administration is not thorough and consistent. Staff interviewed reveal training for medication administration is passed on. The release list of detainee/inmates indicate only detainees/inmates transferring to another facility are ordered a 7-day supply of medication. Experiments and investigational or experimental drugs, devices and procedures are not allowed.

All facility staff receive Suicide Prevention and Prison Rape Elimination Act (PREA) training. In addition, medical staff receive hunger strikes, medical restraints, seclusion and detainee deaths training. There have been no hunger strikes or medical restraints used for the past year. Ten PREA investigative cases were reviewed and found compliant with sexual assault procedures.

The CCCCs suicide prevention program outlines the identification of suicidal detainees/inmates, intake/admission and housing procedures. CCCC had six deaths from June to October in 2016. One death was confirmed as a suicide. Debriefing reports or mortality reviews are not conducted. Required documentation, minutes of debriefing, medical summary, timeline of incarceration, notifications, autopsy reports were not available in the medical department; despite CCCC policy which requires aforementioned documentation be maintained in the medical department. Additionally, no information regarding the 6 inmates death was available or maintained in the Warden's office either.

Review of 15 Restrictive Housing (RH) charts reveal medical conducts a medical assessment of a detainee/inmate before they are placed in RH. Interview with the Mental Health practitioner reveal a detainee/inmate with a stable serious mental illness can be placed in RH for a rule violation. If the detainee/inmate is stable intensive, clinically mental health treatment is not provided for the



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

Case: 1:19-cv-01584  Doc #: 1-10  Filed: 07/11/19  126 of 191.  PageID #: 347
Case: 1:18-cv-02929-SO  Doc #: 1-2  Filed: 12/20/18  34 of 52.  PageID #: 98
CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

entirety of the detainee/inmates stay in RH, nor is a face-to-face conducted at least once a week. Review also denoted detainees/inmates are not kept in RH past 30 days.

**C - Security and Control**                                      **Marginal ("At-Risk")**

The Security and Control review is based on staff and detainee interviews, review of policies and procedures, post orders, and direct observation.

Main Control is staffed on a 24-hour basis with a sally port to control access. The Main Control Room contains video surveillance monitoring, electronic locking systems, emergency keys, fire annunciator panels, perimeter alarms, radio communications, an intercom system, and tinting on windows. Observations of the sally port usage during the Facility Review reveal the Main Control Officer operates ███████████████████████████████████████████████████████████████████████████████. pr ███████████████████████████████████████████████████████████.

Additionally, Main Control's ████████████████████████████████████. A ████████████████████████████████████ This creates a concern if the control center staff become incapacitated.

Correctional Officer posts are located immediately adjacent to detainee living quarters ensuring continued observation of detainee activities and allows staff to quickly respond to emergencies. Officer's stations is centrally located in each housing unit to provide observation of detainee/inmate activity.

Detainees/inmates are escorted by correctional staff when moving about the facility, pat searched and screened with a magnetometer upon entering and exiting the housing unit.████████████ ████████████████████████████████.

A permanent log is maintained at each correctional post, ensuring staff record all routine information, emergencies, and unusual incidents. However, when reviewing logs for information regarding recent suicides no information was reflected. Investigative staff stated the logs were immediately confiscated and taken into evidence and replaced with new ones. However, the new log did not mention the reason for replacement.

Weekly security inspections of all areas of the facility is not being conducted and staff do not perform daily security inspections upon assuming a post. According to staff, areas in need of repair are called into Main Control and Main Control staff then notify county maintenance personnel. A record of such calls or incidents could not be provided. Additionally, correctional supervisors are not signing permanent logs on each shift indicating they have visited the area. There is no documentation of weekly rounds made by the Warden and other facility managers.

A population management system includes records on admissions, processing, and releases of detainees in the Intake area and Main Control via the IMACS system. The facility has a system of physically counting detainees, which also includes counting detainees outside of their assigned living areas. Nevertheless, there are no written procedures to specify how outcounts should be



SENSITIVE LIMITED DISTRIBUTION
Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

conducted. CCCC conducts three formal counts within each 24-hour period (i.e., 0445, 1200, and 2200). There are no standing or face to photo (Bed Book) counts conducted.

Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and debriefings, removing staff involved at the on-set of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). Additionally, video tapes involving UOF are not tagged and labeled as evidence. Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.). ██████████████████████████████████████████

████████████████████████████████████.

Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of the Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black", based on their black para-military uniforms.

During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members direct at detainees/inmates.

SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches", as they escorted them to and from the interview location. The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety.

CCCC does not use or maintain firearms however, the facility does use and maintain less-than-lethal equipment and chemical agents. Chemical agents are properly controlled and stored as required. The facility does not use electrical disablers Storage space is provided for secure storage of less than lethal devices and security equipment in the Special Response Team (SRT) area located on the 5th floor.

Facility keys are not controlled, as indicated through observation by the team during the week. The lack of key control is pervasive throughout the facility, ████████████████████████████████████
████████████████████ A████████████████████████████████████████re
keys haven't been lost or stolen. Emergency keys are contained in a main control and other locations throughout the facility; however, there are no formal procedures in place to ensure strict accountability is maintained.

Security equipment in the SRT area is inventoried each shift to determine condition and expiration dates. Tools are not maintained in the facility. Tools are brought in by county maintenance crewman to repair various items within the facility, as needed. However, an inventory process is not in place to ensure accountability of those tools brought into the facility. Culinary tools and



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                                            Exhibit 2

SENSITIVE LIMITED DISTRIBUTION
Electronically Filed 06/12/2019 17:52 /  / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

Case: 1:19-cv-01584  Doc #: 1-10  Filed: 07/11/19  128 of 191.  PageID #: 349

Case: 1:18-cv-02929-SO  Doc #: 1-2  Filed: 12/20/18  36 of 52.  PageID #: 100
CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018    Facility Review Report

equipment are stored and maintained in the Food Service department and inventoried as required.
Detainee/inmate workers are issued tools to prepare meals however, there are no written procedures
on the issuance of tools and equipment. Furthermore, inventories of medical and dental instruments,
equipment, and supplies (syringes, needles, and other sharps) are not conducted to ensure these
items are not removed by unauthorized persons.

Review of the detainee/inmate handbook reveal rules of detainee conduct specify acts prohibited
within the facility and penalties which can be imposed.  Disciplinary hearings are normally
conducted within 7 days of the detainee/inmate being notified of the charges against them.  An
investigation is held within 24 hours of the time the violation is reported.

A secure area is provided in Intake for the processing, transferring, searching and applying and
removing restraints.  Detainees are fully restrained during transportation, unless medically exempt.
CCCC does not maintain a transportation fleet, as all transportation is conducted by the Cuyahoga
County Sheriff's Department.

On Wednesday during the Facility Review, the entire team arrived in the "Bull Pen" area at
approximately 6:00 a.m. to observe the processing and supervision of inmates. Upon arrival,
approximately three correctional officers were assigned to this floor to provide supervision of the
impending population. The routine staffing assignments for this location is four correctional
officers (3 males and 1 female); however, a female officer called in and staff indicated when this
_____ ` e post is often left vacant. This creates a concern, as policy does not allow cross gender
_____ ████████████████████████████████████████████                . . . .  . .   . . .  .  s
escorted to the "Bull Pen" area are escorted restraint free. Staff indicate they are often not aware of
separation concerns.  Detainee/inmate names are called and upon an affirmative reply are moved
from the corridor, to an assigned holding cell.

Detainees/inmates are not required to recite their register numbers, nor are they confirmed with a
photo card. Some detainees/inmates were observed not in possession of any identification and staff
had no clear or consistent response to the question "How do you verify the identity of
detainees/inmates who have the same last name".  This question was provoked, as the processes
was being observed and staff called out a common Hispanic last name, to which there was more
than one detainee/inmate present with the last name; on this occasion the detainees/inmates said
"which one", and allowed the detainees/inmates to confirm (without positive verification) who the
officer was allegedly calling for. Based on the physical footprint of the area, four officers are not
enough to provide adequate security in this area.

Staff and detainee/inmate interviews reveal the lighting in the court call staging hallway had only
been repaired Tuesday, evening, and prior to this, there was only one operable hallway light.

Detainees/inmates are placed in cells awaiting court which are not equipped with functioning toilets or
have access to running water, are stripped of all furnishing to include a place to sit, and were found to
house up to 12 detainees/inmates, in an cell who's design capacity is for only up to 2 persons.
Additionally, these detainees are left unsupervised and locked in these cells for periods greater than 10
hours. ████████████████████████████████████



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018    Facility Review Report

████████████████████████████████████████████████████

████████████████████████

Detainees/inmates interviews on Wednesday reveal detainees were fed 2 doughnuts and a carton of
milk for breakfast prior to being placed in the holding cell. The breakfast received was woefully
inadequate and met no medical or nutritional guidelines or standards. Inspection of detainee/inmate
court meals which were brought down to be fed to the detainee/inmates in the holding cells reveal
baloney sandwiches were not individually wrapped, but rather 20 to 30 sandwiches packed in one bread
loaf bag, the sandwiches not properly refrigerated or stored and were located in an unused office area
which reeked of dead vermin.

An inmate was observed getting a haircut before going to court in the corridor prior to entering the
Bull Pen area. Interview with the staff and detainee/inmate receiving the haircut reveal,
detainee/inmates have no access to barbering and haircare in their living areas and as a last minute
fix, detainees are provided a hasty pre-court appearance haircut in the hallway. The hallway is not
an appropriate area to ensure safety and sanitation for the barbering process.

████████████████████████████████████████████████████

████████████████████████The keys were never affixed to the employee's person to reduce the
possibility of them being compromised.

**D - Food Service**                                    **Unsatisfactory ("At-Risk")**

A review of the CCCC Food Service department is based on staff and detainee/inmate interviews,
food service policies and procedures, and direct observation of operations. Policies and procedures
are minimal and policies and procedures are not reviewed and updated annually.

The Food Service department staff consists of a Sergeant who manages the food service operation,
a Corporal who serves as assistant manager, and eight civilian staff who supervise approximately
60 male detainee/inmate workers. Correctional Officers assigned to the department handle the
security duties within the department. Food service staff working in the department have completed
ServSafe certification in their respective areas including food service supervision, food preparation,
safety and sanitation.

Policies and cleaning schedules have not been developed and posted to ensure sanitation of
equipment and to ensure areas are cleaned in a frequent and consistent manner. Direct observation
and food service operation inspection reveal lack of documentation, and no daily sanitation
inspections are not conducted by the supervisory staff of the department.

All sheet pans are heavily encrusted with grease deposits and soil accumulation. Equipment and
walls throughout the department have accumulated dirt and food debris. Food-contact surfaces of
cooking equipment, serving pans and sheet pans inspection reveal baked-on food and encrusted
grease on all pans. Sanitation buckets are not used to keep areas clean and sanitized. Several pieces
of equipment are non-operational. Vent hoods, filters and surrounding ceiling areas have



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                                            Exhibit 2

SENSITIVE LIMITED DISTRIBUTION
Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

Case: 1:19-cv-01584 Doc #: 1-10 Filed: 07/11/19 130 of 191. PageID #: 351
Case: 1:18-cv-02929-SO Doc #: 1-2 Filed: 12/20/18 38 of 52. PageID #: 102
CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

accumulated grease and dirt. Mice/vermin are present and were observed running in various throughout the foodservice areas.

The dish washing machine temperatures is not properly documented. The dishwashing machine was found with the wash tank temperature at 180 degrees which is above the manufacturer's requirement of 163 degrees. Food trays are not checked for cracks after being washed and many trays have water seeping inside the trays and causing unsanitary conditions. Insulated food trays are cracked, heavily stained, leaking molded and dirty water from cracks in the food tray perforated seal and is contributing to contamination of food product plated in unserviceable trays.

No gauges are visible on the pot and pan ware washing machine to verify required wash and rinse temperatures. Test strips are available if the need arises for the low temperature sanitation solution to be used. The State of Ohio, City of Cleveland-Department of Public Health conducted an inspection on August 17, 2018. The three violations identified were corrected on site during the inspection.

Food Service civilian staff are medical cleared to work in food service. However, there are no procedures or documentation in place indicating detainees receive a pre-assignment medical examination to work in food service. Staff and detainees/inmates are monitored daily for health and cleanliness. Staff and detainees/inmates are trained in hand washing procedures and are required to wash their hands upon entering the food service area, or when changing tasks during the work period.

Observation of staff and detainee/inmate workers reveals not all were appropriately wearing hair covering and beard guards. Additionally, detainee/inmate workers are not wearing proper foot wear for a food service environment. All detainee/inmate workers are wearing orange clog type footwear and some without socks.

Observation reveals that staff and detainees/inmates in areas outside of food service where food is served are not wearing gloves when handling food delivered.

Review of training documentation for Food Service staff and detainees/inmates reveal training is conducted and documented.

Observation of dry storage rooms and refrigerated and freezer areas reveal required food code temperatures are being maintained. However, all dry and refrigerated storage areas are cluttered and not organized. One of the freezer units has a frozen water leak on the condensing unit with food being stored underneath the leaking unit, creating cross contamination. Perishable food deliveries are not checked for proper temperature requirements by the vendor and there is no documentation to adequately document temperatures.

The facility utilizes a satellite tray feeding operation. Prior to meal service, hot foods are placed in pans and held in hot holding cabinets. Cold foods are placed in pans and placed in the cooler. Meals are then plated on insulated food trays and Correctional Officers deliver these trays within the required time frame to the various housing units. Approved menus are followed and ensures proper



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

food portioning is controlled. Observation of meal service reveal portion sizes are adequate and food temperatures are maintained and within the required ranges.

A two-week cycle menu is used for meal rotation. A complete menu analysis of regular and religious diets is not conducted annually or certified to be nutritionally adequate by a registered dietitian. The general population menu provide for an average daily caloric intake of approximately 2800 calories. Substitutions to the menu are made in accordance with dietitian approved guidelines. Production worksheets document all meals served, recorded temperatures and special requirements.

The intentional and deliberate use of food as a punitive measure; the diet for detainees/inmates in Restrictive Housing Units (RHU) lacks basic daily nutritional requirements, fails to meet daily nutritional caloric intake standards, is not varied and does not meet needs of detainees/inmates housed in the RHU who also present with medical conditions which require dietary variety and consideration. There are no juvenile meal request for an increased caloric diet on file for juveniles housed in the facility in the Food Service department.

Detainees voiced concerns regarding the repetitious nature of the menu and the lack of variety and sufficiency of meals. Meals are not well received by the detained population and no meal surveys are conducted to solicit the input and feedback from the detainees/inmates population regarding meals.

Taste tests of the meals reveal food is seasoned, and served at the appropriate temperature. Three meals are served daily; at least two of the meals are hot. Food service is not providing medical diets. Diet orders required but not being provided include the type of diet prescribed, duration of the diet and any special instructions. There was no religious diet menu available for those whose dietary requirements cannot be met via the common fare menu.

The facility uses the same two-week cycle menu for regular trays and religious and or medical trays. A nutritional analysis is on file for the two-week cycle menu but current credentials for the dietician could not be found. There are no diet menus developed to follow medical diet requirements. Therefore, medical diet trays are not consistent and have no nutritional analysis on file for items served to the detainees/inmates on a medical diet requirement.

Religious diets are not being adhered to as there is no Religious Diet menu to follow to meet the religious dietary laws. Additionally, as there is no religious diet menu to follow nor a nutritional analysis on file for items served to the detainees/inmates on a religious diet.

Observation reveal Food Service staff do most of the preparation of the meals and serve the detainee/inmate population. Detainee/inmate food service workers are mainly utilized for sanitation duties and assist in the preparation of trays served to the detainee population. Detainees/inmates are observed to be under proper supervision at all times. Correctional officers pick up meals and are responsible for handing out meals to the detainees/inmates in a timely and orderly fashion in each



CUYAHOGA COUNTY CORRECTIONAL CENTER        Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

Exhibit 2

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018      Facility Review Report

housing unit. Appropriate hair and beard restraints and disposable gloves are not used to handle food trays during satellite feeding.

**E - Restrictive Housing**                                    **Unsatisfactory ("At-Risk")**

A review of CCCC's RHU management is based on staff, detainee/inmate interviews, review of policy and procedures, and direct observation. The results reveal CCCC has not updated policies and procedures to reflect the United States Department of Justice restrictive housing requirements. There are no specific procedures for the operation and management of the CCCC's RHU.

CCCC's policy on detainees'/inmates' records does not describe or contain procedures for maintaining detainee/inmate RHU file upon release from RHU. Jail-1 has four RHU's on the 10th floor for male detainees/inmates, and Jail-2 have one RHU on the 2nd floor for female detainees/inmates with a Control Pod. The Control Pod manages staff and detainee/inmate access into the unit.

Review of detainees'/inmates' records reveal the frequency and cumulative length of placement in Administrative Segregation or Disciplinary Isolation (RHU) is not documented. Interview with Intake staff reveal detainees/inmates are release from RHU to the community. Review of human resource file for employees assigned to RHU reveal employees assigned to RHU are not evaluated on compliance with RHU policies and procedures as required by FPBDS. The facility does not provide correctional implications of young adult (age 18-24) brain development and associated de-escalation tactics training for assigned RHU staff.

CCCC medical staff conduct a pre-admission to restrictive housing medical evaluation prior to detainees'/inmates' placement in RHU. Detainees/inmates with serious mental illness are housed on the 7th floor mental health pods and dormitory. An interview with mental health staff reveal stable detainees/inmates with mental health issues are place in RHU for rule violations. However, when a detainee/inmate with mental health issues becomes disruptive, mental health staff report to RHU to assess the detainee/inmate and determine the appropriate course of action.

There is no documentation confirming mental health staff visit RHU and conduct face-to-face clinical contact with mental health detainees/inmates as required by FPBDS. The facility has not developed enhanced opportunities for in-cell and out- of- cell therapeutic activities and additional unstructured out-of-cell time for detainees/inmates with mental health issues in RHU.

Review of the list of infractions subject to disciplinary isolation, reveal not all infractions listed meet the standard (i.e. refusing a direct order from staff, refusing to work, stealing or possession of stolen property). Additionally, upon completion of a rule violation investigation for Major or Serious Rule Violations, the designated facility Investigator forwards the disciplinary packet to the Warden for review. The Warden, upon review of the disciplinary packet imposes up to 30 days in disciplinary isolation without a disciplinary hearing; violating detainees/inmates 5th and 14th Amendment Rights under the United States Constitution as they relate to Due-Process.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

Disciplinary Board Hearings are initiated when a detainee/inmate commit a rule violation which will likely result in disciplinary isolation over 30 days. Moreover, detainees/inmates may appeal disciplinary actions to the Warden who imposed the sanction. Because the Warden is the imposing and appeal authority, detainees/inmates have no access to an impartial disciplinary hearing process. Review of several completed detainees'/inmates' disciplinary records and interview with the chair person on the Disciplinary Board, confirms rules violation resulting from the same incident are served consecutively and not concurrently as required by FPBDS.

During the Facility Review two juveniles were found to be housed in the adult RHU for rule violation; the juveniles were not separated by sight and sound from adult detainees/inmates as required by facility policy.
The co-locating of juvenile detainees with adult offenders in the RHU is a direct violation of FPBDS for juvenile detainees/inmates. The juvenile detainee/inmates are not sight and sound separated, are not receiving enhanced developmental nutritional intake requirements and are provided not educational or brain development programming. Juveniles are subjected to the same harsh "Red Zone" RHU conditions as the adult offenders in every fashion from hygiene to recreations and out of cell time;

A review of detainees'/inmates' disciplinary isolation status reveal rule violations committed by detainees/inmates do not meet requirements of the FPBDS for disciplinary isolation. CCCC Inmate Discipline policy and procedures and detainee/inmate handbook's description of CCCCs rules and sanctions subject to disciplinary isolation are not in compliance with the FPBDS. Specifically, the FPBDS indicate rule violations approved for disciplinary isolation should involve violence, escape or a threat to institution safety.

Detainees/inmates were issued rule violation reports and appeared before the Disciplinary Board for possession of narcotics and given sixty days in disciplinary isolation. However, interview with chairperson and a review of the disciplinary records reveal the unknown substance was sent to the Sherriff Office for testing and the results have not been confirmed. In another case, a Correctional Officer failed to secure the entrance door of the pod and a detainee/inmate ran out of the pod. The detainee/inmate was charged and received a rule violation for escape and disciplinary isolation without any evidence of an escape plan. Additionally, a detainee/inmate received a rule violation of escape and attempted escape for possession of a cell phone and there was no evidence of an escape plan. The detainee was sanctioned to disciplinary isolation by the Disciplinary Board.

Review of Health Services policy and procedures confirm medical staff are required to visit detainees/inmates in RHU for two or more days three times a week; however, detainees/inmates in RHU receive no daily visit from medical staff. Observation of medical entering the RHU reveal medical staff enter RHU for medication distribution and did not announced their presence. Interview with management staff and observation of the multidisciplinary committee's weekly meeting reveal medical and mental health staff do not attend the meeting. Those in attendance include the Warden, Investigators, and other Correctional Supervisors. The facility has not developed a program for returning detainee/inmates to less restrictive conditions as promptly as possible, nor implemented a step-down program for detainees/inmates in RHU for preventative purposes to less restrictive housing.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

CCCC detainees/inmates on disciplinary isolation status and administrative segregation pending investigation are given oatmeal, a piece of bread, and milk for breakfast and a bologna sandwich, a piece of fruit and milk for lunch. Detainees/inmates interviewed complained the bologna is rotten and the food trays smell. However, detainee/inmates in general population are provided a different meal. There are no policy and procedures regarding serving detainees/inmates alternative meal that meet basic nutritional requirements when detainee/inmates use food or food tray in a manner to harm staff. Interviews with RHU staff reveal meal restriction is imposed upon inmates by the Warden as punishment. Additionally, detainees/inmates are not provided with cleaning solution or equipment to clean their cells the same as detainees/inmates in general population.

Many RHU were cells were cold, and despite numerous request by detainees/inmates for a second blanket, the request was denied.  When asked for CCCCs policy and or procedures regarding issuance of as second blanket, especially during winter; RHU SRT supervisory staff responded, "There is no policy, it's up to us if they get a second blanket or not".  Continued interview with RHU SRT supervisor and custody staff reveal SRT members use prejudice and unofficial authority to dictate and control detainees/inmates behavior while housed in the RHU, this includes the withholding or denial of personal hygiene items, and deliberate indifference to humane needs such as blankets when it's cold.

Review of RHU watch log and direct observation confirm Correctional Officers observe each detainee/inmate in RHU every 10-minutes on an irregular schedule.  However, Correctional Officers indicated the 10-minute observation of each detainee/inmate was implemented by the Warden due to the recent suicides at the facility. There are no policy and procedures requiring all detainees/inmates in RHU are personally observed every 10-minutes.  However, a memorandum dated October 17, 2018 was posted on the bulletin board in the Special Response Team (SRT) office regarding the revised procedures when conducting security rounds on all detainees/inmates in RHU.

Review of RHU log books reveal the Warden, Assistant Wardens, Shift Sergeant do not visit RHU's as required by FPBDS. Interviews with detainees/inmates in RHU and observation of the SRT officers who work in RHU reveal considerable tension between the two.  SRT officers are dressed in black tactical uniforms and wear stab resistance vests and the focus of their training is tactical deployment. Detainees/inmates are intimidated, and express having difficulty obtaining basic personal needs such as toothpaste, and toilet paper from SRT officers. According to a detainee/inmate, a SRT member told him toilet paper is given out on Wednesdays and the detainee/inmate was given some paper towels to use. Additionally, detainees/inmates advised reviewers SRT officers use excessive force during cell extractions.

The CCCC's staff training curriculum does not consist of RHU policy review and identifying and reporting signs of detainee/inmate mental health decomposition in RHU. Review of Privileges and Rights of Inmates in Disciplinary Isolation form reveal several detainees/inmates did not receive this form and were unaware of their release date from isolation. Moreover, staff do not post the detainees/inmates form on their door as required by CCCC policy.

Just as detainees/inmates in RHU indicate their cells are extremely cold and request a second blanket from the SRT Officers; Detainee/inmates assigned to "No Contact Housing" (Special confinement



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

restrictions ordered by the court which include no access to mail, telephones, or general population)
make the request to SRT Officers and they too are refused a second blanket. Detainees/inmates in both
the RHU and No Contact Housing are not afforded the opportunity to shave and there is no policy or
procedures to document when a detainee/inmate is deprived of any authorized item or activity.

Detainee/inmates assigned to "No Contact Housing" are denied general housing privileges to which they
are entitled, as they are not confined for disciplinary reasons.  Detainee/inmates assigned to "No Contact
Housing" confinement are up to 27 hours, are not allowed daily access to showers, and recreation and are
subjected to the same "Red Zone" lockdown system as RHU detainee/inmates.  Additionally, interviews
with detainees/inmates in the "No Contact Housing" who are lockdown, along with inspection of their
cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering.

Detainees/inmates in the RHU reported using articles of clothing and towels or rags for toilet paper,
when they are not issued or denied toilet paper by SRT staff.

Detainees/inmates in disciplinary isolation status can write letters to family and friends however, they
cannot receive letters as detainees/inmates in the general population, nor can they have social visitation,
access to reading materials, telephone and recreation. These privileges are suspended by the Warden. The
multidisciplinary committee has not identified programs, in addition to the minimum period of
recreation, to increase out-of-cell opportunities for recreation, clinically appropriate treatment therapies,
skill-building, and social interaction with staff and other detainees/inmates as required by FPBDS.

Detainees/inmates on disciplinary isolation status do not have access to education services, basic
commissary services and library services. Additionally, the facility does not have an Imam for Muslim
detainees/inmates.

CCCC has not developed a data base which includes the following: race, national origin, religion, gender
identity, sexual orientation, disability, and age as required by FPBDS. CCCC's policy and procedures
identify the most common reasons detainees/inmates request protective housing (e.g. with prior
cooperation with law enforcement, a conviction for a sex offense, gang affiliation, and sex or gender
identification) and identify procedures for safely housing these detainees/inmates outside of RHU.


F - Safety and Sanitation                                         **Unsatisfactory**

The Safety and Sanitation review consists of staff and detainee/inmate interviews, review of the
facility's policies and procedures and direct observation of the daily operations. The facility does
not conform to all applicable federal, state, and local fire safety codes; to those set forth by the
National Fire Protection Association (NFPA); and the Occupational Safety and Health
Administration (OSHA).

The facility is not fully covered with an automatic sprinkler system.  Jail I has the deluge wet
sprinkler system which is manually operated by the pod officer while Jail II has an automatic
sprinkler system. There is no visual and audible signaling devices in the detainees'/inmates'
housing pods. Fire detection and alarm system is tested quarterly.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                                        Exhibit 2
SENSITIVE LIMITED DISTRIBUTION

Standpipe and hose systems, fire extinguishers and self-contained breathing apparatuses is available at appropriate locations throughout the facility; however, monthly inspections documentation is not available. Additionally, training and medical clearance documentations for staff to use self-contained breathing apparatuses is not available.

Daily pods sanitation/physical security inspections are conducted by the pod officer/supervisor using the monthly facility inspection form; however, the Safety Sergeant does not conduct monthly comprehensive safety and sanitation inspections.

An annual fire inspection was conducted by the Cleveland, Ohio Fire Department on October 26, 2018, however there is no documentation available. The Fire Response/Evacuation plan has not been approved by an independent outside inspector. Additionally, the plan does not identify the location of the facility building/room floor plans, the use of exit signs and directional arrows for flow of traffic and location of publicly posted plan.

Fire evacuation plan diagrams are not posted in ample locations for staff, detainees/inmates, and visitors to find the information they need in the event of an emergency. Two exit signs are damaged and unserviceable.

There is no fire rating documentation for detainees' mattresses, shower curtains and trash receptacles in the housing pods to ensure they are fire-resistant, non-toxic, and non-hazardous. There is no documentation available for the current inspection and testing of the Food Service department's fire detection and suppression hood system.

Fire drills are not conducted every three months on each shift as required by the facility's Fire Safety Plan. Drills are not being documented and evaluated. Staff confirm fire drill are simulated training drills. Direct observation of a fire/man down evacuation exercise conducted in the Restrictive Housing Pod (cell A24/25/26) reveal the need for staff to practice more live evacuation drills. RHU detainees/inmates were released from their cells without restraints at one time. Responding staff did not bring emergency keys and fire extinguishers and there is no emergency visual and audible signaling devices in the detainees/inmates housing pods. The first responding staff; the Safety Manager, a unit officer and nurse, arrived within a minute. The nurse did not carry any emergency equipment and failed to immediately assess the victim while the Safety Manager proceeded to assess and start CPR.

No direction or assistance was provided to the staff performing CPR. The nurse did not exhibit a sense of urgency when calling for back up and emergency equipment. The victim was moved out of the cell within four minutes of the man-down call. On the suspicion of an overdose, the Safety Manager responded by administering nasal Narcan he carried in his belt pouch. Nurses do not carry Narcan. Within five minutes from the start of the man-down drill, three additional nurses responded with a gurney, AED, oxygen and emergency bag. One of the nurses took the lead, assessed the victim and gave direction to stabilize victim and place on the gurney for transport. All responding staff had primary personal protection equipment (PPE – gloves). The medical staff demonstrated competency with the use of the emergency equipment. Many of the responding staff appeared to lack a sense of urgency appropriate to the exercise.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                                              Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

Direct observation reveal inappropriate storage, use and accountability of flammable, toxic, and caustic materials in accordance with OSHA regulations in the following areas; in the Food Service department, Maintenance department, sanitation chemicals storage area, housing pods and roving barber's carts. Several unlabeled bottles with chemicals inside, were found throughout the facility. Also, there is no written documentation of safety training for detainees handling chemicals.

The facility's housekeeping plan/sanitation policy and procedures for cleaning and maintaining the facility is not being enforced. Sanitation levels throughout the facility including the housing pods and cells are poor. Multiple housing pods contained no cleaning chemicals for detainees/inmates to clean their cells. Detainees'/inmates' clothing storage areas are cluttered and unsanitary. In several pods, detainees/inmates are using cardboard boxes as trash receptacles and/or property storage containers.

On the 5th floor of the facility is an area referred to as the "Bull Pen" which at one time was a housing unit with double and single occupancy cells. At some point, the housing unit was repurposed to holding cells for inmates being held for appearance in county court. On the first day of the Facility Review, a facility staff member suggested to this reviewer to visit the "Bull Pen" area. While touring the area, several inmates in one holding cell standing or seating on the floor because there are no benches or other suitable seating for up to eleven inmates per cell who remain in these conditions for approximately 8 to 10 hours. Some inmates were observed eating with no area to place food items other than on the floor. Numerous inmates complained they were thirsty or needed to use the restroom. Observation revealed toilets/washbasins were unserviceable due to the water being turned off by staff.

Two showers located in the male booking area are dirty and unserviceable.

Detainees/inmates in other pods have access to toilets and washbasins with temperature controlled hot and cold running water 24-hours a day. Additionally, detainees/inmates can use toilets without staff assistance when confined to their cells and housing pods. Access to operable and clean showers with temperature controlled hot and cold water is available.

The City of Cleveland, Department of Public Health conducted an annual health inspection on August 17, 2018 with three deficiencies in the Food Service department which were corrected during the inspection. Vermin and pests are controlled through inspections and treatments by Orkin Pest Control Company. However, in 10C housing pod showers, there are flying bugs on the ceiling and walls. During the review, mice were seen in the food service dry storage warehouse.

The facility's water supply is regulated by the Cuyahoga County Department of Public Works. However, the facility's potable water source and supply is not certified annually by an independent outside source.

A ventilation system survey was conducted by Johnson Controls Company however there is no date when the survey was conducted nor signature of the person conducting the survey. Noise levels measurements in detainees'/inmates' housing pods are being documented. Lighting throughout the



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

facility meets FPBDS. Lighting levels in detainees'/inmates' cells are at least 20 ft. candles in grooming and writing areas.

The number of detainees/inmates exceed the facility's rated bed capacity. The rated bed capacity is 1,765 detainees/inmates however during the Facility Review the detainees/inmates count was 2,420. In several housing pods detainees/inmates sleep with mattresses on the floor. In several housing pods detainees/inmates are not provided a place to store their clothes and personal belongings.

Detainees/inmates have access to hygiene items through the commissary. Indigent detainees/inmates may receive necessity items from the pod officer weekly without cost.

Observation of the admission process confirm detainees/inmates are issued one set of clothing. All detainees/inmates booked into the facility and have their own personal underclothing and socks will be allowed to keep them. Detainees/inmates who are proven to be indigent at the time of their booking and or not possessing underclothing will receive county issued underclothing. If they receive monies at a later date, they are required to purchase underclothing from the commissary and return county issued underclothing to the laundry. Detainees/inmates are issued one mattress in the housing pods. Several housing pods cells have worn and damaged mattresses. Mattresses are not being cleaned monthly or after use according to the facility's sanitation policy.

The detainee/inmate hair care policy and program is not effective. Detainees/inmates are not afforded an opportunity for hair care services on a regularly scheduled basis. Barbering equipment is maintained on two roving barber carts, which are not cleaned and disinfected regularly. There are two unlabeled chemical spray bottles and two unlabeled containers with a dirty/hairy chemical solution for disinfecting the hair combs and clipper guides. Neck strips are not available. An inventory of barbering tools and equipment is not available. The schedule for haircuts is not posted in the housing pods.

Essential lighting and life sustaining functions is maintained inside the facility and can operate in an emergency. Power generators are inspected weekly and load tested quarterly. CCCC is a tobacco-free facility.

### G - Services and Programs                                    Satisfactory

The review of Services and Programs is based on a review of policies and procedures, direct observation and interviews with staff and detainees/inmates. CCCC has a formal classification process and plan which begins at admissions for managing and separating detainees. The policy states and the Intake Sergeant confirms, the classification process ensures detainees/inmates are housed in the least restrictive setting necessary to ensure the safety of detainees and staff. The classification system identifies the most common reasons detainees/inmates request protective housing.

Detainee/inmate housing assignments are determined by gender, age, legal status, custody level and special needs. Jail I and II detainees/inmates housing plan consists of the following designations: ages



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
                                                             Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

45+, 40+, 30 +, and 26+; gang affiliation; vulnerable; special needs; step down; veterans; diabetic; Cleveland City; juveniles; and females.

Detainees have access to courts, legal counsel and legal materials however according to staff, detainees/inmates must go through another agency, the Department of Social Services to obtain an unmonitored telephone call with his/her attorney. Attorney/client visiting rooms are available. Detainees may request access to computers with Lexus Nexus software for legal material.

Detainees can send and receive uncensored correspondence from federal, state, and county courts, executive and legislative branch officials of the United States, county and state officials and officers, attorneys and the media. Legal mail to and from attorneys must be properly marked as legal.

The detainee handbook and direct observation confirms detainees' outgoing mail is sealed and not inspected. Indigent detainees/inmates may receive two envelops and writing paper weekly. Detainees/inmates in RHUs disciplinary isolation status can send letters to family and friends however, they cannot receive letters, nor can they have social visitation, access to reading materials, telephone and recreation. The detainee handbook provides a list of authorized and unauthorized items detainees/inmates may be received in packages.

CCCC policy and direct observation verifies general population detainees/inmates have access to smart touch telephones in their pod dayrooms. A Telecommunications Device for the Deaf (TDD) telephone is available in the Sergeant's office on the 4th floor for detainees who are hearing impaired. Security staff are required to check detainee telephones to ensure they are operable and request repairs as needed.

There are three full-time and one part time Chaplains for CCCC facilities. The Administrative Chaplain is responsible for coordinating religious programs for the detainee/inmate population. The Chaplains' endorsements by their appropriate religious certifying bodies were not available for review as requested. Chaplains have physical access to all areas of the facility and rotate weekly to visit detainees in their housing pods. Muslim detainees/inmates complained about not having access to an Imam. According to the Administrative Chaplain, he has made several attempts to recruit an Imam to come into the facilities on a regular basis however he has not documented his attempts. Various other faith group volunteers provide programs and services weekly.

Leisure activities and outside physical activity programs are not consistently provided as stated in the CCCC's policy due primarily to the implementation of the previously described "Red Zone" system.

Visitation is available for detainees/inmates to maintain community and family ties. Social visits are non-contact and limited to two fifteen-minute visits per week. Visitors are required to make an appointment to visit detainees/inmates based upon their housing unit's assigned visiting days. Special visits may be requested for visitors traveling from out of town.

A review of the facility's work program policy and staff interviews reveal USMS detainees are not allowed to participate in the facilities' volunteer work program. Institutional inmate positions include: Food Service Workers, Laundry Room Workers, and General Maintenance Workers; detainees/inmates workers are not compensated for the work they perform.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

Exhibit 2

SENSITIVE: LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

The Grievance Program is managed by the Sergeant who is also responsible for handling detainee/inmate hearings, staff rosters and other operational duties. The facility policy addressing the grievance process totally contradicts information provided in the detainee/inmate handbook.

The handbook instructs detainees/inmates to initiate grievances, other than those medical related, by writing to the Cuyahoga County Sheriff (at his business street address), while the CCCC policy indicates informal and formal grievance options. The facility provides detainees/inmates with two-ply carbonless request forms or Kites which can also be used to file grievances however, detainees/inmates are required to draw in a box and check it for non-medical grievance issues.

Detainees/inmates are not allowed to retain a copy of the form. They must submit both copies to ensure a response is received. A request to review the grievance logs for the past six months was unfulfilled due to the computer system's inability to print the logs by the month. The Grievance Sergeant receives all grievances, logs them in and forwards them to appropriate staff member for response. According to the reviewer's examination of the grievance log on the computer screen, timelines, basis for grievances and dispositions were vague and difficult to determine. Grievance trends are not tracked.



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

## Detailed Findings by Functional Area

### A - Administration and Management

|  | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| A.1 | Policies and Procedures | Unsatisfactory |
| A.2 | Quality Control | Unsatisfactory |
| A.3 | Detainee Records | Unsatisfactory |
| A.4 | Facility Admission and Orientation Program | Marginal |
| A.5 | Detainee Property | Marginal |
| A.6 | Detainee Transfers and Releases | Satisfactory |
| A.7 | Detainees with Disabilities | Satisfactory |
| A.8 | Discrimination Prevention | Marginal |
| A.9 | Staffing | Satisfactory |
| A.10 | Staff Training | Marginal |
| A.11 | Emergency Plans | Marginal |
| A.12 | External Agency Notifications | Unsatisfactory |

**Additional Comments**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

## B - Health Care

|       | Standard | Finding Options<br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|-------|----------|---------|
| B.1   | Health Care Administration | Marginal |
| B.2   | Intake Health Screening | Satisfactory |
| B.3   | Medical, Mental Health, and Dental Appraisals | Marginal |
| B.4   | Access to Health Care | Satisfactory |
| B.5   | Provision of Health Care | Marginal |
| B.6   | Incident Health Care | Marginal |

**Additional Comments**


## C - Security and Control

|       | Standard | Finding Options<br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|-------|----------|---------|
| C.1   | Correctional Supervision | Unsatisfactory |
| C.2   | Detainee Accountability | Satisfactory |
| C.3   | Control of Contraband | Satisfactory |
| C.4   | Use of Force/Non-Routine Application of Restraints | Marginal |
| C.5   | Weapons Control | Satisfactory |
| C.6   | Keys, Tools, and Medical Equipment Control | Unsatisfactory |
| C.7   | Post Orders | Unsatisfactory |
| C.8   | Detainee Discipline | Marginal |
| C.9   | Restrictive Housing | Unsatisfactory |
| C.10  | Detainee Transportation | Satisfactory |

**Additional Comments**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018     Facility Review Report

## D - Food Service

| | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| D.1 | Food Service Administration | Satisfactory |
| D.2 | Food Service Employee/Worker Health | Marginal |
| D.3 | Food Storage and Preparation | Unsatisfactory |
| D.4 | Equipment, Utensils, and Linens | Unsatisfactory |
| D.5 | Detainee Meals and Special Diets | Unsatisfactory |

**Additional Comments**

## E - Restrictive Housing

| | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| E.1 | Detainee Records | Unsatisfactory |
| E.2 | Detainee Transfers and Releases | Unsatisfactory |
| E.3 | Staffing | Unsatisfactory |
| E.4 | Staff Training | Unsatisfactory |
| E.5 | Incident Health Care | Unsatisfactory |
| E.6 | Detainee Discipline | Unsatisfactory |
| E.7 | Administrative/Disciplinary Segregation | Unsatisfactory |
| E.8 | Classification and Housing | Satisfactory |

**Additional Comments**



CUYAHOGA COUNTY CORRECTIONAL CENTER          Oct 30-Nov 1, 2018
Exhibit 2

SENSITIVE LIMITED DISTRIBUTION

CUYAHOGA COUNTY CORRECTIONAL CENTER  Oct 30-Nov 1, 2018  Facility Review Report

### F - Safety and Sanitation

|  | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| F.1 | Fire Safety and Chemical Control | Unsatisfactory |
| F.2 | Sanitation and Environmental Control | Unsatisfactory |
| F.3 | Clothing and Bedding | Satisfactory |
| F.4 | Detainee Hygiene | Satisfactory |
| F.5 | Emergency Power and Communications | Satisfactory |

**Additional Comments**

### G - Services and Programs

|  | Standard | Finding Options<br><br>- Exceptional<br>- Very Good<br>- Satisfactory<br>- Marginal<br>- Unsatisfactory |
|---|---|---|
| G.1 | Classification and Housing | Satisfactory |
| G.2 | Access to the Courts and Legal Materials | Satisfactory |
| G.3 | Mail | Satisfactory |
| G.4 | Telephones | Satisfactory |
| G.5 | Religious Programs | Satisfactory |
| G.6 | Recreation | Unsatisfactory |
| G.7 | Visitation | Satisfactory |
| G.8 | Work Programs | Satisfactory |
| G.9 | Grievance Program | Unsatisfactory |

**Additional Comments**



CUYAHOGA COUNTY CORRECTIONAL CENTER  Oct 30-Nov 1, 2018

Exhibit 2

SENSITIVE LIMITED DISTRIBUTION



EXHIBIT

2

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **GARY BRACK, R.N.**<br>15523 Clifton Blvd.<br>Lakewood OH 44107<br><br>*Plaintiff,*<br><br>vs.<br><br>**ARMOND BUDISH,** *in his official and individual capacities,*<br><br>████████████████<br><br>**KEN MILLS,** *in his individual capacity,*<br><br>████████████████<br><br>**CUYAHOGA COUNTY**<br>c/o its Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115<br><br>**THE METROHEALTH SYSTEM**<br>2500 MetroHealth Drive<br>Cleveland, OH 44109<br><br>**AKRAM BOUTROS,** *in his official and individual capacities,*<br><br>████████████████<br><br>and<br><br>**JANE PLATTEN,** *in her official and individual capacities,*<br><br>████████████████<br><br>*Defendants.* | Case No.<br><br>Judge |

**COMPLAINT WITH JURY DEMAND**

### NATURE OF THE ACTION

1.     Plaintiff Gary Brack, R.N., was a caring nursing director who was fired for speaking up at a public hearing about a healthcare crisis that Cuyahoga County has left festering at the Cuyahoga

County jail. His candid answers to County legislators triggered malfeasance investigations, a string of public-corruption indictments, and renewed cries for County reform.

2.      But his courage had a cost. The County has a culture of retaliation. So he was punished for his protected speech, and others fear to speak, lest they be made examples, too.

3.      Defendant Armond Budish won his office by promising transparent County governance, but his administration demanded silence. "Stay in your lane, nurse Brack," sneered Defendant Ken Mills, Budish's homophobic, since-indicted, and now-former Director of Corrections, when Nurse Brack raised early concerns about jail-safety issues. "I run the jail," said Mills.

4.      Mills's orders came straight from the top. He faithfully executed Budish's mandate to cut costs at any cost and conceal the deadly consequences from the public. He obstructed nurse hiring at the jail, understaffed the officers who protect them, and parachuted into monthly meetings about MetroHealth's healthcare contract, which was supposed to be managed by the County sheriff. Mills spurned their expertise—he scorned the "faggots in medical" and Sheriff Pinkney alike—and ignored repeated warnings with impunity.

5.      So on May 22, 2018, when the Council summoned Mills to explain the "life and death" healthcare crisis in County jails, Mills perjured himself. He denied any involvement in medical-care issues and his obstruction of MetroHealth's nurse-hiring processes. He did so to hide his malfeasance and protect Budish, whose privatization agenda was well-known, and advanced by turmoil in the medical care Nurse Brack managed. And Mills's loyalty was rewarded by his powerful patron.

6.      Budish didn't fire Mills for his lies.

7.      Mills resigned six months later, just before the U.S. Marshals Service released a report about the inhumane conditions he concealed that have resulted in nine inmate deaths in the past year.

8.      But at Budish's command, Nurse Brack was fired for his truth.

9.      Nurse Brack was present at the May 22 hearing, but MetroHealth, Nurse Brack's employer,

ordered him not to speak without permission or criticize its lucrative client. The Council, however,

wanted information from someone with personal knowledge.

10.      So after Defendant Platten, MetroHealth's chief of staff, repeatedly diverted questions about

Mills's role in medical-care issues, the Council asked Nurse Brack for his opinion about relations

with the County, and its role in the healthcare crisis.

11.      Nursing is Nurse Brack's vocation because compassion is his nature, as nurses who knew

him wrote in a moving "Letter of Support" they sent to Budish protesting his removal. And Mills

had spurned repeated warnings about medical-care issues Nurse Brack raised internally.[1] So Nurse

Brack did not limit his speech to the role MetroHealth designated for him. Instead, he spoke as a

compassionate and concerned citizen, and answered the Council's questions from personal

knowledge.

12.      Nurse Brack's testimony exposed Mills's persistent interference with and disdain for vital

matters of inmate health and nurse safety that threatened lives under Nurse Brack's care. His

testimony was explicitly personal and remarkably restrained, as his colleagues emphasized when they

erupted in protest at his removal. Nurse Brack had a moral and ethical obligation to report problems

that interfered with patient care, but he did not complain about Mills's homophobic abuse. Instead,

he focused on the issue the Council probed: what was the relationship like between County and

MetroHealth partners, and did it interfere with medical care? As he testified, based on his personal

opinion, healthcare services were impaired by Mills's flagrant disrespect for Sheriff Pinkney, who

---

[1] Those internal reports were also protected speech. *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 578–79 (6th Cir. 1997); *see also Way v. Shawnee Twp.*, 192 F. Supp. 3d 867, 879 (N.D. Ohio 2016) ("an employee's choice to communicate privately with an employer does not strip the concern of its public concern"...

had been a helpful partner in ameliorating the consequences of Mills's obstruction, and was supposed to be in charge of the MetroHealth relationship.

13.     But Mills was Budish's designee, so Budish was outraged. Rather than address Mills's conduct at the jail, or any of the serious issues Nurse Brack aired, Budish retaliated for exposing his lieutenant's malfeasance and embarrassing his administration.

14.     The next day, Budish and Budish's his chief of staff Earl Leiken drove to MetroHealth to meet with Defendant Boutros, MetroHealth's CEO, and demanded Brack be removed from the jail.

15.     County sources would only confirm this trip anonymously due to fear of reprisal, but as public records memorialize, MetroHealth immediately complied. Then, after summoning Nurse Brack to a meeting, castigating him for speaking beyond his designated role, and drafting a memorandum of Nurse Brack's supposed "violations" to assure Budish that his unconstitutional demand for Nurse Brack's removal had been met, MetroHealth terminated Nurse Brack.

16.     When Nurse Brack asked who ordered his removal, MetroHealth's in-house labor-relations lawyer Emily Fiftal refused to answer. But MetroHealth's CEO Boutros confirmed Budish's demand and Nurse Brack's removal by email to Budish, hoping to preserve MetroHealth's profitable jail contract.

17.     And Budish, for his part, would do it all again. Even as he contracts out County functions, he claims a nonexistent right to suspend First Amendment rights through those very contracts.[2]

18.     Nurse Brack's protected speech cost him his job, but the example made of him harms the public. Criminal indictments have picked off a string of County administrators, but jail employees remain afraid to explain how the Cuyahoga County jail became one of the worst in the nation, because—after Nurse Brack's ousting—they fear retaliation.

---

[2] *Benison v. Ross*, 765 F.3d 649, 663–64 (6th Cir. 2014) (contractual rights do not immunize state actors for exercising their own retaliation for speech.

19.     Nurse Brack brings this lawsuit so that others need not risk their livelihoods to exercise their First Amendment rights, or risk their lives while matters of public concern remain suppressed. The choice is perverse and unconstitutional, for "the First Amendment should never countenance the gamble that informed scrutiny of the workings of government will be left to wither on the vine" by "those who bring, often at some personal risk, its operations into public view."[3]

20.     To protect the nurses, officers, and inmates for whom he still cares, cure a culture of retaliation that hides malfeasance from the public, and vindicate his constitutional rights, Nurse Brack brings this civil-rights action for First Amendment retaliation and prior restraint under 42 U.S.C. § 1983, civil liability for criminal acts, and conspiracy to violate his constitutional and statutory rights.

### PARTIES

21.     Plaintiff Gary Brack, R.N., resides in Cuyahoga County, Ohio, and was MetroHealth's interim director of ambulatory care at the County jail until his removal in retaliation for his protected speech.

22.     Defendant Cuyahoga County is a political subdivision and unit of local government, organized under the laws of the State of Ohio, and acting under color of law. The County is a "person" under 42 U.S.C. § 1983 and was at all relevant times the employer and principal of Defendants Budish and Mills. The County operates the Cuyahoga County Corrections Center ("Corrections Center"), where it is liable for acts and omissions taken under its customs, policies, or practices, and responsible for training and supervising its employees.

---

[3] *Andrew v. Clark*, 561 F.3d 261, 273 (4th Cir. 2009) (Wilkinson, J., concurring) (emphasizing the vital importance of unfettered public-employee speech about "the actual workings—not just the speeches and

23.     Defendant Budish remains, and was at all relevant times, the County Executive for Cuyahoga County, exercising supervisory and policy-making authority for the County, and acting under color of state law. He is sued in his personal and official capacities.

24.     Defendant Mills was hired in 2014 as the County's Director of Corrections to take charge of Budish's plan to regionalize the jails in the county. He resigned in November 2018, days before the U.S. Marshals Service released a report that detailed deplorable conditions inside the Corrections Center, where seven inmates had died since Nurse Brack's removal.  Mills acted at all relevant times under color of state law. He is sued in his personal and official capacities.

25.     Defendant MetroHealth was and "is a county hospital operating under Chapter 339 of the Ohio Revised Code," and "subject to the mandates of the Constitution and 42 U.S.C. § 1983."⁴ It is responsible and liable for acts and omissions taken under its customs, policies, or practices, and is responsible for training and supervising its employees.

26.     Defendant Akram Boutros was and is the Chief Executive Officer of MetroHealth, and exercises supervisory and policymaking authority under color of state law. He is responsible for employment actions, including hiring, suspension, reassignment, discipline, and termination. He is sued in his personal and official capacities.

27.     Defendant Jane Platten was and is MetroHealth's chief of staff, exercising supervisory and policymaking authority under color of state law. She is sued in her personal and official capacities.

### JURISDICTION AND VENUE

28.     The Court has jurisdiction because the acts giving rise to the claims occurred in this county and the amount in controversy exceeds $15,000.

29.     The Court has personal jurisdiction over Defendants.

30.     Venue is proper here because the events giving rise to Nurse Brack's claims took place within this jurisdiction, and all parties reside, work, worked, or are located in this county.

FACTUAL BACKGROUND

**Nurse Brack was an effective and well-respected Director of Nursing.**

31.     Nurse Brack is a registered nurse and medical-services administrator with 20 years' experience. He teaches advanced critical-care nursing at Cuyahoga Community College.

32.     MetroHealth hired Nurse Brack in 2015 to manage its nursing operations for the County. He was hired as Nursing Supervisor because the County refused to create a senior-level management position, but was required to assume director-level responsibilities because there was no one else to perform those tasks.

33.     In December 2017, MetroHealth promoted Nurse Brack to interim director of ambulatory care for the Corrections Center after the County's own director of nursing services had enough of Defendant Mills's virulent homophobia and resigned.

34.     Throughout his tenure at MetroHealth, Nurse Brack was responsible for managing nursing services at the Corrections Center. His primary responsibilities included making nursing schedules, managing daily staff assignments, arranging training and educational in-services for staff, administering staff evaluations and corrective-action plans, handling inmate and family concerns, conducting quality-improvement audits on nursing-medication delivery, conducting inmate-grievance meetings and disciplinary investigations for nursing staff, interviewing and selecting new nursing staff, and coordinating with jail administrators.

35.     Nurse Brack's ordinary job duties did not include making official statements on behalf of the County, the Corrections Center, or MetroHealth. Nor did they include reporting malfeasance, retaliation, or workplace discrimination to the County Council or the public.

36.     Until he spoke at the County Council's May 22, 2018 public hearing, Nurse Brack was never

disciplined by MetroHealth, and was praised for his effective management. He was widely respected

by those with whom he worked, as one County employee recalled in an interview with Cleveland

*Scene*'s Vince Grzegorek:

> Corrections officers loved him. Nurses loved him. He was a leader, which is different
> than being a boss. He put the burden of stress on himself, and he went to council and
> he spoke and he thought he was going to be protected. If they were short staffed, he
> had no shame in doing the low-level jobs of his nurses. If they needed someone to do
> med cart, he was on med cart. If they were short in the dispensary, he was there. If
> you look at our leaders, they sit at their desks, they watch their employees on camera.
> When we're short, they don't help or assist.

37.     Defendant Mills, by contrast, was considered "the worst." "Everyone really disliked him," a

corrections officer explained, because he "never listened to their concerns." Mills "viewed those

concerns as complaining, and he refused many times to take their safety concerns seriously."

38.     Mills's mandate was well-known: "the county wanted so badly to be the regional jail and they

kept biting off more without thinking about housing and staffing and conditions." But Defendant

Budish, who gave Mills his orders, kept his distance from the jail, and his political hands clean. As

one corrections officer anonymously disclosed to *Scene*:

> I've never seen Armond Budish in the building. This guy's a county leader, and I've
> never seen him in the jail. You're running a business, and you're getting called to the
> carpet, wouldn't you say, 'I'm going to go over there. I want full access. I want to see
> for myself what's going on. I want to know the truth."

39.     By May 22, 2018, the County Council wanted the truth. But truth was inconvenient—

personally, commercially, and politically—for Defendants, and they wielded power of state

law. So when Nurse Brack spoke truth, they abused their power and retaliated against him—

solely, as their own writings confirm, for the content of his protected speech.

### Nurse Brack endures homophobic discrimination in the workplace.

40.     Nurse Brack's ordeal began long before his removal. As MetroHealth's Nursing Supervisor,

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

and had an effective working relationship. But Nurse Harris resigned in 2017 because Defendant

Mills is notoriously homophobic, and Nurse Harris is gay.

41.     Mills frequently made homophobic comments in the workplace about Nurse Brack. In one

instance, Mills asked Sheriff's Department Fiscal Officer Donna Kaleal if Nurse Brack and Nurse

Harris were lovers. When she stared at him in confusion, Mills elaborated: "They're fucking

faggots."

42.     On another instance, Mills stated "I hate those fucking faggots up in medical."

43.     Mills's homophobic bigotry was "widespread," as the County's Agency of Inspector General

("AIG") concluded after "interviewing seventeen witnesses and reviewing numerous documents."

The AIG found *"sufficient evidence to indicate Mills likely made discriminatory comments*

*regarding Marcus Harris'[s] and Gary Brack's perceived sexual orientation; and was not*

*sufficiently compliant with the County's continuing commitment to diversity."*[5]

44.     Even after Nurse Harris resigned and retained an attorney, Nurse Brack remained, fighting

an uphill, one-man battle to protect the nurses, officers, and inmates in his care.

                    **Nurse Brack endures Mills's interference with medical care.**

45.     Defendant Mills had no formal role in administering the County's medical-services contract

with MetroHealth, but his mandate from Budish prevented pushback when he interfered. As Mills

was wont to declare, unchallenged, "I run the jail." Mills issued operational directives and attended

monthly sheriffs' meetings, where he bragged about how the Corrections Center was underbudget.

46.     As Nurse Brack repeatedly warned, those savings were achieved by dangerous staff cuts that

left nurses unprotected. By understaffing corrections officers, Mills created "red zones" on floors

where inmates had to remain locked in their cells for up to 27 hours at a time. The noun became a

---

[5] County Inspector General's Report of Investigation (Dec. 31, 2018) ("AIG Report") (attached as Ex. 1) at 1
(boldface italics in original). Mills refused to cooperate with the investigation. *Id.* ("Despite numerous requests
~~that Mills testify or appear for an interview within the AIG, Mills has not done so.~~").

verb: to be "red-zoned" was a feature of County incarceration, and inmates invented complaints to get to Nurse Brack's clinic, telling nurses that they "just wanted to get out of that cell."

47. One night, when Nurse Brack was working late, his night nurses received 30 complaints of "chest pain" from inmates on the same floor—an understaffed "red zone" where inmates had been confined to their cells for nearly 24 hours. Nurse Brack raised these concerns with Mills—it was then that Mills told "Nurse Brack" to stay in his "lane," and out of Mills's domain.

48. Nurse Brack had also reported to Mills deficiencies in mental-health treatment. In 2017, Mills excluded medical staff from participating in "administrative segregation" rounds to a special Corrections Center floor for inmates suffering from mental illness. As Nurse Brack explained, he maintains continuing-education certifications in correctional healthcare, and best practices require adequate medical staffing to address behavioral issues. But Mills smirked. Mills had never attended any of the correctional-healthcare conferences, but again, as he reiterated, "I run the jail."

49. Budish's mandate gave Mills virtual impunity, and Mills disregarded with contempt concerns raised by County and MetroHealth officials alike. In one instance, an inmate had smuggled an extra bologna sandwich to his cell, and, when apprehended, threw the sandwich at an officer. The officers' response to the indignity was savage. After cuffing the inmate, officers smashed his face so violently into the ground that his front teeth came out his nose, placed him in a restraint chair, and jammed a mask over his broken face to conceal their assault.

50. Mills's officers refused to let nursing staff remove the mask to assess the inmate's injuries, but a night nurse saw the masked man and requested medical evaluation. Mills's security supervisor refused: "he wants to try and hit one of my officers—he can sit the fuck there for hours."

51. So the night-shift nurse called Nurse Brack at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the County

waited another half-hour before transporting the man to medical. The mask was lifted, EMS was called, and MetroHealth had to reconstruct a face.

52.     Mills's coverup began immediately. A monthly sheriffs' meeting was scheduled for the next day, at which Mills was, as usual, in attendance. So were Nurse Brack and MetroHealth's Medical Director, Dr. Tallman, who expressed concern about the incident. But Mills knew his loyalty to Budish earned him protection.

53.     Mills smiled at the jail's then-Warden, Eric Ivey, who was later indicted for instructing officers to turn body-cameras off, and lied through his teeth about the inmate who had been beaten: "I reviewed the situation and the officers used appropriate force to the threat of what the inmate was using." When Dr. Tallman asked to view security footage, Mills refused: "I already reviewed it—nothing was done wrong."

54.     This concerned Sheriff Pinkney, who said he would follow up. But when he did, the security and body-camera footage had somehow "disappeared." Mills had pure contempt for the sheriff, even on matters as serious as violent misconduct by corrections officers. With Budish's blessing, and Ivey's assistance, Mills "ran the jail," and acted with impunity.

### MetroHealth restrains Nurse Brack's speech.

55.     By May 2018, healthcare at the County jails was in a state of crisis. Mills had ignored repeated warnings from Nurse Brack, and blocked nurse hiring until the situation grew untenable. Mills was forced to issue a "mission-critical request" to the Council for nurse staffing, so the Public Safety Committee convened a hearing to address it, summoning Mills and MetroHealth administrators to "explain how we had gotten to that point."

56.     MetroHealth had designated Dr. Tallman to attend, and though Dr. Tallman declined on the basis of a scheduling conflict, he worked with Nurse Brack to prepare testimony. The night before

the hearing, they exchanged emails about the hearing, and sent an outline of planned remarks to Defendant Platten.

57.     Before the hearing, however, Platten instructed Nurse Brack not to criticize the County, and directed him not to speak without her advance permission. She did so as his supervisor, effecting MetroHealth's policy to prohibit employees from criticizing the County.

58.     As MetroHealth memorialized in a notice of supposed violations, Platten "had specified to Nurse Brack that it was Platten's role to speak on behalf of MetroHealth at the meeting, and Nurse Brack's role was to help with technical operational questions." She directed Nurse Brack that if he did speak at the meeting he needed to do so diplomatically, and forbade him from saying anything that would damage MetroHealth's relationship with Cuyahoga County.

59.     A reasonable employee in Nurse Brack's position would have been chilled by Platten's orders from criticizing County employees, exposing County malfeasance, or otherwise engaging in protected speech.

60.     But Nurse Brack was made of stronger stuff.

### Nurse Brack engages in protected speech.

61.     At the May 22 Council hearing, Mills had denied any involvement in nurse-staffing issues. He also claimed that the nurse-staffing crisis was purely fiscal—the County needed more money. Chairman Michael Gallagher asked Mills why the issue had suddenly become "mission-critical," and asked Mills if there were other causes—if, for example, "the folks that are working in the jail, the RNs, the LPMs, medical staff to doctors, Chief Medical Executive, do they have concerns and do they express those concerns to you?" But Mills demurred, falsely claiming ignorance. "I'm not directly related to this, so they don't come to me and talk; they go through their chain of command."

62.     So Chairman Gallagher pressed the point, asking Mills: "so you think the relationship with the staff is OK?" Mills said "Yes." Gallagher's skepticism was evident ("If you're not willing to

answer that's fine because I'll find out. . .'") and, noting Dr. Tallman's absence, he sought someone with direct knowledge.

63.     Defendant Platten promptly introduced herself and Nurse Brack, but Chairman Gallagher skipped her, asking Nurse Brack directly about staff relations. Nurse Brack truthfully explained that Mills had obstructed nurse hiring, and that relationships with him were not good. As Chairman Gallagher summarized, "you're saying it's not necessarily a dollar figure that's part of the problem?" Nurse Brack acknowledged that pay issues were important, but emphasized communication issues and prior fruitless attempts to address issues that had been repeatedly reported to Mills.

64.     Mills, Nurse Brack explained, involved himself in monthly sheriffs meetings about medical operations, had received complaints about issues affecting the provision of medical care, and made decisions that compromised inmate healthcare without consulting medical staff.

65.     When Chairman Gallagher asked Mills if he had blocked nurse hiring, Mills denied it And Platten, who repeatedly interjected to minimize Mills's role, promptly backed him up with an empty formalism. She didn't interact with Mills, she said, because "he doesn't have management over the medical staff," and by contract, the sheriff was responsible for MetroHealth's provision of medical services at the jail.

66.     Councilwoman Yvonne Conwell pressed Mills, however, on his involvement with medical services. Mills claimed, again, that he was uninvolved with medical staffing, but admitted his responsibility for jail operations. So Councilwoman Conwell asked Nurse Brack to approach the microphone and describe relations with Mills regarding operations and security.

67.     Nurse Brack reiterated truthfully that relations with Sheriff Pinkney were excellent, but Mills's interference was problematic, and Mills exercised improper authority over medical services that compromised health and safety at the jail. The problem, Nurse Brack explained, was that Mills had no respect for the Sheriff's duly appointed role:

Part of that, and this is my personal opinion, but the level of disrespect I see in these meetings by Ken Mills to the sheriff, the eye-rolling, the body language, the body movements, I've never, in my professional career witnessed that. I think that there's a total disrespect for the sheriff's position within the correctional center, honestly.

**The County retaliates against Nurse Brack for his protected speech.**

68.    On May 23, 2018, the day after the Council hearing, Defendant Budish and his chief of staff

Earl Leiken drove to MetroHealth for an in-person meeting about Nurse Brack. They met with

Defendants Boutros and Platten and demanded that Nurse Brack be terminated.

·69. .    Defendants were motivated to retaliate against Nurse Brack for the content of his protected

speech. As MetroHealth confirmed in writing, the County immediately requested that Nurse Brack

be removed from his role at County Corrections. On May 25, 2018, three days after the hearing,

Defendant Boutros wrote a simpering email to affirm his compliance with Budish's demand:

> Executive Budish,
>
> Thank you for meeting with us this past Wednesday to discuss the jail medical program. As we discussed, MetroHealth is committed to our partnership with Cuyahoga County in providing the highest quality medical services at the main corrections center and it's [*sic*] regional facilities. . . .
>
> As per your request for MetroHealth to immediately remove our Nurse Supervisor employee from the jail clinic, we have made the adjustment to our staffing model and as of May 28, 2018 the employee will no longer provide services at the jail clinic. . . . . Thank you, Armond. Again, we are committed to our partnership and look forward to continuing to work together.
>
> Regards,
> Akram[6]

70.    On May 25, 2018, two days after Budish and Mills drove to MetroHealth to demand Nurse

Brack's removal, MetroHealth complied. Nurse Brack was stripped by that government entity of his

management position and placed on administrative leave.[7]

---

[6] Boutros email to Budish, Pinckey, Leiken, and Platten (May 25, 2018) (attached as Ex. 2).

[7] MetroHealth demanded that Nurse Brack select one of two demotions before June 2, 2018, but when informed that Nurse Brack had been requested to provide an FBI interview, abandoned the ultimatum and offered to provide him with counsel.

71.     And, the County claimed—falsely, insofar as it ignored the Constitution—that it was required to comply with the County's demand as "a contracted service provider."[8] MetroHealth candidly admitted its motive in targeting Nurse Brack's protected speech: it had caused "immediate damage to MetroHealth's relationship with Cuyahoga County," and required "immediate attention and renewed commitments from members of MetroHealth's executive leadership."

72.     In a two-page, single-spaced memorandum to supplement Defendant Boutros's email to Budish and assuage MetroHealth's profitable client, MetroHealth set out in no uncertain terms its retaliatory motive for removing Nurse Brack from the jail. Nurse Brack was still on leave, but MetroHealth summoned him to a meeting with its labor lawyer, Emily Fiftal, and two other senior administrators, and required to sign the putative notice of employment violations (the "Removal Memorandum").[9]

73.     The Removal Memorandum opened with a "Description of violation," and confirmed that MetroHealth removed Nurse Brack for his protected speech at the May 22, 2018 Council meeting. In black letters, it confirmed every element of Nurse Brack's First Amendment retaliation claim.

74. .    First, the Removal Memorandum confirmed that Nurse Brack spoke in his personal capacity and not in the ordinary scope of his duties. "In a scenario that Mr. Brack does not generally encounter in the ordinary scope of his duties," it opened, "Mr. Brack's very negative comments about MetroHealth's relationship with the County were outside the scope of his role and should have been handled through appropriate MetroHealth leadership and media relations."[10]

---

[8] Removal Memorandum (June 4, 2018) (attached as Ex. 3) at 1.

[9] *Id.*

[10] This resolves any issue under *Garetti v. Ceballos*, 547 U.S. 410 (2006) and *Lane v. Franks*, 134 S.Ct. 2369 (2014) as to whether Nurse Brack's speech was protected against retaliation. *See Mayhew v. Town of Smyrna, Tennessee,* 856 F.3d 456, 464 (6th Cir. 2017) ("Although *Garetti* carves out an exception to First Amendment protection for speech that 'owes its existence to a public employee's professional responsibilities,' this exception 'must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment.' Or, in *Lane's* words, 'the critical question under *Garetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns

75.     Second, it confirmed that Nurse Brack spoke on a matter of public concern—his knowledge of mismanagement and obstruction by Mills, and his disrespect for officials charged with vital public functions.[11] "In a public meeting of the Cuyahoga County Council Public Safety and Justice Affairs Committee," it proceeded, "Mr. Brack was asked to describe the relationship between MetroHealth and Cuyahoga County regarding the clinical operations at County Corrections." Criticism of official conduct and unauthorized action by public officials, particularly involving matters of health and safety, is quintessentially of public concern, and the County Council was specifically interested in the subjective character of the relationship between County officials and nursing staff, because it affected nurse-hiring, retention, and clinical operations generally. But the Removal Memorandum faulted Nurse Brack for providing that very information—for noting that Mills threw his weight around in meetings where he lacked proper authority, and for "using highly negative and subjective terms" to characterize Mills's conduct in the discharge of his official responsibilities. And it was signed by a lawyer for a public healthcare provider who should have known that "When an institution oversees some aspect of public safety, the correct operation of that institution is a matter of public concern," and "the interest in public safety outweighs the state's interest in conducting its affairs collegially."[12]

76.     Third, the Removal Memorandum confirmed retaliatory motivation, both on the County's part, and on MetroHealth's. The County's problem was that Nurse Brack's criticisms were "personally offensive" to Mills, and Budish "immediately requested" his removal. MetroHealth's

---

those duties.'") (cleaned up; citations omitted); *see also Allard v. Michigan House of Representatives*, 200 F. Supp. 3d 703, 709–10 (W.D. Mich. 2016) (speech was made in personal capacity because it "accus[ed] . . . supervisors of malfeasance.").

[11] Mills was later indicted for the lies Nurse Brack exposed, but the First Amendment does not "limit reports of wrongdoing to illegal acts, for a public concern includes any matter of political, social, or other concern to the community." *Mayhew*, 856 F.3d at 469 (cleaned up). This includes "mismanagement by public employees." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 544 (6th Cir. 2012).

[12] *Hoover v. Borough of 307 F.3d 460, 469 (6th Cir. 2002)*

problem was reputational and financial: Nurse Brack's truthful public testimony harmed

MetroHealth's relationship with Budish, its "reputation" and "key relationships" and required

remedial attention to preserve a profitable contract. Indeed, for that very reason, Nurse Brack had

been specifically "coached" by Platten, who unconstitutionally forbade him from criticizing the

County, even as she tried to ensure he was to have no substantive speaking role, and instructed him

to alter his truthful testimony about misconduct to be "diplomatic."

77.     County Communications Director Mary Louise Madigan confirmed to media that the

County requested Nurse Brack be replaced and did so in retaliation for his truthful speech.

78.     Those commitments are public record. These public officials were operating with such

impunity that they frankly disclosed and confirmed in writing that they were retaliating against Nurse

Brack for his protected speech on May 22, 2019.

79.     Nurse Brack asked who at the County demanded his removal, but MetroHealth's attorney

for labor relations, Emily Fiftal, refused to tell him, saying "I don't know that we have to tell you

nor do we at this point want to tell you." But Budish's role was no great secret.

### The County's culture of retaliation is well known.

80.     The swift and vindictive backlash against Nurse Brack was consistent with the the County's

culture of retaliation. Budish's desire to avoid embarrassment was well-known, as was his solicitude

for Mills. In but one example, in December 2018, when Sherriff Pinkney was asked to testify before

the Council about who at the County had reached out to an unbid vendor, Naph Care, to explore

privatization options for medical care at the Corrections Center, Pinkney falsely disclaimed

knowledge. He knew it was Mills, but feared Budish.

81.     Afterwards, Pinkney explained to Nurse Brack that he was worried Budish would be "ticked

off" if he identified Mills. Budish had specifically instructed Pinkney to be "politically correct," and

Pinkney knew Budish would retaliate if Pinkney's testimony embarrassed Budish or Mills, telling

Nurse Brack, "I talked with Budish and I can't just throw Mills under the bus to humiliate Budish." The sheriff had frequently voiced his dislike for Mills to Nurse Brack, but said he was powerless to correct Mills's interference because of Budish.

### Other public employees protest Nurse Brack's removal.

82.     Two days later, on June 6, 2018, several of Nurse Brack's colleagues at the VA (where he worked part-time) drafted and sent Budish a heartfelt "Letter of Support" protesting the County's retaliation against Nurse Brack. His colleagues expressed "disappointment and concern regarding the County's response to Gary Brack after the Public Safety and Justice Affairs Meeting," and insisted that the County make amends. The VA nurses found it "distressing" that the County treated Nurse Brack's warnings as evidence of a lack of trust. As a nurse, they explained, Nurse Brack was ethically obligated to speak up about issues that might harm his patients, and "morally obligated to report problems."

83.     Nurse Brack "championed courage and brought clarity to problems the jail is facing where others could not or would not take that risk," the letter explained. "We insist that Cuyahoga County not promote a culture of fear while claiming to want trust."

### MetroHealth terminates Nurse Brack's employment.

84.     Nures Brack remained in limbo on administrative leave as he was subpoenaed to testify in state and federal criminal investigations involving official malfeasance at the jail. On June 29, 2018, the undersigned counsel informed MetroHealth of Nurse Brack's claims for First Amendment retaliation and workplace discrimination and requested MetroHealth take no further action against Nurse Brack, warning that holding his discharge over his head, particularly while he was asked to provide investigators with information about his employment, amounted to further retaliation.

85.     On July 10, 2018, MetroHealth's general counsel Laura McBride responded, stating that MetroHealth would be terminating Nurse Brack's paid leave if he did not accept other non-director

roles (or serve as a staff nurse) while he explored options. None of the roles MetroHealth offered

were equivalent to his previous director-level responsibilities.

86.     By letter dated August 29, 2018, MetroHealth terminated Nurse Brack's employment.

## CLAIM 1
### CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (AGAINST ALL DEFENDANTS)

1.     Plaintiff incorporates all previous allegations.

2.     Defendants' acts detailed above constitute a conspiracy to violate Nurse Brack's

constitutional rights.

3.     Defendants came to a mutual agreement and understanding to remove Nurse Brack from his

position in retaliation for his protected speech. In furtherance of this conspiracy, Defendants

undertook the acts detailed above, which would not have been undertaken without the agreement.

Those included removing Nurse Brack from his role in the jail and then constructively discharging

him through threatened demotion.

4.     Nurse Brack's constitutional rights were violated as a result of this conspiracy, causing him

irreparable harm.

5.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and

continues to suffer economic and non-economic damages for which Defendants are liable.

6.     Defendants acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 2
### FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983
### (AGAINST ALL DEFENDANTS)

87.     Plaintiff incorporates all previous allegations.

88.     Nurse Brack was a public employee who engaged in protected activity by providing internal

reports of wrongdoing and public testimony before the County Council, and providing testimony to

federal and state investigators, on matters of public concern when that speech was not part of his ordinary job duties. In speaking out, Nurse Brack engaged in constitutionally protected activity under the First and Fourteenth Amendments.

89.     Defendants knew Nurse Brack had engaged in protected speech, but took adverse actions against him, including making caustic remarks and expressing hatred in the workplace, creating and circulating a notice of putative employment violations, and constructively discharging him.

90.     Nurse Brack's First Amendment-protected speech was a substantial or motivating factor in the adverse actions he suffered at Defendants' hands.

91.     Defendants lack any countervailing interest that outweighs Nurse Brack's interest in speaking out on the above-mentioned matters, or the public's interest in knowing about mismanagement at the County jail.

92.     The contours of Nurse Brack's rights to speak on matters of public concern as a private citizen were sufficiently clearly established at the time he exercised them to apprise Defendants that retaliating against him for exercising those rights was unlawful.

93.     Defendants retaliated against Nurse Brack under color of state law. Budish retaliated against Nurse Brack by demanding that MetroHealth remove him from his position at the jail.[13] MetroHealth, Boutros, and Platten retaliated against Nurse Brack by doing Budish's bidding as described above.

94.     Mills spurred Budish to retaliate.

95.     As a direct and proximate result of Defendants' retaliation, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable,

---

[13] *See Larry v. Powerski*, 148 F.Supp.3d 584 (E.D. Mich. 2015) ("the substance of the plaintiff's retaliatory harassment allegations present entirely free-standing claims for relief that would be actionable against him individually even if the hospital itself had acted on Pawelski's termination recommendation.").

including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

96.     Defendants' acts under this policy were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from adopting such unlawful policies.

### CLAIM 3
### LOCAL-GOVERNMENT LIABILITY FOR FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983
### (AGAINST THE COUNTY AND METROHEALTH)

97.     Plaintiff incorporates all previous allegations.

98.     Defendants Budish, Mills, Boutros, and Platten are or were sufficiently empowered public officials that their acts constitute the customs, policies, and practices of the County and MetroHealth, respectively. By creating and accepting memoranda that purported to justify retaliation against Nurse Brack for criticizing mismanagement and malfeasance by Mills, Defendants implemented and ratified a policy of retaliating against employees who criticize County administrators.

99.     As a direct and proximate result of this unconstitutional policy, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which the County and MetroHealth are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

### CLAIM 4
### UNLAWFUL FIRST AMENDMENT PRIOR RESTRAINT UNDER 42 U.S.C. § 1983
### (AGAINST METROHEALTH, BOUTROS, AND PLATTEN)

100.     Plaintiff incorporates all previous allegations.

101.     MetroHealth, through its sufficiently empowered policymakers, imposed and ratified orders prohibiting Nurse Brack from responding honestly to questions from legislators if his responses

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

and Platten purported to require Nurse Brack to seek permission before speaking, and forbade him from criticizing the County.

102.     As a direct and proximate result of these Defendants' prior restraints on Nurse Brack, he has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

103.     Defendants' acts under this policy were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from adopting such unlawful policies.

### CLAIM 5
### LOCAL-GOVERNMENT LIABILITY FOR PRIOR RESTRAINT UNDER 42 U.S.C. § 1983
### (AGAINST METROHEALTH)

104.     Plaintiff incorporates all previous allegations.

105.     Defendants Budish, Mills, Boutros, and Platten are or were sufficiently empowered public officials that their acts constitute the customs, policies, and practices of the County and MetroHealth, respectively. By memorializing Platten's directives through counsel, and retaliating against Nurse Brack for violating them, MetroHealth ratified a policy of imposing advance restrictions on employee criticisms of County malfeasance, effecting a prior restraint on protected public-employee speech.

106.     As a direct and proximate result of this unconstitutional policy, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

107.     Defendants' acts under this policy were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from adopting such unlawful policies.

## CLAIM 6
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—INTERFERING WITH CIVIL RIGHTS UNDER R.C. 2307.60 AND 2921.45
### (AGAINST ALL INDIVIDUAL DEFENDANTS)

108.    Plaintiff incorporates all previous allegations.

109.    Under R.C. 2921.45 (Interfering with Civil Rights), no public servant, under color of his

office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any

person of a constitutional or statutory right. This provision carries a criminal penalty.

110.    Under R.C. 2307.60 (Civil Liability for Criminal Acts), anyone injured in person or property

by a criminal act may recover full damages in a civil action.

111.    The individual defendants are public servants. Under color of their office, employment, or

authority, each knowingly deprived Nurse Brack of his constitutional and statutory rights as detailed

above, including his right to be free from retaliation for speaking on matters of public concern as a

private citizen.

112.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will

continue to suffer economic and non-economic damages for which Defendants are liable, including,

but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages,

and benefits, and other terms, privileges, and conditions of employment.

113.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 7
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—COMPLICITY UNDER R.C. 2307.60 AND 2923.03 TO INTERFERE WITH CIVIL AND STATUTORY RIGHTS UNDER R.C. 2921.45
### (AGAINST ALL INDIVIDUAL DEFENDANTS)

114.    Plaintiff incorporates all previous allegations.

115.    Under R.C. 2923.03 (Complicity), no person, acting with the kind of culpability required for

the commission of an offense, shall do any of the following.

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the

Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

116.    This provision carries a criminal penalty.

117.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full

damages in a civil action.

118.    Defendants were engaged in complicity to interfere with Nurse Brack's civil and statutory

rights.

119.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will

continue to suffer economic and non-economic damages for which Defendants are liable, including,

but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms,

privileges, and conditions of employment.

120.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 8
CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—OBSTRUCTING OFFICIAL
BUSINESS UNDER R.C. 2921.31 AND 2307.60
(AGAINST DEFENDANTS BUDISH, MILLS, AND BOUTROS)

121.    Plaintiff incorporates all previous allegations.

122.    Under R.C. 2921.31, it is unlawful "to prevent, obstruct, or delay the performance by a

public official of any authorized act within the public official's official capacity, shall do any act that

hampers or impedes a public official in the performance of the public official's lawful duties."

123.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full

124.     Defendants Mills and Budish intentionally interfered with Nurse Brack's discharge of his duties as interim director of ambulatory care, including by intentionally understaffing corrections officers, interfering with nurse hiring, and demanding (and in Mills's case causing Budish to demand) that MetroHealth remove Nurse Brack from those responsibilities for criticizing Defendant Mills.

125.     As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

126.     Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 9**
**CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—COMPLICITY UNDER R.C. 2307.60**
**AND 2923.03 TO OBSTRUCT OFFICIAL BUSINESS UNDER R.C. 2921.31**
**(AGAINST ALL INDIVIDUAL DEFENDANTS)**

127.     Plaintiff incorporates all previous allegations.

128.     Under R.C. 2923.03 (Complicity), no person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

    (1) Solicit or procure another to commit the offense;

    (2) Aid or abet another in committing the offense;

    (3) Conspire with another to commit the offense in violation of section 2923.01 of the
    Revised Code;

    (4) Cause an innocent or irresponsible person to commit the offense.

129.     This provision carries a criminal penalty.

130.     Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLJK1

Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

132.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will

continue to suffer economic and non-economic damages for which Defendants are liable, including,

but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages,

and benefits, and other terms, privileges, and conditions of employment.

133.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful conduct.

CLAIM 10
(ALTERNATIVE CLAIM)
CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—RETALIATION BECAUSE
PUBLIC SERVANT DISCHARGED HIS DUTIES
UNDER R.C. 2307.60 AND 2921.05
(AGAINST ALL DEFENDANTS)

134.    Plaintiff incorporates all previous allegations.

135.    Under R.C. 2921.05, no person, purposely and by unlawful threat of harm to any person or

property, shall retaliate against a public servant because the public servant discharged his duties. The

provision carries a criminal penalty.

136.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full

damages in a civil action.

137.    If the Court determines that Nurse Brack's speech was in the course of discharging his

duties and not speaking in his capacity as a citizen—which it should not, then Defendants retaliated

against Nurse Brack for discharging his duties.

138.    This retaliation involved ratifying homophobic harassment, threatening disciplinary action,

and ordering and/or constructively terminating and then terminating Nurse Brack.

139.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will

continue to suffer economic and non-economic damages for which Defendants are liable, including,

but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages,

140.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 11
### (ALTERNATIVE CLAIM)
#### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—COMPLICITY UNDER R.C. 2307.60 AND 2921.05 TO RETALIATION BECAUSE PUBLIC SERVANT DISCHARGED HIS DUTIES
#### (AGAINST ALL DEFENDANTS)

141.    Plaintiff incorporates all previous allegations.

142.    Under R.C. 2923.03 (Complicity), no person, acting with the kind of culpability required for

the commission of an offense, shall do any of the following:

> (1) Solicit or procure another to commit the offense;

> (2) Aid or abet another in committing the offense;

> (3) Conspire with another to commit the offense in violation of section 2923.01 of the
>
> Revised Code;

> (4) Cause an innocent or irresponsible person to commit the offense.

143.    This provision carries a criminal penalty.

144.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full

damages in a civil action.

145.    If the Court determines that Nurse Brack's speech was in the course of discharging his

duties and not speaking in his capacity as a citizen—which it should not, then Defendants were

engaged in complicity to retaliate because a public servant was discharging his duties.

146.    This retaliation involved ratifying homophobic harassment, threatening disciplinary action,

and ordering and/or constructively terminating and then terminating Nurse Brack.

147.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will

continue to suffer economic and non-economic damages for which Defendants are liable, including,

but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

148.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 12
## (ALTERNATIVE CLAIM)
### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (AGAINST METROHEALTH)

149.    Plaintiff incorporates all previous allegations.

150.    Clear public policies exist regarding protecting those in government custody from foreseeable harm, permitting County Council to gather facts and receive information regarding its areas of legislative and oversight responsibility, providing adequate medical care to inmates, and related policies.

151.    Nurse Brack's dismissal was motivated by his raising the alarm about the manifest dangers of the jail mismanagement under Mills. If the Court determines that Nurse Brack was not protected by any of the causes of action above, dismissing or constructively discharging an employee under the circumstances described above would jeopardize each of those public policies.

152.    MetroHealth had no legitimate business justification for constructively discharging Nurse Brack.

153.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which MetroHealth is liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

154.    Defendant's acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

CLAIM 13
(ALTERNATIVE CLAIM)
CIVIL CONSPIRACY TO WRONGFULLY TERMINATE NURSE BRACK
(AGAINST DEFENDANTS BUDISH, MILLS, AND THE COUNTY)

155.     Plaintiff incorporates all previous allegations.

156.     Defendants Budish, Mills, and the County maliciously worked together with MetroHealth to

effectuate Nurse Brack's wrongful termination in violation of public policy.

157.     As described above, one or more Defendants committed overt acts in furtherance of the

conspiracy acting purposefully without reasonable or lawful excuse.

158.     As a direct and proximate result of Defendants' unlawful conduct, Nurse Brack has suffered

and will continue to suffer economic and non-economic damages for with these Defendants are

liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, loss of

salary, wages, and benefits, and other privileges and conditions of employment.

159.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter Budish, Mills, and others from engaging in this type of unlawful conduct.

PRAYER FOR RELIEF

For the reasons stated above, Nurse Brack respectfully requests the following relief from the Court:

A.     Declare that Defendants' acts and conduct constitute violations of federal and state law and the United States Constitution;

B.     Enter judgment in Plaintiff's favor on all claims for relief;

C.     Enjoin Defendants from engaging in First Amendment retaliation or otherwise encroaching on civil and constitutional rights;

D.     Award Plaintiff full compensatory damages, economic and non-economic, including, but not limited to, damages for back pay, front pay, pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that he has suffered and is reasonably certain to suffer in the future;

E.     Award Plaintiff punitive damages as appropriate for all intentional and malicious violations of federal and state law and constitutional rights;

F.     Award pre-judgment and post-judgment interest at the highest lawful rate;

G.   Award Plaintiff his reasonable attorneys' fees (including expert fees) and all other costs of this suit;

H.   Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable just, or proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/ Ashlie Case Sletvold*
Subodh Chandra (0069233)
Ashlie Case Sletvold (0079477)
Brian Bardwell (0098423)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Gary Brack*



**CUYAHOGA COUNTY
AGENCY OF INSPECTOR GENERAL**

REPORT OF INVESTIGATION

CASE NUMBER:                              18-0050-I

SUBJECT(S) INFO:                        Kenneth Mills, Former Regional Director of Corrections
COUNTY DEPARTMENT:             Cuyahoga County Sheriff's Department

SOURCE OF REFERRAL:            Cuyahoga County Human Resources Department
METHOD OF REFERRAL:           Email
INITIATED:                                    September 24, 2018
DATE OF REPORT:                       December 31, 2018 (amended January 8, 2019)

## I. Summary

The Cuyahoga County ("County") Agency of Inspector General ("AIG") received notice that Regional Director of Corrections Kenneth Mills was potentially engaging in discriminatory comments and behavior in the workplace. Following requests from the Law Department and Human Resources, the AIG investigated the allegations. Consistent with its requirement to avoid interfering with investigations by other government entities, the AIG temporarily suspended its proceedings during the pendency of an investigation by the US Marshal's service.

After interviewing eighteen witnesses and reviewing numerous documents, *the AIG is of the opinion that there is sufficient evidence to indicate Mills likely made discriminatory comments regarding Marcus Harris' ("Harris") and Gary Brack's ("Brack") perceived sexual orientation; and was not sufficiently compliant with the County's continuing commitment to diversity.* Despite numerous requests over several weeks that he appear for an interview with the AIG, Mills has not done so.

The AIG investigation confirmed three witnesses who reported first-hand knowledge of Mills' discriminatory comments. Further, other County employees reported as to widespread commentary in the workplace regarding similar comments allegedly made by Mills. These secondary reports are given little or no weight as to Mills' personal conduct. Nonetheless, the reports by secondary sources are reported because they were widely-disseminated and reflect – at minimum – the need for the County to re-double its current efforts to support a Culture of Respect. It is also indicative of the need to protect whistleblowers from the fears of retaliation for reporting such conduct. The AIG did not find sufficient direct evidence to support claims that Mills made anti-semitic comments.

Effective November 15, 2018, Mills resigned from County employment. As such, the AIG cannot recommend corrective action specific to Mills. The AIG, however, recommends that the County expand its training and educational efforts that will reinforce the County's commitment to supporting a Culture of Respect.

**EXHIBIT**

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 2 of 14

## II. Background

### A. Cuyahoga County Sheriff's Department

According to its website the mission of the Sheriff's Department is as follows:

> Our mission as caretaker of the public's safety is dedicated to maintaining the trust and respect of those we serve by resolutely and aggressively enforcing the law and by committing ourselves to the efficient and effective delivery of safety services. As agents of the community, we strive to provide appropriate custodial care along with programs that support the physical, spiritual and constitutional needs of individuals committed to our custody. Further, every effort will be made to assist the inmates in our custody to understand and take responsibility for their involvement in the justice system.

The Department has several divisions – Civil, Law Enforcement and Corrections.  The County Sheriff is Clifford Pinkney.

### B. Cuyahoga County Sheriff's Department – Corrections Division

According to the Corrections webpage, the County Corrections Center ("CCC") is the second largest Jail in the state and is a full-service Jail serving over 26,000 inmates annually.

During the course of the investigation, AIG staff learned that there are currently three locations, Downtown, Euclid, and Bedford. The Downtown Jail, which is the primary facility, consists of two high rise buildings housing all levels of security statuses, from maximum security to weekenders.

The CCC operates a full-service Kitchen, Medical Clinic and Pharmacy and provides Social Service programing, all managed by a staff of over 700 employees. CCC partners with MetroHealth for medical care.

The CCC is managed by a Regional Director of Corrections, a Warden, three Associate Wardens, Facility Services Manager, Mental Health Services Manager, and Health Care Services Director. The daily operations are managed by sergeants who oversee Corporals and a complement of approximately 550 Corrections Officers.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 3 of 14

## C. Kenneth Mills

Kenneth Mills ("Mills") was employed by the County for four years. Mills began working at the County in 2014 as Director of Public Safety and Justice. In 2015, he transitioned to Regional Director of Corrections where he served until his resignation on November 15, 2018.

Mills resigned before AIG staff had an opportunity to interview him. Subsequently, AIG staff attempted to contact Mills and his legal counsel multiple times – by telephone, regular mail, and certified mail. In response, Mills left a voicemail indicating that he needed to consult with legal counsel as to whether he would be willing to speak with the AIG. After his voicemail, communications were directed only to Mills' legal counsel. However, despite multiple efforts, the AIG was not able to interview Mills.

| DATE | CONTACT TYPE | NUMBER/EMAIL/ ADDRESS | NOTES |
|------|--------------|------------------------|-------|
| November 19, 2018 | Telephone to Mills' number in personnel file. | | Line ringing – then fast beeping – could not leave a message. |
| November 27, 2018 | Telephone to Mills' number in personnel file. | | Line ringing – then fast beeping – could not leave a message. |
| November 27, 2018 | Regular USPS to Mills' address in personnel file. | | |
| November 27, 2018 | Certified USPS to Mills' address in personnel file. | | Return receipt received by AIG December 11, 2018. |
| December 12, 2018 | Telephone – Voicemail from Mills. | | Mills left a voicemail message for IG stating he needed to discuss AIG request with attorney. |
| December 13, 2018 | Telephone to Mills' cell phone number. | | AIG obtained Mills' cell phone number and called to request contact information for attorney. |
| December 13, 2018 | Telephone - Message left for Mills' attorney Kevin Spellacy at his office. | | AIG staff left a message with Attorney Spellacy's assistant. |
| December 13, 2018 | Email to Mills' attorney Kevin Spellacy – requesting interview with Mills no later than December 21, 2018. | | |
| December 13, 2018 | Certified USPS to Mills' attorney Kevin Spellacy at his office requesting | | Return receipt received by AIG December 19 or 20, 2018. |

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 4 of 14

|  | interview with Mills no later than December 21, 2018. |  |  |
|---|---|---|---|
| December 14, 2018 | Telephone – Voicemail from Mills' attorney Kevin Spellacy. |  | Spellacy left a voicemail for AIG staff returning AIG call. |
| December 18, 2018 | Telephone - Message left for Mills' attorney Kevin Spellacy at his office. |  | AIG staff left a message with Spellacy's assistant. |

As of the date of this report, the AIG has received no affirmative or negative response from Mills or his attorney regarding its request for an interview with Mills. Accordingly, there is no interview of Mills in this report.

### D. Investigation

#### 1. Written and Electronic Documents Reviewed by AIG in the Course of this Investigation

- Letter from Gary Brack's Attorney, Subodh Chandra
- Kenneth Mills Emails from 1/1/18 - 9/20/18
- Kenneth Mills Emails from 1/1/17-12/31/17
- Kenneth Mills HR Personnel File, Job Description, Disciplinary File
- Cuyahoga County Ethics Code
- Cuyahoga County Employee Handbook

#### 2. Interview of Gary Brack – May 30, 2018

Prior to this interview, Brack was the interim Nursing Director at the County Jail. Brack was employed by MetroHealth but worked with the three County jails: the downtown jail location, the Euclid jail location, and the Bedford Heights location. Brack started working with County jails in September of 2016, as a Nursing Supervisor. He also took on administrative duties such as scheduling and grievances. When Nursing Director, Harris, resigned from his position, Brack became the interim Nursing Director until MetroHealth pulled him from working at the County jail.

During an interview with AIG staff, Brack indicated that he had received reports of discriminatory comments and behavior by Mills. In April 2018, Brack was told by Employee-1 ("Employee-1") that Mills asked Employee-1 "if Gary [Brack] and Marcus [Harris] were fucking". According to Employee-1, Mills then said, "I hate fucking faggots" when she asked why he cared. When asked about any other discriminatory behavior on the part of Mills, Brack also mentioned that when discussing a budgeting concern, Mills purportedly made anti-semitic comments to Employee-1 regarding County Executive Armond Budish ("Executive Budish").

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 5 of 14

### 3. Interview of Employee-1 – October 1, 2018 and November 16, 2018

Employee-1 ("Employee-1") has been employed by the County Sheriff's Department ("Sheriff's Department") in the Fiscal Office ("Fiscal") for ten (10) years. Employee-1 has six direct reports and reports directly to senior leaders in the Sheriff's Department.

During the interview, AIG staff asked Employee-1 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-1 gave the following examples:

1. Employee-1 stated that in 2017 when she and Mills were discussing Harris' mileage reimbursement request (that Mills did not want to sign), Mills asked her "You do know they're lovers? They are faggots". Employee-1 stated that Mills may have said "fucking faggots", but was not certain;

2. Employee-1 stated that in 2017 when she and Mills were discussing requesting more money for cameras in the jail, Mills told her the "You know the Executive is not going to give you any more money, he's a Jew";

3. Employee-1 stated that in 2017 Mills told Employee-1 that an African-American sergeant is an inadequate employee. Employee-1 then asked how she got her job, and Mills pointed to his arm as though he meant skin color;

4. In 2017 Employee-6 told Employee-1 that one of nurses intended to file a sexual harassment complaint against Mills; and

5. Employee-1 stated Mills told her the Sheriff thinks he is untouchable because he is the first African-American Sheriff.

Employee-1 noted that Mills always made these comments when there were no other witnesses.

When asked if she ever made a formal report regarding Mills' comments, Employee-1 stated she was reluctant to report due to a fear of retaliation and when Brack was terminated her fears were confirmed.

### 4. Interview of Employee-2 – October 23, 2018

Employee-2 ("Employee-2") is a senior manager in the County Office of Budget and Management ("OBM"). Employee-2 also advises the County Executive and County Council on budget-related matters.

According to Employee-2, no one from the Sheriff's Department reports directly to OBM, but Employee-2 and her team work with Employee-1. OBM, however, does make budget restriction recommendations.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 6 of 14

Employee-2 stated that she believes there was a personality conflict between Mills and Employee-1.

During the interview, AIG staff asked Employee-2 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-2 gave the following examples:

1. Mills told Employee-2 that Employee-4 and Sheriff Pinkney were stupid, lazy, and did not want to manage the jail;

2. Mills told Employee-2 that Sheriff Pinkney was only appointed because he is black;

3. Mills made an anti-homosexual comment in Employee-2's office. Employee-2 does not remember exactly what he said but she stated her belief that Mills' comments indicated that he "does not like homosexuals"; and

4. Mills stated that he thought Harris and Brack were dating.

Employee-2 noted that these comments were not made in the presence of other witnesses.

### 5. Interview of Sheriff Clifford Pinkney – October 4, 2018

Sheriff Pinkney has been employed with the County Sheriff's Department since 1991. Sheriff Pinkney has held the following positions: deputy sheriff, deputy sergeant, lieutenant, Chief Deputy Sheriff, and in 2015 became the Sheriff. As County Sheriff, Pinkney's job duties include overseeing the Sheriff's Department office operations, as well as developing and maintaining partnerships with stakeholders, in the community, and with other law enforcement entities. Sheriff Pinkney reports to Executive Budish. Sheriff Pinkney's direct reports include Employee-4, Special Assistant to the Sheriff, Director of Regional Corrections, Business Services Manager, Medical Director, and other Sheriff personnel as necessary.

During the interview, AIG staff asked Sheriff Pinkney if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Sheriff Pinkney gave the following examples of complaints he had received:

1. Employee-1 told Sheriff Pinkney that Mills made comments about Brack and Harris' sexuality;

2. Employee-1 told Sheriff Pinkney that Mills made comments about working for African Americans – something to the effect of "they are lazy" and he would not enjoy working for two African Americans if George Taylor took the Chief job;

3. Employee-1 told Sheriff Pinkney that Mills made a derogatory comment about Executive Budish being Jewish and therefore cheap;

4. There was a rumor that Mills did not like women or African Americans;

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 7 of 14

5. Sheriff Pinkney received separate telephone calls from two female Common Pleas Judges stating they believed that Mills dislikes women.  In fact, one of the Judges stated she did not want to work with Mills because he was "condescending and a chauvinist"; and

6. Employee-6 told Sheriff Pinkney the nurses complained about Mills' behavior but were afraid to come forward due to the possibility of retaliation from Mills.

The Sheriff stated he did not take action on Employee-1's statements because he had no proof other than Employee-1's allegations and he knew Employee-1 and Mills had a strained relationship.  Furthermore, he did not take action on the other information because they were informal "gripes" and he had no evidence or specific information.

### 6. Interview with Employee-3 – October 15, 2018

Employee-3 ("Employee-3") was a day shift charge nurse in the main dispensary. Employee-3 recently resigned from the County and is moving to work in a federal prison. At the time of the interview, Employee-3 had worked for the County for almost 15 years. Employee-3's duty as charge nurse was to oversee all staff nurses, be responsible for day-to-day operations in the dispensary, and respond to emergencies.

During the interview, AIG staff asked Employee-3 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-3 gave the following examples:

1. There was discussion among corrections officers ("CO") that Mills sent an email that said, "that fucking faggot" (referring to Harris) "is never going to tell me what to do"; and

2. It was believed in the jail that Mills does not like gay people.

Other pertinent information included:

1. Employee-3 stated that when Mills first came to the County he would always talk to her. The attempted communications were "super friendly" and "odd".

2. Employee-3 stated that in the jail she heard corrections officers refer to Harris as a "woman" or a "faggot." Employee-3 also stated that, after Brack was terminated, many corrections officers said they were glad that the "fag is gone."

3. Employee-3 stated that there was an issue with male inmates receiving bras and panties.  Floor supervisors did not want to provide the underclothes and therefore required a medical prescription before providing the underclothes to inmates.  The nurses would tell the COs that no prescription was necessary, and the COs would still refuse to provide the requested underclothes to the inmates.

Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 06/21/2019 /Cuyahoga County Amanda Meltzer  Confirmation CDBKM1
Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 8 of 14

## 7. Interview of Employee-4 – September 27, 2018

At the time of the interview, Employee-4 had been a senior leader of the Cuyahoga County Sheriff's Department for three (3) years. Employee-4 reports directly to Sheriff Pinkney. Employee-4's direct reports include an employee from, both the law enforcement and administrative divisions of the Sheriff's department, the Director of Regional Corrections, and the Medical Director from MetroHealth. As of November 19, 2018, Employee-4 is now the interim Director of Regional Corrections.

During the interview, AIG staff asked Employee-4 if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-4 gave the following examples:

1. Someone (he does not remember who) told Employee-4 that Mills made a comment about Brack and Harris dating.

2. Someone (he does not remember who) told Employee-4 that there are female employees and female Judges who did not like to interact with Mills.

3. Someone (he does not remember who) commented to Employee-4 that Mills made an anti-Semitic comment about Executive Budish - something to the effect that Executive Budish is a Jew and does not want to give money to Mills' budget.

Employee-4 noted that Mills and Employee-1 did not get along well together.

## 8. Interview of Employee-5– October 1, 2018

Employee-5 ("Employee-5") is a senior leader in the County Sheriff's Department. Employee-5 started in this role in September 2018. Employee-5 reports to Warden Eric Ivey ("Ivey"), who reports to Director of Regional Corrections Ken Mills ("Mills"), who reports to Chief George Taylor who reports to Sheriff Clifford Pinkney ("Sheriff Pinkney"). Within his chain of command, Employee-5 supervises a total of sixty (60) COs, a corporal, and a sergeant—who reports directly to Employee-5. Employee-5's job duties include booking and release.

During the interview, AIG staff asked Employee-5 if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-5 gave the following example: There was a claim that Mills said one of the County employees makes too much money for a woman.

## 9. Interview of Employee-6 – October 3, 2018

Unlike other witnesses identified in this report, Employee-6 is an employee of MetroHealth Hospital System, not an employee of the County. Employee-6 works in the County jail as the Ambulatory Director, and she has been in this position for 4 ½ years. Her duties include budgeting and operations within the CCC medical facility. Her direct reports are nurse

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 9 of 14

practitioners and paramedics, and she reports to Julia Brunner (Director of Ambulatory) at MetroHealth.

During the interview, AIG staff asked Employee-6 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-6 gave the following examples:

1. There was a rumor that Mills said Harris and Brack are gay and are dating; and

2. Employee-1 told Employee-6 that Mills said Employee-6 made too much money for a woman.

### 10. Interview of Employee-7 – October 4, 2018

Employee-7 has been with the county for five years. Her current position is Business Administrator in the Fiscal Department. She has been in her current position since February 2017, and was in Justice Services previously for one year. She is currently 2nd in command in the Fiscal Department, and her duties are to discover and manage grants whether they are federal grants, state grants and any other grants that may be available for the jails. She also manages revenue tracking, statistic request, manages the analysis, staffing numbers, etc., and ad hoc reports. Her direct reports are Lylia Latham, Judy Fulkerson, and there is a current vacancy. Employee-7 reports to Employee-1, Employee-1 reports to Taylor and Taylor reports to the Sheriff.

During the interview, AIG staff asked Employee-7 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-7 gave the following examples:

1. Employee-7 heard Mills made a comment about the Sheriff that made her uncomfortable enough to abruptly leave a meeting. Employee-7 believes the comment was something to the effect of the Sheriff is too tight to give up money for new cameras and could find the money if he wanted to," the miser"; and

2. There was a discussion that the former business service manager left the Public Safety and Justice Department because Mills was sexist; and

3. Employee-7 heard from Employee-1 that Mills said Harris and Brack were "fags".

### 11. Interview of Dr. Thomas Tallman – October 12, 2018

Dr. Thomas Tallman ("Tallman") is employed by MetroHealth Hospital, and he currently holds the position as the Medical Director of the jails. Dr. Tallman has held this position for 4 ½ years and was previously employed as an emergency room physician for the Cleveland Clinic . His duties as Medical Director are to oversee the correctional health program, including its scheduled sick call process; oversee the 24/7 intake process; respond to medical emergencies or acute medical issues as they come up, and handle the overall health of inmates. Dr. Tallman reports to Dr. Julia Brunner at MetroHealth Hospital. Dr. Julia Brunner is the Director of Ambulatory Services and Outpatient Services. She also has frequent meetings with Jane

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 10 of 14

Platten at MetroHealth Hospital. Tallman's direct reports are nurses, the director of nursing, nursing supervisor, pharmacist, x-ray tech, dental, and all healthcare workers assigned to CCC. All nurses report to Tallman even if they are county employees.

During the interview, AIG staff asked Dr. Tallman if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Dr. Tallman gave the following examples:

1. Employee-1 told Dr. Tallman that Mills made comments about two nurses being gay lovers; and

2. Employee-1 told Dr. Tallman that Mills said, "we're never going to get more CO's because the Jew won't spend money." (referring to Executive Budish)

### 12. Interview of Employee-8 – December 4, 2018

Employee-8 is the Charge Nurse for Mental Health and Intake at the County jail. Her responsibilities include supervising Licensed Practical Nurses and Medical Techs. Employee-8 has been a County employee for 13 years. She reports to Nursing Director Aisha Parnell who reports to Dr. Tallman and/ Employee-6.

During the interview, AIG staff asked Employee-8 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-8 gave the following example:

- Employee-8 stated that Mills changed the policy regarding female CO tasks. Employee-8 explained that Mills changed the policy so that female COs could watch male pods and walk male inmates around the jail. Employee-8 stated, even when it was not necessary, Mills would require female COs to watch male pods saying something to the effect of "they took the job so they can do it."

### 13. Interviews of
### Employee-9 – October 3, 2018
### Employee-10 – October 9, 2018

When AIG staff asked the above employees if they knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. The above employees stated they had heard rumors of discrimination and/or homophobic comments but had no specific information.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 11 of 14

14. **Interviews of**
**Employee-11 – September 28, 2018**
**Employee-12 – October 5, 2018**
**Employee-13 – October 1, 2018**
**Employee-14 – October 5, 2018**

When AIG staff asked the above employees if they knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. The above employees stated they had no direct or indirect knowledge of such comments or behavior.

15. **Interview of Employee-15 – January 7, 2019.**

Employee-15 is a County corrections officer with more than ten years of service. Employee-15 stated that he personally heard Mills say "that faggot is trying to go after us", referring to Marcus Harris. Employee-15 recalled that this statement was made at some point in time after public complaints regarding the provision of medical services within the Jail.

## III. Analysis and Findings

### A. As a County Employee Kenneth Mills was Subject to the County Ethics Code

Section 402.01(F) of the County Code states "employee" shall mean any employee of Cuyahoga County, but not limited to, any person employed, full or part time in a temporary or permanent capacity, by the County Executive, the Prosecuting Attorney, the County Council, the Personnel Review Commission, the Board of Revision, the Inspector General, and any other county agency hereafter established by or pursuant to the charter. As Director of Regional Corrections, Mills was an employee for purposes of Chapters 402 and 403 of the County Code. Mills, therefore, are subject to the guidelines established by the County Code and prohibitions therein.

### B. Section 403.10 of the County Ethics Code Prohibits Discrimination

Pursuant to Section 403.10 of the County Ethics Code, no employee shall discriminate against anyone on the basis of race, religion, national origin, sex, gender, ethnicity, sexual orientation, gender identity and expression, disability, or genetic information.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 12 of 14

## C. Cuyahoga County Employees are subject to the County Employee Handbook

### 1. Cuyahoga County is Committed to Diversity

Pursuant to Section 3.01 of the County Employee Handbook,

> The County is committed to fostering a diverse and inclusive workforce, which includes building an environment that respects the individual, promotes innovation and offers opportunities for all employees to develop to their full potential.

### 2. Cuyahoga County is an Equal Employment Opportunity Employer

Pursuant to Section 3.02 of the County Employee Handbook,

> The County is committed to providing equal employment opportunities for all individuals regardless of race, color, ancestry, national origin, language, religion, citizenship status, sex, age, marital status, sexual preference or orientation, gender identity/expression, military/veteran status, disability, genetic information, membership in a collective bargaining unit, status with regard to public assistance, or political affiliation.

### 3. Cuyahoga County Must Investigate Reports of Discrimination

Pursuant to Section 3.05 of the County Employee Handbook, once potential discrimination is reported,

> The County will investigate all reported concerns. An investigation may include conducting interviews, obtaining written statements, and reviewing records. The County will complete investigations in a prompt manner. The length of the investigation will vary based on the circumstances involved. After obtaining and reviewing all available information, the County will determine if any employee violated any County policy. The employee who made the report and the accused employee(s) will be notified in writing of this determination.

> If the County finds that an employee has violated any County policy then Human Resources, in consultation with the employee's department director or designee, will determine the appropriate action, which may include corrective action, disciplinary action, mediation, training, or transfer.

In the instant matter, the Department of Human Resources requested that the AIG conduct the investigation to avoid any appearance of bias or impropriety.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 13 of 14

## D. *There is sufficient evidence to indicate that Mills likely made discriminatory comments about Harris and Brack's perceived sexual orientation*

Employee-1 stated that during a discussion with Mills about Harris' mileage reimbursement request, Mills said to her "You do know they're lovers? They are faggots." Additionally, Employee-2 stated that Mills made anti-homosexual comments in her presence, noted he thought Harris and Brack were dating, and made it clear he did not like people who are homosexual. Employee-15 stated that personally heard Mills say "that faggot is trying to go after us", referring to Marcus Harris. Based on these three separate statements, *the AIG is of the opinion that there is sufficient evidence to indicate Mills likely made discriminatory comments about Harris and Brack's perceived sexual orientation.* It is unclear, however, whether he took any action based on this discriminatory attitude.

## E. *There is sufficient evidence to indicate that Mills was not sufficiently supportive of Cuyahoga County's Continuing Commitment to Diversity*

Employee-1 stated that in 2017 during a discussion with Mills about requesting more money for cameras in the jail, Mills told her "You know the Executive is not going to give you any more money, he's a Jew". Employee-1 further stated that in 2017 Mills told her that a sergeant in the Sheriff's department was a terrible employee and insinuated that she only got her job because she is African American. Employee-1 also stated that Mills told her Sheriff Pinkney thought he was untouchable because he is the first African American Sheriff. Likewise, Employee-2 stated that Mills told her Sheriff Pinkney was only appointed because he is African American.

Sheriff Pinkney received separate telephone calls from two female Common Pleas Judges stating they believed that Mills dislikes women. Allegedly, one of the Judges stated she did not want to work with Mills because he was "condescending and a chauvinist". Moreover, indicating a failure to promote a culture of respect, there was substantial belief among County employees that Mills had made inappropriate comments.

Based on the above statements and information *the AIG is of the opinion that there is sufficient evidence to indicate Mills was not compliant with the County's commitment to diversity.* Specifically, Mills did not appear to be "fostering a diverse and inclusive workforce", or "building an environment that respects the individual". Rather he was inappropriately concerned with the gender, race, and religion of County employees and elected officials.

## IV. Conclusion and Recommendations

The AIG's investigation found an abundance of reports regarding Mills' comments and behavior. However, there were incidents that were relayed to AIG staff by individuals who had first-hand knowledge of Mills' alleged discriminatory comments. Specifically, three County employees separately heard Mills make different discriminatory comments regarding the perceived sexual

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 14 of 14

orientation of a subordinate employee and a contractor. Furthermore, Mills failed to fully comply with the County's commitment to diversity or to promote a culture of respect within the jail. Finally, the reports from the witnesses indicate a need to redouble the County's continuing efforts to support a culture of respect and to allay fears of retaliation for reporting inappropriate conduct.

Effective November 15, 2018, Mills resigned from County employment. As such, the AIG cannot recommend corrective action as to Mills. The AIG, however, recommends that the County expand its educational efforts to support a culture of respect and protection of whistleblowers.

_____      _1. 8. 19_
Valissa Turner Howard                 Date
First Assistant Deputy Inspector General


Approval as to conclusions and recommendations:

_____      _1 - 8 - 19_
Mark D. Griffin                       Date
Inspector General

Electronically Filed 06/12/2019 17:52 / / CV 19 916707 / Confirmation Nbr. 1736141 / CLJK1

Electronically Filed 05/21/2019 Cuyahoga County Agency of Inspector General CLJK1
Electronically Filed 06/19/2019 12:42 / SERVICE / CV 19 916707 / Confirmation Nbr. 1741552 / CLDMK

From: Akram Boutros
To: Armond Budish
Cc: cpinkney@cuyahogacounty.us; elelken@cuyahogacounty.us; Jane Platten
Subject: Jail Medical Services
Date: Friday, May 25, 2018 9:06:08 AM

Executive Budish,

Thank you for meeting with us this past Wednesday to discuss the jail medical program. As we discussed, MetroHealth is committed to our partnership with Cuyahoga County in providing the highest quality medical services at the main corrections center and it's regional facilities. We believe the relationship and delivery model we have have developed together with your staff not only provides quality, custom services but does so while demonstrating tangible cost savings for the County.

As per your request for MetroHealth to immediately remove our Nurse Supervisor employee from the jail clinic, we have made the adjustment to our staffing model and as of May 28, 2018 the employee will no longer provide services at the jail clinic. A replacement Administrator will start on site Tuesday, May 29th.

Also on Wednesday, Chief of Staff Leiken agreed to schedule a meeting with MetroHealth to further discuss the staffing model and vacancies. We appreciate the opportunity and our team is available at Chief Leiken earliest convenience for that meeting.

Thank you, Armond. Again, ware committed to our partnership and look forward to continuing to work together.

Regards,

Akram

Get Outlook for iOS

**MetroHealth**

Gary Brack, Supervisor, Nursing, County Correctional Healthcare (Interim Director,
Ambulatory, County Correctional Healthcare)
Record of Discussion 6/4/18

Description of violation: In a scenario that Mr. Brack does not generally encounter in the
ordinary scope of his duties, Mr. Brack exercised poor judgment and engaged in conduct that
was unprofessional and disrespectful, not in alignment with expectations of a MetroHealth
leader, and against the interests of the System, its reputation, and its key relationships. His
conduct was in violation of The MetroHealth System Policy II-36 Corrective Action (prohibiting
grossly inappropriate behavior), MetroHealth's STAR-IQ values including Teamwork and
Respect, and MetroHealth's Code of Conduct.

In a public meeting of the Cuyahoga County Council Public Safety and Justice Affairs
Committee held on May 22, 2018, Mr. Brack was asked to describe the relationship between
MetroHealth and Cuyahoga County regarding the clinical operations at County Corrections. Mr.
Brack did provide some objective information, but he also went beyond an objective report by
using highly negative and subjective terms and by lodging an unprofessional and personal attack
against Mr. Kenneth Mills, Director of Regional Corrections for Cuyahoga County. In public
and recorded testimony before Committee members – during which Mr. Brack repeatedly and
expressly purported to speak on behalf of The MetroHealth System – Brack described the
relationship between the County and MetroHealth as "very tumultuous." He called Mills "the
obstructionist" in the parties' concerted efforts, stated that Mills engages in "passive-aggressive
behavior" and acts with "imagined authority," and criticized Mills's nonverbal conduct and
"total disrespect" in meetings, stating that "I've never in my professional career witnessed that."
Without working with MetroHealth's leadership or media affairs professionals, Mr. Brack has
since reinforced these sentiments to various media outlets.

Mr. Brack's conduct was in violation of specific coaching that he received prior to the meeting.
Jane Platten, Chief of Staff, had specified to Mr. Brack that it was Ms. Platten's role to speak on
behalf of MetroHealth at the meeting, and Mr. Brack's role was to help with technical
operational questions. Ms. Platten had directed Mr. Brack that if he did speak at the meeting, he
needed to do so diplomatically. He failed to do.

Mr. Brack's unprofessional and personally offensive conduct caused immediate damage to
MetroHealth's relationship with Cuyahoga County and to MetroHealth's public reputation,
requiring immediate attention and renewed commitments from members of MetroHealth's
executive leadership. Indeed, as a client of MetroHealth's services, the County immediately
requested that Mr. Brack be removed from his role at County Corrections, citing a lack of a
trusting and strong working relationship. Being a contracted service provider to the County,
which controls County Corrections property and operations, MetroHealth was required to

 **MetroHealth**

As a County hospital, MetroHealth values its partnership with Cuyahoga County, and the parties are actively collaborating on a number of highly visible, key public health endeavors, such as MetroHealth's campus transformation, improvement of the West 25th Street corridor, and the opioid crisis in the County. The parties' contractual agreement regarding provision of medical services at County Corrections has been a flagship arrangement for both parties, enabling MetroHealth to reach patients in a unique care environment while enabling the County to realize cost savings. MetroHealth does not take issue with the fact that Mr. Brack has identified and raised concerns regarding County-MetroHealth interactions or with ongoing staffing concerns; indeed, these are issues that MetroHealth leadership has worked to address and will continue to address going forward.

Rather, MetroHealth takes issue with the highly personal and unprofessional manner in which Mr. Brack raised these concerns. Mr. Brack's very negative comments about MetroHealth's relationship with the County were outside the scope of his role and should have been handled through appropriate MetroHealth leadership and media relations. His very personal comments about Mr. Mills constituted a gross violation of MetroHealth's policies and STAR IQ values, including Teamwork and Respect, and its Code of Conduct. Mr. Brack's public conduct brought into question his ability — and MetroHealth's ability — to continue to foster our critical relationship with the County, putting MetroHealth's interests in jeopardy.

Expectations: This type of inappropriate and unprofessional conduct must not occur again, and Mr. Brack is required to conduct himself in accordance with MetroHealth's STAR-IQ values, Code of Conduct, and applicable policies, especially where he purports to speak on behalf of The MetroHealth System regarding its business relationships. As a member of management, he is expected to be mindful of and act in a manner to foster MetroHealth's relationships and reputation. While he is certainly welcome to and is encouraged to raise concerns that he has, he must do so respectfully and in accordance with MetroHealth's values. For sensitive communications, he should consult MetroHealth leadership and media relations.

Though this will be considered documentation of non-disciplinary counseling, further incidents of unprofessional and inappropriate behavior will result in formal discipline, up to and including termination of employment.

_(signature)_      Date: _6-4-18_
Gary Brack, Supervisor, Nursing (Interim Director, Ambulatory)

_(signature)_      Date: _6/4/18_
Justin Bruner, MD, MS, Physician Executive, Ambulatory Operations

_(signature)_      Date: _6/4/18_
Emily Fiftal, Director - Employee/Labor Relations, Employment Counsel